## CLASS ACTION SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement"), effective as of the last date of execution set forth below, is made by and between Plaintiffs Joshua Lewis, James Cavanaugh, and Nathaniel Timmons ("Plaintiffs"), on behalf of themselves and the Settlement Class (defined below), and Defendant Lytx, Inc. ("Lytx" or "Defendant"; and collectively with Plaintiffs, the "Parties"). This Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims (as defined below) against the Released Parties (as defined below), upon and subject to the terms and conditions of this Agreement, and subject to the final approval of the Court.

## RECITALS

WHEREAS, on October 13, 2021, Plaintiff James Cavanaugh, individually and on behalf of a putative class, filed a class action lawsuit against Lytx in the United States District Court for the Northern District of Illinois alleging violations of the Illinois' Biometric Information Privacy Act ("BIPA"), designated as *Cavanaugh v. Lytx, Inc*., No. 1:21-cv-05427 (N.D. Ill.) (the "Cavanaugh Action").

WHEREAS, on November 17, 2021, Plaintiff Joshua Lewis, individually and on behalf of a putative class, filed a class action lawsuit against Lytx and Maverick Transportation LLC ("Maverick")[1] in the Circuit Court of Madison County, Illinois, No. 2021L001379, alleging violations of BIPA, which was subsequently removed to the United States District Court for the Southern District of Illinois (the "Court"), in the action *Lewis v. Lytx Inc., et al*., No. 3:22-cv-00046-NJR (S.D. Ill.) (the "Lewis Action").

1

WHEREAS, on December 29, 2021, Plaintiff Nathaniel Timmons, individually and on behalf of a putative class, filed a class action lawsuit against Lytx and Gemini Motor Transport, L.P. ("Gemini") in the United States District Court for the Northern District of Illinois alleging violations of BIPA, designated as *Timmons v. Lytx Inc., et al.*, No. 1:22-cv-05068 (N.D. Ill.) (the "Timmons Action").

WHEREAS, pursuant to an unopposed motion, the Timmons Action was reassigned to the Hon. Edmond Chang and related to the Cavanaugh Action under Local Rule 40.4. Subsequently, on November 10, 2022, a Consolidated Amended Complaint was filed in the Cavanaugh Action (*see* Cavanaugh Action, Dkt. 49), adding Plaintiff Nathaniel Timmons and Defendant Gemini Motor Transport, L.P., which was accepted by the court on February 29, 2024 (*see id.*, Dkt. 87).

WHEREAS, on December 19, 2022, Lytx filed a motion to dismiss, with a supporting memorandum of law in the Lewis Action (*see* Lewis Action, Dkt. Nos. 49-51), which Mr. Lewis opposed (*see id.*, Dkt. 52). On June 26, 2023, the Court denied Lytx's motion to dismiss (*see id.*, Dkt. 68), and Lytx filed its Answer on August 7, 2023 (*see id.*, Dkt. 79), which it subsequently amended (*see id.*, Dkt. 83). Discovery proceeded in the Lewis Action in accord with the Court's order dated September 21, 2023. *See id.*, Dkt. 90.

WHEREAS, on February 29, 2024, the Cavanaugh Action Court overruled Gemini's objection to consolidation and denied its request for severance and a stay of claims against it. *See* Cavanaugh Action Dkt. 87. On April 12, 2024, Lytx and Gemini filed a joint motion to dismiss, with a supporting memorandum of law in the Cavanaugh Action (*see id.*, Dkt. Nos. 92 and 93),

---

[1] On March 9, 2023, the Court granted final approval of a class action settlement between Plaintiff Lewis and Maverick that resolved all claims against Maverick and dismissed it from the

which Mr. Cavanaugh and Mr. Timmons opposed (*see id.*, Dkt. 100). That motion remains pending against Gemini, but the Court granted Mr. Cavanaugh's, Mr. Timmons', and Lytx's joint motion to stay claims against Lytx pending this Settlement (*see id.*, Dkt. 115).

WHEREAS, on April 29, 2024, the Court in the Lewis Action entered an Amended Scheduling Order (*see* Lewis Action, Dkt. 95) and an order referring this case to the Mandatory Mediation Program (*see id.*, Dkt. 96).

WHEREAS, Mr. Lewis and Lytx filed a Joint Motion to Stay all proceedings in the Lewis Action pending mediation (*see id.*, Dkt. 98), which the Court granted (*see id.*, Dkt. 99).

WHEREAS, on September 12, 2024, counsel in the Cavanaugh and Lewis Actions jointly mediated the Cavanaugh and Lewis Actions. While the cases did not settle at the end of the full-day mediation before Hon. Judge James R. Epstein (Ret.), the Parties continued to negotiate with the aid of Hon. Judge Epstein (Ret.) and thereafter agreed to a mediator's proposal. As a result of these further negotiations and with the assistance of Hon. Judge Epstein (Ret.), the Parties were able to reach an agreement in principle on September 20, 2024, which they reported to the Court on that same date. *See id.*, Dkt. 113.

WHEREAS, over the next several weeks the Parties continued to negotiate a term sheet, which was ultimately executed on October 14, 2024, and provides that Plaintiffs, in connection with the Settlement, shall file an amended complaint in the Lewis Action to add Plaintiffs Cavanaugh and Timmons as Named Plaintiffs.

WHEREAS, Lytx, at all times, has denied and continues to deny any wrongdoing whatsoever and has denied and continues to deny that it committed any wrongful act or violation of law or duty alleged in the Action. Nonetheless, taking into account the uncertainty and risks

case. Dkt. 63.

inherent in any litigation, Defendant has concluded that it is desirable and beneficial that the Action be fully and finally settled and terminated in the manner and upon the terms and conditions set forth in this Agreement. This Agreement is a compromise, and the Agreement, any related documents, and any negotiations resulting in it shall not be construed as or deemed to be evidence of or an admission or concession of liability or wrongdoing on the part of Defendant, or any of the Released Parties (defined below), with respect to any claim of any fault or liability or wrongdoing or damage whatsoever.

WHEREAS, Plaintiffs maintain the strength of their position, the validity of their claims and the propriety of class certification in this Action. Nonetheless, Plaintiffs believe settlement is appropriate, because, in part, Lytx has produced evidence to persuade Plaintiffs that its technology provides Lytx with a strong defense that Lytx's technology does not collect, capture, possess, obtain, store, use, disseminate, disclose, or profit from biometric identifiers or information, and that proving Lytx technology does otherwise would present a significant challenge and a substantial burden upon Plaintiffs should this matter proceed to summary judgment or trial. Plaintiffs and Class Counsel also recognize the expense and delay associated with continued prosecution of the Action against Defendant through pleadings, motions, class certification, summary judgment, trial, and any subsequent appeals. Plaintiffs and Class Counsel have also taken into account the uncertain outcome and risks of litigation, especially in complex class actions, as well as the difficulties inherent in such litigation. Therefore, Plaintiffs believe it is desirable that the Released Claims be fully and finally compromised, settled, and resolved with prejudice. Based on their evaluation, Class Counsel have concluded that the terms and conditions set forth in this Agreement (the "Settlement") are fair, reasonable, and adequate to the Settlement

4

Class, and that it is in the best interests of the Settlement Class to settle the claims raised in the Action pursuant to the terms and provisions of this Agreement.

**NOW**, **THEREFORE**, **IT IS HEREBY STIPULATED AND AGREED** by and among Plaintiffs and Defendant, by and through their undersigned counsel that, subject to final approval of the Court after a hearing or hearings as provided for in this Agreement, in consideration of the benefits flowing to the Parties from the Agreement set forth herein, that the Action and the Released Claims shall be finally and fully compromised, settled, and released, and the Action shall be dismissed with prejudice, upon and subject to the terms and conditions of this Agreement.

<u>**AGREEMENT**</u>

1. **DEFINITIONS**

As used in this Agreement and the related documents attached as Exhibits A (Proposed Order Granting Preliminary Approval); B (Email Notice); C (Postcard Notice); D (Long-Form Notice); E (Claim Form); F (Proposed Order Granting Final Approval); and G (Proposed Amended Complaint), the following terms have the meanings specified below:

1.1    **"Action"** means the civil action entitled *Lewis v. Lytx Inc., et al*., No. 3:22-cv-00046-NJR (S.D. Ill.) following the anticipated addition of Plaintiffs Cavanaugh and Timmons in *Cavanaugh v. Lytx, Inc*., No. 1:21-cv-05427 (N.D. Ill.) for the purposes of settlement.

1.2    **"Agreement"** or **"Settlement Agreement"** means this Class Action Settlement Agreement and Release, including all attached and/or incorporated exhibits.

1.3    **"Amended Complaint"** means the Amended Complaint being filed with this Settlement Agreement that adds Plaintiffs Cavanaugh and Timmons as Named Plaintiffs in the Action.

1.4    **"Approved Claim"** means a Claim Form submitted by a Settlement Class Member that is submitted timely and in accordance with the directions on the Claim Form and the provisions of this Agreement and approved by the Settlement Administrator pursuant to the provisions of this Agreement.

1.5    **"Attorneys' Fees and Costs"** means all fees, costs and expenses to be awarded as per the Settlement of this Action pursuant to the Fee and Cost Application.

1.6    **"CAFA Notice"** refers to the notice requirements imposed by 28 U.S.C. § 1715(b).

1.7    **"Cash Award"** means a cash payment to an eligible Class Member.

1.8    **"Claim Form"** means the document substantially in the form attached hereto as Exhibit E, as approved by the Court. The Claim Form, to be completed by Settlement Class Members who wish to file a claim for a payment, shall be available in electronic and paper format in the manner described below.

1.9    **"Claims Deadline"** means the date by which all Claim Forms must be postmarked or received to be considered timely and shall be no later than ninety (90) calendar days after the Notice Date. The Claims Deadline shall be clearly set forth in the Preliminary Approval Order as well as in the Notice and the Claim Form.

1.10    **"Class Counsel"** means the law firms of Carney Bates & Pulliam PLLC; Lieff Cabraser Heimann & Bernstein LLP; Milberg Coleman Bryson Phillips Grossman PLLC; Workplace Law Partners, P.C.; Werman Salas P.C.; and Nick Larry Law LLC.

1.11    **"Class Period"** means October 12, 2016, through the earlier of Preliminary Approval or January 1, 2025.

6

1.12    **"Class Representatives"** or **"Plaintiffs"** means the named Plaintiffs Joshua Lewis, James Cavanaugh, and Nathaniel Timmons, the latter two who will be added as Plaintiffs in the Amended Complaint.

1.13    **"Court"** means the United States District Court for the Southern District of Illinois, the Honorable Nancy J. Rosenstengel presiding, or any judge who shall succeed her as the Judge in this Action.

1.14    **"Data Privacy Agreements"** are agreements governing the use of Class Member information provided by Defendant's customers.

1.15    **"Days"** means calendar days, unless otherwise noted. When a deadline or date under this Agreement falls on a weekend or a legal Court holiday, the deadline or date shall be extended to the next business day that is not a weekend or legal Court holiday.

1.16    **"Defendant"** or **"Lytx"** means Lytx, Inc.

1.17    **"Defendant's Counsel"** means the law firm of Cozen O'Conner.

1.18    **"DriveCam"** means a Lytx DriveCam® Event Recorder, including all models thereof (e.g., SF300, SF400, etc.).

1.19    **"Effective Date" or "Final"** means one (1) business day following the later of: (i) the date upon which the time expires for filing or noticing any appeal of the Final Approval Order; (ii) if there is an appeal or appeals, other than an appeal or appeals solely with respect to the Fee Award or Service Award, the date of completion, in a manner that finally affirms and leaves in place the Final Approval Order without any material modification, of all proceedings arising out of the appeal(s) (including, but not limited to, the expiration of all deadlines for motions for reconsideration or petitions for review and/or certiorari, all proceedings ordered on remand, if any, and all proceedings arising out of any subsequent appeal(s) following decisions

7

on remand); or (iii) the date of final dismissal of any appeal or the final dismissal of any proceeding on *certiorari* with respect to the Final Approval Order.

1.20    **"Efficacy Information"** has the meaning set forth in Section 7.4.

1.21    **"Escrow Account"** means the separate, interest-bearing escrow account to be established by the Settlement Administrator under terms acceptable to all Parties at a depository institution insured by the Federal Deposit Insurance Corporation. Defendant shall cause the Settlement Fund to be deposited into the Escrow Account in accordance with the terms of this Agreement and the money in the Escrow Account shall be invested in the following types of accounts and/or instruments and no other: (i) demand deposit accounts and/or (ii) time deposit accounts and certificates of deposit, in either case with maturities of forty-five (45) days or less. The costs of establishing and maintaining the Escrow Account shall be paid from the Settlement Fund. The Escrow Account shall be maintained by the Settlement Administrator.

1.22    "**Fee and Cost Application"** means that written motion or application by which Plaintiffs and/or Class Counsel requests that the Court award Attorneys' Fees and Costs and the Service Awards. This shall be submitted to the Court and made available on the Settlement Website by no later than twenty-one (21) days before the Objection Deadline and Opt-Out Deadline.

1.23    **"Final Approval Hearing"** means the hearing before the Court, no sooner than 120 days from the Notice Date, to: (a) determine whether to grant final approval to this Settlement Agreement as fair, reasonable, and adequate; (b) consider any timely objections to this Settlement and all responses thereto; and (c) rule on the Fee and Cost Application.

1.24    **"Final Approval Order and Judgment"** means an order granting final approval of the Settlement, substantially in the form of Exhibit F to this Agreement, in which the Court

grants final approval of this Settlement Agreement, finally certifies the Settlement Class, and authorizes the entry of a final judgment and dismissal of the Action with prejudice. The Court's adoption of the substantive terms of the proposed Final Approval Order and Judgment (Exhibit F) is a material term of this Settlement Agreement. In the event the Court issues separate orders addressing the matters constituting final settlement approval, the Final Approval Order includes all such orders.

1.25    **"Funding Date"** means seven (7) business days after (i) the Effective Date, or (ii) receipt of a W-9 form and payment instructions from the Settlement Administrator, whichever is later.

1.26    **"Litigation"** means this Action together with the Cavanaugh Action and Timmons Action.

1.27    **"Long Form Notice"** means the notice that shall be made available on the Settlement Website, in the form attached hereto as Exhibit D.

1.28    **"MV+AI"** means the Machine Vision + Artificial Intelligence algorithm in use at any time during the Class Period, which predicts distracted driving behaviors.

1.29    **"Net Settlement Fund"** means the Settlement Fund after subtracting the Settlement Costs (defined below).

1.30    **"Notice" or "Notices"** means the notice of this proposed Class Action Settlement Agreement and the Final Approval Hearing, which is to be sent to the Settlement Class substantially in the manner set forth in this Agreement, is consistent with the requirements of Due Process, Rule 23, and is substantially in the form of Exhibits B, C, and D hereto.

1.31    **"Notice Date"** means the date by which the Notice set forth in Section 7 commences, which shall be no later than seventy (70) days after Preliminary Approval.

1.32    **"Objection Deadline"** means sixty (60) days following the Notice Date.

1.33    **"Opt-Out Deadline"** means sixty (60) days following the Notice Date.

1.34    **"Person"** means, without limitation, any individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity, and their spouses, heirs, predecessors, successors, representatives, parents, subsidiaries, or assigns. "Person" is not intended to include any governmental agencies or governmental actors, including, without limitation, any state Attorney General office.

1.35    **"Preliminary Approval Order"** means the Order entered by the Court, substantially in the form of Exhibit A to this Agreement, that grants the relief requested in the Motion for Preliminary Approval, including preliminarily approving the Settlement and Notice Plan. The Court's adoption of the substantive terms of the proposed Preliminary Approval Order (Exhibit A) is a material term of the Settlement Agreement.

1.36    **"QSF"** means a court-approved Qualified Settlement Fund for federal tax purposes pursuant to Treas. Reg. § 1.468B-1 in which will be deposited the Settlement Fund.

1.37    **"Release"** means the releases set forth in Section 12 of this Settlement Agreement.

1.38    **"Released Claims"** means any and all claims, liabilities, demands, causes of action, and lawsuits, whether known or unknown, filed or unfiled, asserted or as of yet unasserted, existing or contingent, whether legal, statutory, equitable, or of any other type or form, whether under federal, state, or local law, and whether brought in an individual, representative, or any other capacity, of every nature and description whatsoever, including, but

not limited to, claims that were or could have been brought in the Litigation or any other actions

filed (or to be filed) by Plaintiffs or Class Members against the Released Parties arising out of or

relating to the capture, collection, storage, possession, transmission, conversion, purchase,

obtaining, sale, lease, profit from, disclosure, re-disclosure, dissemination, transmittal,

conversion and/or other use of data derived from the use of a DriveCam device between October

12, 2016 and the earlier of Preliminary Approval or January 1, 2025, including, but not limited

to, claims arising out of the Illinois Biometric Information Privacy Act, 740 ILCS 14/10, *et seq.*

This release includes, without limitation, statutory, constitutional, contractual, and/or common

law claims for damages (including statutory and liquidated damages), unpaid costs, penalties,

liquidated damages, punitive or exemplary damages, interest, attorneys' fees, litigation costs,

restitution, or equitable relief to the extent permitted by applicable law which may arise from the

Released Claims. Nothing herein is intended to release any claims any governmental agency or

governmental actor has against Defendant.

  1.39 **"Released Parties"** means Defendant Lytx and its current and former affiliates,

parents, subsidiaries, and divisions, and each of their owners, officers, directors, shareholders,

members, agents, employees, attorneys, insurers, benefit plans, predecessors, successors, and

assigns. For the avoidance of doubt, this definition does not cover any third-party beneficiaries of

the Released Parties, including, in the Cavanaugh Action, Defendant Gemini.

  1.40 **"Releasing Parties"** means Plaintiffs, those Settlement Class Members who do

not timely opt out of the Settlement Class, and all of their respective present or past heirs,

executors, estates, administrators, predecessors, successors, assigns, associates, affiliates,

employers, employees, agents, consultants, independent contractors, insurers, attorneys,

accountants, financial and other advisors, underwriters, shareholders, lenders, auditors,

investment advisors, legal representatives, successors in interest, and companies, firms, trusts, and corporations.

1.41   **"Service Award"** means the service payments to the Class Representatives, in accordance with Section 4.2 of this Settlement Agreement.

1.42   **"Settlement Administration Expenses"** means the expenses incurred by the Settlement Administrator in providing Notice (including CAFA notice), processing claims, responding to inquiries from members of the Settlement Class, coordinating payment for Approved Claims, and related administrative services.

1.43   **"Settlement Administrator"** means EisnerAmper.

1.44   **"Settlement Class"** means all individuals who, while present in the State of Illinois, operated a vehicle equipped with a DriveCam, and for whom MV+AI was used to predict distracted driving behaviors, between October 12, 2016 and the earlier of Preliminary Approval or January 1, 2025.

1.45   **"Settlement Class Member"** or **"Class Member"** means a Person who falls within the definition of the Settlement Class as set forth above and who does not timely submit a valid request for exclusion.

1.46   **"Settlement Costs"** means: (i) Settlement Administration Expenses; (ii) Class Counsel's Court-approved attorneys' fees and reimbursement of reasonable costs; (iii) Court-approved Service Awards paid to Plaintiffs; and (iv) any other Court-approved deductions.

1.47   **"Settlement Fund"** means the non-reversionary cash fund that shall be established by or on behalf of Defendant in the total amount of four million, two hundred and fifty thousand dollars ($4,250,000.00 USD) to be deposited into the Escrow Account, according to the schedule set forth herein, plus all interest earned thereon. The Settlement Fund is the total

sum that Lytx will pay in connection with this Agreement, regardless of the size of the Settlement Class, deposited into a common fund for payment of (i) distributions to Settlement Class Members, (ii) the Fee Award, (iii) the Service Awards, and (iv) all Settlement Administration Expenses.

1.48    "**Settlement Payment**" means a *pro rata* portion of the Settlement Fund less any applicable tax withholdings, Settlement Administration Expenses, Service Awards to the Class Representative, and Fee Award.

1.49    **"Settlement Website"** means the Internet website operated and maintained by the Settlement Administrator as described in Section 7.3.5.

1.50    **"Unknown Claims"** means claims that could have been raised in the Action or are otherwise released by this Agreement and that Plaintiffs, any member of the Settlement Class, or any Releasing Party do not know or suspect to exist, which, if known by him, her or it, might affect his, her, or its agreement to release the Released Parties or the Released Claims or might affect his, her, or its decision to agree, to object, or not to object to the Settlement.

2.    **SETTLEMENT TERMS AND BENEFITS TO THE SETTLEMENT CLASS**

2.1    **Monetary Consideration**. Defendant shall pay or cause to be paid, in total, $4,250,000 (four million two hundred and fifty thousand dollars) into the QSF for the benefit of the Settlement Class (the "Settlement Payment") by wire transfer or check to a bank account identified by the Settlement Administrator on or before the Funding Date (i.e., the Settlement Fund). Funding will only occur after the Settlement Administrator provides Defendant with a completed W-9 and payment instructions. The Settlement Fund will be maintained by the Settlement Administrator for the benefit of the Settlement Class Members and Class Counsel. All of the monies deposited by Defendant into the Settlement Fund will be placed in an interest-

bearing escrow account established and maintained by the Settlement Administrator. The interest

generated, if any, will accrue to the benefit of the Settlement Class and is to be added into the

Settlement Fund. This sum will be used to pay Approved Claims and any Settlement Costs. In no

event will Defendant be required to pay any more than $4,250,000 (four million two hundred and

fifty thousand dollars) in connection with the Settlement.

      2.2     The Settlement Administrator shall establish and deposit the Settlement Fund into

a single account, with insurance that exceeds any amounts deposited in that account, chosen in

the best judgment of the Settlement Administrator to preserve the fund and facilitate the payment

of Settlement Costs and other expenditures approved by the Court.

      2.3     All portions of the Settlement Fund expended by the Settlement Administrator for

settlement administration or notice costs shall be non-refundable to Defendant. Upon the

Effective Date, Defendant shall have no further ownership interest in the Settlement Fund. The

Settlement Administrator may only use the Settlement Fund consistent with the terms of the

Settlement. Upon receipt of the Settlement Fund, the Settlement Administrator is authorized to

deduct notice and administration costs without further Court approval.

      2.4     The Settlement Fund will be used for the benefit of the Settlement Class and shall

not revert to Defendant. Notwithstanding the foregoing or any other provision in the Settlement,

if the Settlement fails to achieve the Effective Date or the Settlement is terminated pursuant to

Section 14 below, Class Counsel shall return any attorneys' fees, costs, and expenses ordered by

the Court within three (3) business days (including any interest that would have accrued on such

attorneys' fees, costs, and expenses had it remained in the Settlement Fund) after Defendant

provide notice to Class Counsel that the Settlement has failed to achieve the Effective Date or

that the Settlement has been terminated, and the Settlement Administrator shall return all monies

remaining in the Settlement Fund, including any interest that has accrued, to Defendant within fourteen (14) business days after it receives notice that the Settlement has failed to achieve the Effective Date or that the Settlement has been terminated. The Settlement Administrator may deduct all Settlement Costs it has incurred prior to the date it received such notice.

2.5    Defendant shall pay or cause to be paid into the Escrow Account portions of the Settlement Amount to pay for Settlement Administration Expenses as those become due. Defendant shall pay or cause to be paid into the Escrow Account the remainder of the Settlement Amount no later than the Funding Date.

3.    **SETTLEMENT BENEFITS**

3.1    Each Settlement Class Member may submit a Claim until the Claims Deadline. Each Settlement Class Member with an Approved Claim shall be entitled to a cash payment in an amount reflecting the *pro rata* portion of the Net Settlement Fund as further described in Section 3.2.

3.2    The Net Settlement Fund shall be allocated such that 50% is reserved solely for residents of Illinois and the other 50% is reserved solely for non-Illinois residents. The *pro rata* amount that each Settlement Class Member shall be entitled to from the Net Settlement Fund will depend on the precise number of Approved Claims for Illinois and non-Illinois residents. Each Approved Claim filed by Illinois residents will be entitled to a *pro rata* share of the one-half of the Net Settlement Fund allocated to Illinois residents. Each Approved Claim filed by non-Illinois residents will be entitled to a *pro rata* share of the one-half of the Net Settlement Fund allocated to non-Illinois residents.

3.3     **Distribution of the Settlement Fund**. The Settlement Administrator shall distribute the funds in the Settlement Fund within the following time periods with respect to each such payment.

3.3.1     The Settlement Administrator shall pay to Class Counsel any attorneys' fees, costs, and expenses ordered by the Court, as described in Section 4.1 no later than three (3) business days after the Funding Date;

3.3.2     No later than three (3) business days after the Funding Date, the Settlement Administrator shall pay to Class Counsel the amount of any Service Awards awarded by the Court, according to the process described in Section 4.2;

3.3.3     No later than fourteen (14) days after the Funding Date, the Settlement Administrator shall pay all Approved Claims to Settlement Class Members. The Settlement Administrator shall pay, from the Net Settlement Fund, all Approved Claims by (a) check via first class U.S. mail; or (b) electronic means via Venmo, CashApp, Zelle, PayPal, etc., upon election of the Settlement Class Member, which the Parties agree to make available as alternative payment options. All cash payments issued to Settlement Class Members via check will state on the face of the check that it will expire and become null and void unless cashed within one hundred and fifty (150) days after the date of issuance. To the extent that any checks issued to a Settlement Class Member are not cashed within one hundred fifty (150) days after the date of issuance, such uncashed check funds shall be addressed in the manner set forth in Section 8.11.

3.3.4     Prior to paying Approved Claims, the Settlement Administrator shall be paid for any previously unreimbursed costs of administration.

4.    **FEE AND SERVICE AWARDS**

4.1    **Attorneys' Fees and Costs**. Pursuant to Fed. R. Civ. P. 23(h), Class Counsel may move for an award of attorneys' fees not exceeding one-third of the Settlement Fund ($1,416,666.67), plus reimbursement of reasonable costs and expenses incurred in relation to their investigation and litigation of this Action not exceeding $125,000.00, both to be paid from the Settlement Fund, by filing a Fee and Cost Application with the Court. Defendant may choose to oppose some or all of Plaintiffs' request for fees. The Parties agree not to appeal any Court award of attorneys' fees and costs and expenses that is consistent with the foregoing limitations.

4.1.1    Except as provided in this Section 4.1, the Parties will bear their own attorneys' fees, costs, and expenses incurred in the prosecution, defense, or settlement of the Action. Defendant's obligation to pay attorneys' fees and costs to any person incurred on behalf of Plaintiffs and/or the Settlement Class in this Action shall be limited to the judicially approved amount established pursuant to this Section, and such obligation shall be paid from the Settlement Fund. In no event shall Defendant's aggregate liability under this Settlement, including attorneys' fees and costs, exceed $4,250,000 (four million two hundred and fifty thousand dollars). Any allocation of fees between or among Class Counsel and any other person representing Plaintiffs or the Settlement Class shall be the sole responsibility of Class Counsel, subject to any alterations by the Court.

4.1.2    The Parties warrant that they commenced negotiations on proposed Attorneys' Fees and Costs (along with the Service Award discussed in Section 4.2) only after they reached agreement on all other materials terms of this Settlement Agreement.

4.1.3    In the event that the Settlement does not become effective for any reason, including termination by one or more of the parties as contemplated by the terms of this

17

Agreement, the agreement to pay Attorneys' Fees and Costs shall be void, and no doctrine of waiver, estoppel, or preclusion will be asserted in any litigated proceedings in this matter. No statements made or actions taken by either party in furtherance of the Fee and Cost Application constitute or may be used as an admission of, or evidence of, the validity or invalidity of any claims for Attorneys' Fees and Costs.

4.2     **Payment to Class Representatives**. In recognition of the significant time and effort Class Representatives have personally invested in the Action, including but not limited to consulting with Class Counsel and providing information and input necessary for the prosecution of this case, which efforts have provided a benefit to the Settlement Class, each Class Representative will be entitled to apply to the Court for a Service Award and Defendant will not object to a Service Award to be paid to Class Representatives from the Settlement Fund, provided that it does not exceed $10,000.00 each, subject to Court approval. Within three (3) business days of the Funding Date, and after receiving W-9 forms from the Class Representatives, the Settlement Administrator shall pay to Class Counsel the amount of any service payments awarded by the Court out of the Settlement Fund, and Class Counsel will disburse such funds. No interest will accrue on such amounts at any time. The Parties warrant that they commenced negotiations on the proposed Service Award (along with the Attorneys' Fees and Costs discussed in Section 4.01) only after they reached agreement on all other material terms of this Settlement Agreement.

4.2.1     The Parties agree that the effectiveness of this Settlement Agreement does not require and is not conditioned upon the Court's approval of a Fee Award and/or Service Awards. No decision by the Court, or modification, reversal, or appeal of any decision by the

Court, concerning the payment of a Fee Award and/or Service Awards shall be grounds for
cancellation or termination of this Settlement Agreement.

5.    **PRELIMINARY APPROVAL**

5.1    The Parties shall cooperate in good faith, and agree, subject to their fiduciary and
other legal obligations, to take all reasonably necessary steps to obtain the Court's approval of the
terms of this Settlement Agreement.

5.2    **Order of Preliminary Approval**. By November 22, 2024, Plaintiffs shall move
the Court for entry of the Preliminary Approval Order in substantially the form attached as
Exhibit A. Pursuant to the motion for preliminary approval, Plaintiffs will request that the Court:

5.2.1    Find it will likely be able to approve the Settlement as fair, reasonable,
and adequate;

5.2.2    Preliminary certify the Settlement Class for settlement purposes only;

5.2.3    Approve the form, content, and manner of Class Notice and find that the
notice program set forth in this Agreement constitutes the best notice practicable under the
circumstances, and satisfies due process and Rule 23 of the Federal Rules of Civil Procedure;

5.2.4    Direct that Class Notice be sent to the Settlement Class;

5.2.5    Appoint EisnerAmper as the Settlement Administrator;

5.2.6    Permit Plaintiffs to file an Amended Complaint in the Action to add
Plaintiffs Cavanaugh and Timmons;

5.2.7    Set the date and time for the Final Approval Hearing, which may be
continued by the Court from time to time without the necessity of further notice to the Settlement
Class except for an update to the Settlement Website; and

5.2.8    Set the Claims Deadline, the Objection Deadline, and the Opt-Out Deadline.

6.    **SETTLEMENT ADMINISTRATION**

6.1    <u>Third-Party Settlement Administrator</u>. The Settlement will be administered by the Settlement Administrator, who will be jointly chosen and overseen by Class Counsel and Defendant's Counsel, subject to Court approval.

6.2    The Settlement Administrator's responsibilities include but are not limited to: (i) holding and supervising the Settlement Fund; (ii) providing notice in accordance with the Court-approved Notice Plan; (iii) obtaining Settlement Class Member contact information; (iv) obtaining new addresses for returned email and mail; (v) setting up and maintaining the Settlement Website; (vi) fielding inquiries about the Settlement; (vii) processing claims; (viii) acting as a liaison between Class Members and the Parties regarding claims information; (ix) approving claims, rejecting any invalid Claim Form, including those where there is evidence of fraud; (x) directing the payment of Cash Awards to Class Members by check and/or electronic funds transfers; and (xi) any other tasks reasonably required to effectuate the foregoing.

6.3    The Settlement Administrator shall maintain reasonably detailed records of its activities under this Agreement. The Settlement Administrator shall maintain all such records as are required by applicable law in accordance with its normal business practices. The Settlement Administrator shall also provide reports and other information to the Court as the Court may require. The Settlement Administrator shall provide Class Counsel and Defendant's Counsel with information concerning Notice, administration, and implementation of the Settlement Agreement.

6.4     Before the entry of the Final Approval Order, the Settlement Administrator shall only take such action toward notice and settlement administration that is reasonable and necessary. Any reasonable and necessary costs of notice and settlement administration that are incurred prior to the Funding Date shall be paid from the Settlement Fund once it is established. No later than three (3) days after Class Counsel submits the Motion for Preliminary Approval of the Settlement, the Claims Administrator shall provide an estimate—for Defendant's Counsel's and Class Counsel's review and approval—of the amount of reasonable and necessary costs required for mail and email notice, and establish the Settlement Website, as well as any other initial administration costs. In the event that this Settlement Agreement is terminated in accordance with its terms, Defendant shall bear any costs of providing Class Notice already incurred.

7.     **NOTICE TO THE SETTLEMENT CLASS**

7.1     **Settlement Class Data**. Any personal information relating to Class Members provided to the Settlement Administrator or Class Counsel pursuant to this Settlement shall be provided solely for the purpose of the notice and claims process under this Settlement. This information shall be kept in strict confidence. Neither the identity of Defendant's customers nor the Class List Information shall be shared with Plaintiffs or Class Counsel.

7.1.1     Notwithstanding the foregoing, the Settlement Administrator may share with Class Counsel: (a) confirmation that an individual who contacts Class Counsel regarding the Settlement is or is not a Settlement Class Member and information related to any claim that a potential Settlement Class Member did or did not submit (but may not provide any information regarding that individual beyond such yes/no confirmation); and (b) the Efficacy Information.

7.1.2   Class Counsel expressly agrees not to use or reference any information referenced in this paragraph for any purpose beyond seeking or obtaining court approval of this Settlement. For the avoidance of doubt, Class Counsel agrees that it will not use such information in this Action outside of seeking or obtaining Settlement approval, and will not use such information in any manner related to asserting claims on behalf of any party in any other action in any forum or to aide or support any other counsel or party in bringing any claim in any action in any forum.

7.1.3   Defendant's customers shall have the right to negotiate and enter into Data Privacy Agreements with Defendant, Plaintiffs, Class Counsel, and/or the Settlement Administrator (as appropriate) to govern the treatment of any data provided pursuant to this Agreement.

7.1.4   In the exercise of its duties outlined in this Agreement, the Settlement Administrator shall have the right to reasonably request additional information from the Parties or any Settlement Class Member.

7.2   **Settlement Class List**. Defendant shall have thirty-one (31) days after the Preliminary Approval Order, to contact its customers seeking a list and contact information of all Settlement Class Members for purposes of compiling the Settlement Class List. At a minimum, the communication to Defendant's customers will identify the kinds of contact information that should be provided for the Settlement Class List if available, including Class Members' name, last known address(es), cell phone number(s), and email address(es), and a deadline of thirty-one (31) days to provide this information to Lytx. Defendant, in turn, will provide any Class List information it receives solely to the Settlement Administrator within five (5) days after the thirty-one-day deadline.

7.3    The Notice Program shall consist of the following:

7.3.1    The Notices shall advise the Settlement Class of their rights, including the right to be excluded from, comment upon, and/or object to the Settlement Agreement or any of its terms. The Notices shall specify that any objection to the Settlement Agreement, and any papers submitted in support of said objection, shall be considered by the Court at the Final Approval Hearing only if submitted in the form and manner set forth in Section 9.1. The Notices shall also specify that any request from exclusion from the Settlement, shall be considered valid only if exercised in the form and manner set forth in Section 9.2.

7.3.2    **Direct Notice**. By no later than the Notice Date and for Settlement Class Members for whom an email address is unavailable, the Settlement Administrator shall send Notice, substantially in the form attached as Exhibit C, via First Class U.S. Mail (the "Postcard Notice"). For Settlement Class Members for whom a valid email address is available in the Class List, the Settlement Administrator shall send Notice via email (the "Email Notice"), substantially in the form attached as Exhibit B. In the event transmission of email notice results in any "bounce-backs," the Settlement Administrator shall, where reasonable, correct any issues that may have caused the "bounce-back" to occur and make a second attempt to re-send the Email Notice. If the second attempt to re-send the Email Notice is unsuccessful, the Settlement Administrator shall send the Postcard Notice.

7.3.3    **Publication Notice**. The Parties acknowledge that a robust Publication Notice is necessary. The Settlement Administrator will effectuate a plan to reach the Settlement Class Members including social media, online advertising targeted at commercial vehicle drivers, and print media.

7.3.4    **Reminder Notice**. The Parties agree that the Settlement Administrator shall send a reminder Notice via email, substantially in the form attached as Exhibit B (with minor, non-material modifications to indicate that it is a reminder email rather than an initial notice), to all Settlement Class Members for whom a valid email address is available in the Class List. The Reminder Notice shall be transmitted halfway through the claims period, i.e. forty-five (45) calendar days after the Notice Date.

7.3.5    **Settlement Website**. By no later than the Notice Date, Notice shall be provided on a case-specific settlement website that will enable Settlement Class Members to file Claim Forms online. The Notice provided on the Settlement Website shall be substantially in the form of Exhibit D hereto (the "Long-Form Notice"). The Settlement Website shall include at least the following information: (i) a summary of the Action and the settlement terms; (ii) a "Contact Us" page with Settlement Administrator contact information; (iii) the Settlement Agreement, motions for approval and for attorneys' fees, when available, and any other important documents in the case; (iv) important case dates and deadlines, including the Objection/Exclusion Deadline and the Claim Deadline; (v) a summary of Settlement Class Member rights, including how to object to and request exclusion from the Settlement, and how to make a claim; and (vi) the date, time, and location of the Final Approval Hearing.

7.3.6    **Toll-Free Telephone Number**. The Notice Program shall also establish a toll-free telephone line for Settlement Class Members with an interactive voice response ("IVR") system to provide Settlement Class Members with responses to frequently asked questions and provide essential information regarding the Action. Any "scripts" used with the IVR, along with FAQ's, must be pre-approved by the Parties.

7.3.7 **CAFA Notice**. The Settlement Administrator, on behalf of Defendant, shall server the Class Action Fairness Act ("CAFA") Notice required by 28 U.S.C. § 1715 within ten (10) days of the filing of the Preliminary Approval Motion. The costs of such CAFA Notice shall be paid from the Settlement Fund as Settlement Costs.

7.4 **Efficacy Information.** Defendant agrees to provide the Settlement Administrator with statistical information regarding its efforts to obtain Class List information sufficient for the Settlement Administrator to opine as to the efficacy of the overall notice program ("Efficacy Information"). Efficacy Information may include the number of Settlement Class Members identified, the number of Settlement Class Members contacted, and the number of Settlement Class Members who provide the requested Class List information. Efficacy Information does not include any identifying information of Defendant's customers or Settlement Class Members. The Parties agree to discuss in good faith whether Lytx will provide any additional information to the Settlement Administrator for this purpose.

7.5 **Declaration of Compliance**. The Settlement Administrator shall prepare a declaration attesting to compliance with the Class Notice requirements of this Settlement Agreement. Such declaration shall be provided to Class Counsel and Defendant's Counsel no later than sixteen (16) days prior to the Final Approval Hearing, and Class Counsel will file the declaration with the Court in support of Final Approval.

7.6 **Best Notice Practicable**. The Parties agree that compliance with the procedures described in this Section is the best notice practicable under the circumstances and is due and sufficient notice to the Settlement Class the pendency of the Action, certification of the Settlement Class, the terms of the Settlement Agreement, and the Final Approval Hearing, and

satisfies the requirements of the Federal Rules of Civil Procedure, the United States Constitution, and any other applicable law, rule, and/or regulation.

8.    **CLAIMS PROCESS**

8.1    Each Settlement Class Member who does not timely and validly request exclusion from the Class as required in this Agreement shall be entitled to make a claim.

8.2    To make a claim, Class Members must submit by the Claims Deadline a valid and timely Claim Form, which shall contain the information set forth in Exhibit E to this Agreement, including the Class Member's full name and address.

8.3    The Claims Administrator shall be responsible for receiving and keeping safe and secure all Claims Forms.

8.4    The Claims Administrator shall review Claim Forms submitted by Class Members to determine whether they are eligible for settlement payment.

8.5    The Claims Administrator shall reject any Claim Forms that are incomplete, inaccurate, or not timely received, and is not required to, but may first request additional information.

8.6    Counsel for the Parties shall be kept apprised of the volume of claims, and the volume and nature of defective claims, and Class Counsel are permitted to communicate with Class Members as they deem appropriate to cure such deficiencies. Defendant shall have the right to suggest denial of claims if Defendant has a good faith belief that such claims are improper or fraudulent. Any suggested denial of claims shall be provided to Class Counsel in writing. If the Parties cannot agree upon which claims should be denied, then they shall submit the issue to the Court for determination.

8.7     The Settlement Administrator shall be obliged to employ reasonable procedures to screen claims for abuse or fraud and deny Claim Forms where there is evidence of abuse or fraud. The Settlement Administrator will reject any claim that does not comply in any material respect with the instructions on the Claim Form or is submitted after the Claims Deadline. Each claimant who submits an invalid Claim Form to the Settlement Administrator must be given a notice of the Claim Form's deficiency and an opportunity to cure the deficiency within twenty-one (21) days of the date of the notice. The Settlement Administrator may contact any Person who has submitted a Claim Form to obtain additional information necessary to verify the Claim Form.

8.8     Defendant's Counsel and Class Counsel shall have the right to challenge the acceptance or rejection of a Claim Form submitted by Settlement Class Members and to obtain and review supporting documentation relating to such Claim Form. The Settlement Administrator shall follow any agreed decisions of Class Counsel and Defendant's Counsel as to the validity of any disputed submitted Claim Form. To the extent Class Counsel and Defendant's Counsel are not able to agree on the disposition of a challenge, the disputed claim shall be submitted to the Court for determination.

8.9     **Electronic Distribution of Funds.** To the maximum extent possible, and in order to minimize the costs of Settlement Administration, the Claims Administrator will pay Cash Awards via electronic funds transfer. The Claims Administrator shall provide a secure portal on the Settlement Website by which Class Members can have the option of having their claim payment transmitted to them electronically, through Automated Clearing House ("ACH") direct deposit, or other reliable means.

8.10    **Mailing of Settlement Check.** For Class Members who submit valid and timely claims who do not receive their cash awards via electronic transfer as set forth in Section 8.9, the Claims Administrator shall mail Settlement checks via U.S. mail. If any settlement checks are returned, the Claims Administrator shall attempt to obtain a new mailing address for that Class Member by taking the steps described in Section 7.3. If, after a second mailing, the settlement check is again returned, no further efforts need be taken by the Claims Administrator to resend the check. The Claims Administrator shall advise Class Counsel and Defendant's Counsel of the names of the claimants whose checks are returned by the postal service as soon as practicable. Each settlement check will be negotiable for one hundred fifty (150) days after it is issued.

8.11    After 150 days, any unclaimed or non-deliverable funds, including uncashed checks, shall be addressed as follows:

8.11.1  If the amount of unclaimed or non-deliverable funds is less than $100,000, this amount will be transferred to a mutually agreeable *cy pres* approved by the Court.

8.11.2  If the amount of unclaimed or non-deliverable funds is more than $100,000, a second *pro rata* distribution shall be made to the Settlement Class Members who cashed their initial checks. That settlement check will be negotiable for one hundred fifty (150) days after it is issued. In the event that there are unclaimed or non-deliverable funds remaining after the second *pro rata* distribution, this amount will be transferred to a mutually agreed *cy pres* approved by the Court.

8.12    To the extent a Class Member is entitled to a Cash Award in an amount that meets or exceeds the threshold for reporting the payment to the IRS, the Claims Administrator shall engage in additional direct notice to such persons to attempt to obtain the necessary tax forms. The Claims Administrator may engage in more than one round of such additional notice.

28

Payments shall be made without withholding and shall be reported to the IRS and the payee, to the extent required by law, under the payee's name and Social Security number on an IRS Form 1099. If this Settlement Agreement is not approved or for any reason the Effective Date does not occur, no payments or distributions of any kind shall be made from the Settlement Fund, other than payments to the Claims Administrator for services rendered and costs incurred.

9. **OBJECTIONS AND EXCLUSIONS**

9.1     **Objections to Settlement**. Any Settlement Class Member who intends to object to this Agreement must present the objection in writing, which must be postmarked on or before the Objection Deadline, and include a caption or title that identifies it as "Objection to Class Settlement in *Lewis, et al. v. Lytx, Inc.*, Case No. 3:22-cv-00046-NJR." So-called "mass" or "class" objections shall not be allowed. Specifically, each objection must be on behalf of one Settlement Class Member and shall not incorporate other Settlement Class Members by list, case name, description of a putative class, etc.

9.1.1     The written objection must also include: (1) the objector's name and address; (2) an explanation of the basis upon which the objector claims to be a Settlement Class Member; (3) all grounds for the objection, including all citations to legal authority and evidence supporting the objection; (4) the name and contact information of any and all attorneys representing, advising, or in any way assisting the objector in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection (the "Objecting Attorneys"); (5) a statement indicating whether the objector intends to appear at the Final Approval Hearing (either personally or through their Objecting Attorneys who shall file an appearance with the Court in accordance with the Local Rules); (6) a list of all class action settlements to which the objector has lodged an objection in the last five years; (7) the objector's

29

handwritten or electronically imaged written signature; and (8) if a Settlement Class Member or any of the Objecting Attorneys has objected to any class action settlement where the objector or the Objecting Attorneys asked for or received any payment in exchange for dismissal of the objection, or any related appeal, without any modification to the settlement, a statement identifying each such case by full case caption and amount of payment received.

       9.1.2   The Parties will have the right to depose or seek discovery from any objector to assess whether the objector has standing and to understand the nature of the objection.

      9.2   **Exclusions from Settlement**. Any Settlement Class Member who validly elects to be excluded from this Agreement shall not: (i) be bound by any orders or the Final Judgment; (ii) be entitled to relief under this Settlement Agreement; (iii) gain any rights by virtue of this Agreement; or (iv) be entitled to object to any aspect of this Agreement. To exercise the right to be excluded, a member of the Settlement Class must timely send a written request for exclusion to the Settlement Administrator, and must include in any such exclusion request: (a) his/her full name, address, and current telephone number; (b) the entity or entities for whom they drove and when; (c) all grounds for the request to be excluded, with factual and legal support for the stated request, including any supporting materials; (d) the identification of any other exclusion requests he/she has filed, or has had filed on his/her behalf, in any other class action cases in the last five years; and (e) the requestor's signature. If represented by counsel, the Settlement Class Member requesting to be excluded must also provide the name and telephone number of his/her counsel. So-called "mass" or "class" opt-outs shall not be deemed as valid opt-outs. Specifically, each opt-out must be on behalf of one Settlement Class Member and shall not incorporate other Settlement Class Members by list, case name, description of a putative class, etc. To be valid, a

30

request for exclusion must be postmarked or received by the date specified in the Notice and approved by the Court. If the total number of opt-outs exceed 350 Settlement Class Members, Lytx shall have the right to terminate this Agreement.

9.2.1    Any Settlement Class Member who does not, using the procedures set forth in this Agreement and the Notice, seek exclusion from the Settlement Class will be bound by all of the terms of this Agreement, including the terms of the Final Judgment to be entered in the Action and the Releases provided for in the Agreement, and will be barred from bringing any action against any of the Released Parties concerning the Released Claims. A Settlement Class Member who opts out of the Class may not object to this Agreement or the Settlement and is not entitled to be heard at the Final Approval Hearing.

9.3    **Other Challenges to Settlement**. Any challenge to the Settlement Agreement or the Final Judgment shall be pursuant to appeal under the Federal Rules of Appellate Procedure and not through a collateral attack.

10.    **FINAL APPROVAL HEARING AND FINAL APPROVAL ORDER**

10.1    If the Settlement is approved preliminary by the Court, and all other conditions precedent to the Settlement have been satisfied, no later than fourteen (14) days prior to the Final Approval Hearing:

10.1.1  Plaintiffs shall request that the Court enter the Final Approval Order in substantially the form attached as Exhibit F, with Class Counsel filing a memorandum in support of the motion;

10.1.2  Class Counsel and/or Defendant may file a memorandum addressing any objections to the Settlement.

31

10.2    At the Final Approval Hearing, the provisions of this Agreement should be

approved, whether the Settlement should be finally approved as fair, reasonable, and adequate,

whether any objections to the Settlement should be overruled, whether the fee award and any

service payment to the Class Representatives should be approved, and whether a judgment

reflecting final approval of the Settlement should be entered.

10.3    At the Final Approval Hearing, the Court will consider and determine whether: (i)

it has personal and subject matter jurisdiction over all Settlement Class Members; (ii) to approve

the Settlement Agreement as fair, reasonable, and adequate, and in the best interests of, the

Settlement Class Members; (iii) to find that the Class Notice implemented pursuant to the

Agreement constitutes the best practicable notice under the circumstances, is reasonable and

constitutes due, adequate, and sufficient notice to all persons entitled to receive notice, and meets

all applicable requirements of the Federal Rules of Civil Procedure, the Due Process Clause of

the United States Constitution, and the rules of the Court; (iv) to find that the Class

Representatives and Class Counsel adequately represent the Settlement Class for purposes of

entering into and implementing the Agreement; (v) to dismiss the Action with prejudice, without

fees or costs to any party except as provided in the Settlement Agreement; (vi) to retain

jurisdiction of all matters relating to the interpretation, administration, implementation,

effectuation and enforcement of this Settlement; and (vii) to enter Final Judgment.

11.    **FINAL JUDGMENT**

11.1    The judgment entered at the Final Approval Hearing will be deemed final for

purposes of this Agreement after the latest of the following: (i) if no individual, or counsel on the

individual's behalf, has filed an appearance that would give the individual potential standing to

appeal the Final Approval Order, then on the date the settlement is finally approved by the Court;

(ii) if an individual, or counsel on the individual's behalf, has filed an appearance, and no notice of appeal of the Final Approval Order is filed, the expiration date of the time for filing any appeal from the judgment, including any extension of such expiration date granted by order of any court of competent jurisdiction, by operation of law, or otherwise; (iii) the date of final affirmance on an appeal of the judgment, the expiration of the time for a petition for rehearing and a petition for certiorari of the judgment, or, if such a petition is filed, either the denial of that petition or, if the petition is granted, the date of final affirmance of the Judgment following review pursuant to that grant; or (iv) the date of final dismissal of any appeal of the judgment or the final dismissal of any proceeding to review the judgment.

## 12.  RELEASE OF CLAIMS

12.1    The obligations incurred pursuant to this Settlement Agreement shall be a full and final disposition of the Action and any and all Released Claims, as against all Released Parties.

12.2    Upon the Effective Date, Plaintiffs, Settlement Class Members, and the Releasing Parties shall be deemed to have released the Released Claims against the Released Parties, as defined above.

12.3    Upon the Effective Date, and to the fullest extent permitted by law, each Settlement Class Member, shall, either directly, indirectly, representatively, or in any capacity, be permanently barred and enjoined from filing, commencing, prosecuting, continuing, pursuing, intervening in, or participating (as a class member or otherwise) in any lawsuit, action, or other proceeding in any jurisdiction (other than participation in the Settlement as provided herein) against any Released Party based on the Released Claims.

12.4    Upon the Effective Date, Plaintiffs, the Settlement Class Members, and the Releasing Parties shall be deemed to have, and shall have, expressly waived and relinquished, to

the fullest extent permitted by law, the provisions, rights and benefits of Section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY

12.5    Upon the Effective Date, each of the Releasing Parties shall be deemed to have, and shall have, waived any and all provisions, rights and benefits conferred by any law of any state, the District of Columbia or territory of the United States, by federal law, or principle of common law, or the law of any jurisdiction outside of the United States, which is similar, comparable or equivalent to Section 1542 of the California Civil Code. Plaintiffs, the other Settlement Class Members, and the Releasing Parties acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Release, but that it is their intention to finally and forever settle and release the Released Claims, notwithstanding any Unknown Claims they may have.

13.    **NO ADMISSION OF LIABILITY**

13.1    Lytx maintains that neither it, its technology (including its MV+AI technology), or its customers by using its technology collects, captures, possesses, obtains, stores, uses, disseminates, discloses, or profits from biometric identifiers or information.

13.2    Defendant's agreement as to certification of the Settlement Class is solely for purposes of effectuating the Settlement and no other purpose. Defendant retains all of its objections, arguments, and defenses with respect to class certification and any other issue, and reserves all rights to contest class certification and any other issue if the Settlement set out in this

Agreement does not result in entry of the Final Approval Order and Judgment, if the Court's

approval is reversed or vacated on appeal, if this Settlement is terminated as provided herein, or

if the Settlement set forth in this Settlement Agreement otherwise fails to become effective.

13.3     The Parties acknowledge that there has been no stipulation to any classes or

certification of any classes for any purpose other than effectuating the Settlement, and that if the

Settlement set forth in this Settlement Agreement is not finally approved, if the Court's approval

is reversed or vacated on appeal, if this Settlement Agreement is terminated as provided herein,

or if the Settlement set forth in this Settlement Agreement otherwise fails to become effective,

this agreement as to certification of the Settlement Class becomes null and void ab initio, and

this Settlement Agreement or any other settlement-related statement may not be cited regarding

certification of any class, or in support of an argument for certifying any class for any purpose

related to the Lewis Action, the Cavanaugh Action, the Timmons Action, or any other

proceeding.

13.4     Neither the Settlement Agreement, nor the Settlement contained herein, nor any

act performed or document executed pursuant to or in furtherance of the Settlement Agreement,

including court orders: (i) is or may be deemed to be or may be used as an admission of, or

evidence of, the validity or lack thereof of any Released Claim, certifiability of a class, or of any

wrongdoing or liability of any of the Released Parties; or (ii) is or may be deemed to be or may

be used as an admission of, or evidence of, any fault or omission of any of the Released Parties

in any civil or administrative proceeding before any court, administrative agency or other tribunal.

13.5     However, the Settlement, this Agreement, and any acts performed and/or

documents executed in furtherance of or pursuant to this Agreement and/or Settlement may be

used in any proceedings as may be necessary to effectuate the provisions of this Agreement.

35

Further, if this Settlement Agreement is approved by the Court, any Party or any of the Released

Parties may file this Agreement and/or the Final Approval Order and Judgment in any action that

may be brought against such Party or Parties in order to support a defense or counterclaim based

on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or

reduction, or any other theory of claim preclusion or issue preclusion or similar defense or

counterclaim.

14.    **TERMINATION OF AGREEMENT**

14.1    This Settlement Agreement may be terminated by either Party by serving on

counsel for the opposing party and filing with the Court a written notice of termination within ten

(10) days (or such longer time as may be agreed between Class Counsel and Defendant's

Counsel) only upon any of the following occurrences:

14.1.1  the Court rejects, materially modifies, or materially amends or changes the

terms of the Settlement as embodied in this Settlement Agreement unless such modification or

amendment is accepted in writing by all Parties;

14.1.2  the Court declines to enter, without material change, the material terms in

the proposed Preliminary Approval Order or the proposed Final Approval Order and Judgment;

or

14.1.3  an appellate court reverses the Final Approval Order and Judgment, and

the Settlement is not reinstated and finally approved without material change by the Court on

remand.

14.2    To avoid ambiguity, the Order on Attorneys' Fees shall not constitute grounds for

termination under this Section.  In the event of a termination of this Settlement Agreement based

on an occurrence specified above, Class Counsel and Defendant's Counsel agree to negotiate in

good faith in an attempt to reach an appropriate, amended settlement agreement.

      14.3    If either Plaintiffs or Defendant terminate this Agreement as provided for above,

the Agreement shall be of no force and effect and the Parties' rights and defenses shall be

restored, without prejudice, to their respective positions as if this Agreement had never been

executed, and any orders entered by the Court in connection with this Agreement shall be

vacated. However, any payments made to the Claims Administrator for services rendered up to

the date of termination shall not be refunded to Defendant.

15.     **MISCELLANEOUS**

      15.1    **Real Parties in Interest**.  In executing this Settlement Agreement, Plaintiffs, on

behalf of themselves and the Settlement Class, and Class Counsel represent and warrant that, as

far as they are aware, Settlement Class Members are the only persons with a legal interest in any

of the claims that are described or referred to herein, or in any of the pleadings, records, and

papers in the Action, and, except as provided herein, Plaintiffs and Class Counsel are unaware of

any Released Claims or part thereof having been assigned, granted or transferred in any way to

any other person, firm, or entity.

      15.2    **Claims Against Cash Awards.** In the event a third party, such as a bankruptcy

trustee, former spouse, or other third party has or claims to have a claim against any of a Cash

Award made to any Class Member, it is the responsibility of the Class Member to transmit the

funds to such third party, and neither the Parties nor the Claims Administrator will bear any

responsibility or liability to such third party.

15.3    **No Tax Advice.** Plaintiff, Class Counsel, Defendant, Defendant's Counsel, and the Claims Administrator make no representations as to the taxability of the relief to any Class Member. Class Members are responsible for seeking their own tax advice at the own expense.

15.4    **Voluntary Agreement**. This Settlement Agreement is executed by the Parties voluntarily and each of the Parties warrants that it or he has executed this Settlement Agreement without being under duress or undue influence from any source.

15.5    **Binding Effect**. This Settlement Agreement shall bind and inure to the benefit of the respective successors, assigns, legatees, heirs, and personal representatives of each of the Parties.

15.6    **Parties Represented by Counsel**. The Parties hereby acknowledge that they have been represented in negotiations for and in the preparation of this Settlement Agreement by independent counsel of their own choosing, that they have read this Settlement Agreement and have had it fully explained to them by such counsel, and that they are fully aware of the contents of this Settlement Agreement and of its legal effect.

15.7    **Authorization**. Each Party warrants and represents that there are no liens or claims of lien or assignments, in law or equity or otherwise, of or against any of the Released Claims, and, further, Plaintiffs warrant they are fully entitled and duly authorized to release the Released Claims.

15.8    **Amendment**. The Settlement Agreement may be amended or modified only by a written instrument signed by or on behalf of all Parties or their respective successors-in-interest.

15.9    **Entire Agreement**. This Agreement contains the entire understanding between Defendant and Plaintiffs on behalf of themselves and the Settlement Class, regarding the Settlement of the Action, and this Settlement Agreement supersedes all previous negotiations,

agreements, commitments, understandings, and writings between Defendant and Plaintiffs, including through their respective counsel, in connection with the settlement of the Action.

15.10    **Headings.** The headings used herein are used for the purpose of convenience only and are not meant to have legal effect.

15.11    **Exhibits.** All of the Exhibits to this Agreement are material and integral parts thereof and are fully incorporated herein by this reference.

15.12    **Time Periods.** The time periods and dates described herein are subject to Court approval and may be modified upon order of the Court or written stipulation of the Parties.

15.13    **Construction and Interpretation.** This Agreement is deemed to have been prepared by counsel for all Parties, as a result of arms' length negotiations among the Parties. Because all Parties have contributed substantially and materially to the preparation of this Agreement, it shall not be construed more strictly against one Party than another.

15.14    **Governing Law.** This Settlement Agreement is entered into in accordance with the laws of the State of Illinois and shall be governed by and interpreted in accordance with the laws of the State of Illinois, without regard to its conflict of law principles.

15.15    **Further Assurances.** Each Party shall do any and all acts or things reasonably necessary to carry out the express intent of this Settlement Agreement. The Parties will cooperate in good faith in the administration of this Settlement and agree to use their best efforts to promptly file a Motion for Preliminary Approval with the Court and to take any other actions required to effectuate this Settlement. Any unresolved dispute regarding the administration of this Agreement will be decided by the Court or by a mediator upon agreement of the Parties.

15.16   **Future Changes in Laws or Regulations.** The Parties agree that changes in law or regulation shall not provide any basis for any attempt to alter, modify, or invalidate this Settlement.

15.17   **Continuing Jurisdiction.** The Parties to this Settlement Agreement stipulate that the Court shall retain jurisdiction over the Action after the entry of the Final Approval Order and Judgment to oversee the implementation and enforcement of this Settlement Agreement, the Preliminary Approval Order, the Final Approval Order and Judgment, and the determination of Class Counsel's request for attorneys' fees and litigation expenses, as well as Service Awards, and any award thereon.

15.18   **Potential Changes to Attachments.** The Parties agree to request that the Court approve the forms of the Preliminary Approval Proposed Order attached as Exhibit A, the Long Form Notice attached as Exhibit B, the Email Notice attached as Exhibit C, the Postcard Notice attached as Exhibit D, the Claim Form attached as Exhibit E, the Final Approval Proposed Order attached as Exhibit F, and the proposed Amended Complaint attached as Exhibit G. The fact that the Court may require non-substantive changes to any of these documents does not invalidate this Settlement Agreement.

15.19   **Notices.** Unless otherwise specifically provided herein, all notices, demands, or other communications between the Parties given hereunder shall be in writing and shall be deemed to have been duly given as of the date of electronic mailing. Postal mailing will be provided as well, addressed as follows:

To Class Counsel:

Randall K. Pulliam
CARNEY BATES & PULLIAM, PLLC
One Allied Dr., Ste.1400

Little Rock, AR 72202
rpulliam@cbplaw.com

To Lytx's Counsel:

Max E. Kaplan
COZEN O'CONNOR
1650 Market St., Ste. 2800
Philadelphia, PA 19130
MKaplan@cozen.com

15.20  **Costs.** Except as otherwise provided herein, each Party shall bear its own costs.

15.21  **Counterparts.** This Settlement Agreement may be executed in counterparts, each
of which shall constitute an original, but all of which together shall constitute one and the same
instrument. The several signature pages may be collected and annexed to one or more documents
to form a complete counterpart.  Photocopies and .pdf of executed copies of this Settlement
Agreement may be treated as originals.

IN WITNESS WHEREOF, each of the signatories has read and understood this Settlement
Agreement, has executed it, and represents that they are authorized to execute this Settlement
Agreement on behalf of the Party or Parties they represent, who or which has agreed to be bound
by its terms and has entered into this Settlement Agreement.

**One of Plaintiffs' Attorneys, on behalf of Themselves and the proposed Settlement Class**

**Lytx, Inc.**

By: _Joshua Matthew Lewis (Nov 22, 2024 11:10 CST)_
     **Plaintiff Joshua Lewis**

By: _Shelley Bennett_
     8BE908AFFA084B3...

Date: Nov 22, 2024

Date: 11/22/2024

By: _____
     **Plaintiff Timmons**

Date: _____

By: _____
     **Plaintiff Cavanaugh**

Date: _____

**One of Plaintiffs' Attorneys, on behalf of Themselves and the proposed Settlement Class**

**Lytx, Inc.**

By: _____
     **Plaintiff Joshua Lewis**

By: _____

Date: _____

Date: _____

By: _____
     **Plaintiff Timmons**

Date: __11 / 22 / 2024_____

By: __James Cavanaugh_____
     **Plaintiff Cavanaugh**

Date: __11/22/2024 06:10PM UTC__

42

Doc ID: 4f0a488e0a973751d5883ea6d16060cf4bd5d7c4

# **EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JOSHUA LEWIS, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | Case No. 3:22-cv-00046-NJR |
| MAVERICK TRANSPORTATION LLC, and LYTX, INC., | |
| Defendants. | |

**[PROPOSED] ORDER GRANTING**
**PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

This matter is before the Court on Plaintiffs' unopposed Motion for Preliminary Approval of Class Action Settlement (the "Motion"). The Motion attaches and incorporates a Class Action Settlement Agreement (the "Settlement" or "Settlement Agreement") that, together with the exhibits thereto, sets forth the terms and conditions for the settlement of claims, on a classwide basis, between Plaintiffs Joshua Lewis, Nathaniel Timmons, and James Cavanaugh ("Plaintiffs") individually and on behalf of the Settlement Class and Defendant Lytx, Inc. ("Lytx" or "Defendant," and, along with Plaintiffs, the "Parties").

Having carefully considered the Motion, the Settlement Agreement together with all exhibits and attachments thereto, the record in this matter, and the briefs and arguments of counsel, and the Court determining that it likely will be able to approve the Settlement as fair, reasonable, and adequate under Fed. R. Civ. P. 23(e)(2), that it will likely be able to certify a class for purposes of judgment on the Settlement under Rules 23(a) and (b)(3), and that the proposed plan of notice (the "Notice Program") to the Settlement Class is the best notice practicable under the circumstances and consistent with the requirements of due process and Federal Rule of Civil Procedure 23(c)(2), and that a hearing should and will be held after notice to the Settlement Class

to confirm that the Settlement is fair, reasonable, and adequate, and to determine whether this Court should enter a judgment approving the Settlement and an order of dismissal of this action based upon the Settlement,

IT IS HEREBY ORDERED as follows:

1.      Unless otherwise defined herein, all terms that are capitalized herein shall have the same meaning ascribed to those terms in the Settlement Agreement.

2.      The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) and personal jurisdiction over the Parties and the members of the Settlement Class.

3.      The Motion is **GRANTED**.

## PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT

4.      The Court finds that, subject to the Final Approval Hearing, the Court will likely be able to approve the Settlement as fair, reasonable, adequate, and in the best interests of the Settlement Class.

5.      The Court further finds that the Settlement substantially fulfills the purposes and objectives of the class action and provides beneficial relief to the Settlement Class, especially considering the risks and delay of continued litigation.

6.      The Court further finds that Plaintiffs and Class Counsel have adequately represented, and will continue to adequately represent, the Class.

7.      The Court further preliminarily finds that the Settlement is substantively fair. The Court will assess Class Counsel's request for attorneys' fees and expenses after receiving a motion from Class Counsel supporting such request. At this stage, the Court finds that the plan to request fees and litigation expenses creates no reason not to grant the Motion and direct notice to the Class.

8.     The Court preliminarily finds that the Settlement relief provided—a $4,250,000 non-reversionary settlement fund ("Settlement Fund")—is fair, reasonable, and adequate taking into account, *inter alia*, the costs, risks, and delay of further litigation, trial and appeal, the alleged harm to the Class, the proposed method of distributing payments to the Class and the absence of any agreement required to be identified under Rule 23(e)(3).

9.     The Court also finds that the Settlement Agreement: (a) is the result of arm's-length negotiations involving experienced counsel, with the assistance of a mediator; (b) is sufficient to warrant notice of the Settlement and the Final Approval Hearing to the Settlement Class; (c) meets all applicable requirements of law, including Federal Rule of Civil Procedure 23 and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715; and (d) is not a finding or admission of liability by Lytx.

## CERTIFICATION OF THE SETTLEMENT CLASS

10.     Under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and solely for purposes of judgment on the proposed Settlement, the Court preliminarily approves the following settlement class ("Settlement Class"):

> All individuals who, while present in the State of Illinois, operated a vehicle equipped with a Lytx DriveCam® Event Recorder ("DriveCam"), and for whom machine vision and artificial intelligence ("MV+AI") was used to predict distracted driving behaviors between October 12, 2016, and the earlier of Preliminary Approval or January 1, 2025.

11.     Excluded from the Settlement Class are (1) any Judge or Magistrate presiding over this Action and members of their families; (2) the Defendant, its subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, agents, and attorneys; (3) persons who properly execute and file a timely request for exclusion from the Settlement Class; and (4) the

legal representatives, successors or assigns of any such excluded persons.

12.    All Persons who are members of the Settlement Class who have not submitted a timely request for exclusion are referred to collectively as "Settlement Class Members" or individually as a "Settlement Class Member."

13.    For purposes of settlement only, the Court finds that it will likely be able to certify the Settlement Class under Federal Rules of Civil Procedure 23(a) and (b)(3), as the prerequisites thereunder have been met, including (1) that the Settlement Class is so numerous that joinder of all members is impracticable; (2) that there are questions of law and fact common to members of the Settlement Class that predominate over questions affecting only individual members (e.g., whether Lytx collected and stored Settlement Class Members' biometric data, without consent, through dash cam devices in a manner that violated BIPA, and whether Plaintiffs and the Settlement Class Members are entitled to uniform statutory damages under BIPA); (3) that Plaintiffs' claims are typical of the claims of the Settlement Class; (4) that Plaintiffs and Class Counsel will fairly and adequately protect the interests of the Settlement Class; and (5) that a settlement class action is a superior method of fairly and efficiently adjudicating this Action.

14.    Under Federal Rule of Civil Procedure 23, and for settlement purposes only. Plaintiffs Joshua Lewis, James Cavanaugh, and Nathaniel Timmons are hereby appointed Class Representatives and the following are hereby appointed as Class Counsel: Carney Bates & Pulliam PLLC; Lieff Cabraser Heimann & Bernstein LLP; Milberg Coleman Bryson Phillips Grossman PLLC; Workplace Partners, P.C.; Werman Salas P.C.; and Nick Larry Law LLC.

15.    The Court finds that the above attorneys are competent and capable of exercising the responsibilities of Class Counsel and that Plaintiffs will adequately protect the interests of the Settlement Class defined above.

16.    Certification of the Settlement Class shall be solely for settlement purposes and without prejudice to the Parties in the event the Settlement is not finally approved by this Court or otherwise does not take effect. The Parties preserve all rights and defenses regarding class certification in the event the Settlement is not finally approved by this Court or otherwise does not take effect.

## NOTICE AND ADMINISTRATION

17.    The Court directs the Settlement Administrator to perform the functions and duties set forth in the Settlement Agreement and to provide such other administration services as are reasonably necessary to facilitate the completion of the Settlement.

18.    The Court has carefully considered the forms and methods of notice to the Settlement Class set forth in the Settlement ("Notice Program"). The Court finds that the Notice Program is reasonably calculated to apprise members of the Settlement Class of the pendency of this action, the terms of the Settlement, and the right to object to the Settlement and to exclude themselves from the Settlement Class. The Court finds that the Notice Program constitutes the best notice practicable under the circumstances and fully satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the requirements of due process, and the requirements of any other applicable law, such that the terms of the Settlement, the releases provided for therein, and this Court's final judgment will be binding on all Settlement Class Members. The Court further finds that the Notice Program constitutes valid, due, and sufficient notice to all persons entitled thereto, and meets the requirements of due process. Accordingly, the Court finds that no notice other than that specifically identified in the Settlement Agreement is necessary in this Action.

19.    The Court hereby approves the Notice Program and the form, content, and requirements of the Postcard Notice attached as Exhibit C to the Settlement Agreement, the Email

Notice attached as Exhibit B to the Settlement Agreement, and the Long Form Notice attached as Exhibit D to the Settlement Agreement (the "Notices"), and the Claim Form attached as Exhibit E to the Settlement Agreement (the "Claim Form").

20.     The Court finds that the Notices clearly and concisely state in plain, easily understood language, *inter alia*: (a) the nature of the case; (b) the definition of the Settlement Class; (c) the class claims and issues; (d) that the Court will exclude from the Settlement Class any Settlement Class member who timely and validly requests exclusion; (e) the time and manner for requesting such exclusion; and (f) the binding effect of a class judgment on Settlement Class members under Rule 23(c)(3). The Parties, by agreement, may revise the Notices and Claim Form in ways that are not material, or in ways that are appropriate to update those documents for purposes of accuracy or formatting, consistent with this Order.

21.     In compliance with the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, Defendant shall promptly provide written notice of the proposed Settlement to the appropriate authorities.

22.     The Settlement Administrator shall cause the Notice Program to be executed within seventy (70) days following the entry of this Order (the "Notice Date"). Class Counsel, prior to the Final Approval Hearing, shall file with the Court a declaration executed by the Settlement Administrator attesting to the timely completion of the Notice Program.

23.     No later than the Notice Date, the Settlement Administrator shall maintain the Settlement Website to provide full information about the Settlement and allow for the filing of claims online.

24.     No later than 16 days prior to the Final Approval Hearing, the Settlement Administrator shall serve on counsel for all Parties a declaration stating that the Notice required

by the Agreement has been completed in accordance with the terms of the Preliminary Approval Order, and that the CAFA Notice was served. The Settlement Administrator shall likewise provide Defendant and Class Counsel with a final list of persons who submitted timely and valid requests for exclusion from the Settlement Class.

## SUBMISSION OF CLAIMS AND REQUESTS FOR EXCLUSIONS

25.     Settlement Class Members who wish to receive benefits under the Settlement must complete and submit a timely and valid Claim Form in accordance with the instructions contained therein. To be timely, Claim Forms must be postmarked or received by the Settlement Administrator by _____, 20__. Settlement Class Members who do not submit a claim and those who do not submit a timely and valid claim will not receive a payment under the Settlement, but they will be bound by the Settlement.

26.     The Settlement Administrator shall review all claims to determine their validity and shall employ reasonable procedures to screen claims for abuse and fraud, and to deny claims where there is evidence of abuse or fraud. The Settlement Administrator may reject any claim that is not submitted by a Settlement Class Member; that does not comply in any material respect with the instructions on the Claim Form; or that is submitted after the Claims Deadline.

27.     As set forth in the Settlement Agreement, each claimant who submits an invalid Claim Form to the Settlement Administrator must be given a notice of the Claim Form's deficiency and an opportunity to cure the deficiency within twenty-one (21) days of the date of the notice. The Settlement Administrator may contact any Person who has submitted a Claim Form to obtain additional information necessary to verify the Claim Form. Each and every member of the Settlement Class who does not timely and validly submit a claim shall be forever barred from participating in any distributions of the Settlement Fund, and shall be bound by all determinations

and orders pertaining to the Settlement, including the release of all claims to the extent set forth in the Settlement, unless such person requests exclusion from the Settlement in a timely and proper manner, as hereinafter provided.

28.     A member of the Settlement Class wishing to request exclusion (or "opt-out") from the Settlement shall mail a request for exclusion to the Settlement Administrator. The request for exclusion must be in writing, must be mailed to the Settlement Administrator at the address specified in the Notice, must be postmarked no later than sixty (60) days following the Notice Date ("Opt-Out Deadline"), must include (a) his/her full name, address, and current telephone number; (b) the entity or entities for whom they drove and when; (c) all grounds for the request to be excluded, with factual and legal support for the stated request, including any supporting materials; (d) the identification of any other exclusion requests he/she has filed, or has had filed on his/her behalf, in any other class action cases in the last five years; and (e) the requestor's signature. . The request for exclusion shall not be effective unless it provides the required information and is made within the time stated above. No member of the Settlement Class, or any person acting on behalf of or in concert or in participation with a member of the Settlement Class, may request exclusion of any other member of the Settlement Class from the Settlement.

29.     Members of the Settlement Class who timely request exclusion from the Settlement will relinquish their rights to benefits under the Settlement and will not release any claims against Lytx.

30.     All members of the Settlement Class who do not timely and validly request exclusion shall be bound by all terms of the Settlement Agreement and by the Final Approval Order and Judgment even if they have previously initiated or subsequently initiate individual litigation or any other proceedings against Lytx.

31.    The Settlement Administrator shall promptly provide all Parties with copies of any exclusion requests, and Plaintiffs shall file a list of all persons who have validly opted out of the Settlement with the Court prior to the Final Approval Hearing.

### APPEARANCES AND OBJECTIONS

32.    Any member of the Settlement Class who does not file a timely request for exclusion, but who wishes to object to approval of the proposed Settlement, to the award of attorneys' fees and costs, or to the Service Awards to the Class Representatives must file with the Court a written statement (along with any supporting papers), postmarked or filed on or before 60 days following the Notice Date ("Objection Deadline"), that includes a caption or title that identifies it as "Objection to Class Settlement in *Lewis, et al. v. Lytx, Inc.*, Case No. 3:22-cv-00046-NJR." The written statement must also include: (1) the objector's name and address; (2) an explanation of the basis upon which the objector claims to be a Settlement Class Member; (3) all grounds for the objection, including all citations to legal authority and evidence supporting the objection; (4) the name and contact information of any and all attorneys representing, advising, or in any way assisting the objector in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection (the "Objecting Attorneys"); (5) a statement indicating whether the objector intends to appear at the Final Approval Hearing (either personally or through their Objecting Attorneys who shall file an appearance with the Court in accordance with the Local Rules); (6) a list of all class action settlements to which the objector has lodged an objection in the last five years; (7) the objector's handwritten or electronically imaged written signature; and (8) if a Settlement Class Member or any of the Objecting Attorneys has objected to any class action settlement where the objector or the Objecting Attorneys asked for or received any payment in exchange for dismissal of the objection, or any related appeal, without any

modification to the settlement, a statement identifying each such case by full case caption and amount of payment received..

33.     A Settlement Class Member who has timely filed a written objection stating the Settlement Class Member's intention to appear at the Final Approval Hearing as set forth above may appear at the Final Approval Hearing in person or through counsel to be heard orally regarding his or her objection. It is not necessary, however, for a Settlement Class Member who has filed a timely objection to appear at the Final Approval Hearing. No Settlement Class Member wishing to be heard orally in opposition to the approval of the Settlement and/or the request for attorneys' fees and costs and/or the request for a Service Award to each of the Class Representatives will be heard unless that Settlement Class Member has filed a timely written objection as set forth above, including a statement that the Settlement Class Member intends to appear at the Final Approval Hearing. No non-party, including members of the Settlement Class who have timely opted out of the Settlement, will be heard at the Final Approval Hearing.

34.     Any Settlement Class Member who does not make an objection to the Settlement in the manner provided herein shall be deemed to have waived and forfeited any and all rights he or she may have to object, appear, present witness testimony, and/or submit evidence; shall be barred from appearing, speaking, or introducing any testimony or evidence at the Final Approval Hearing; shall be precluded from seeking review of the Settlement by appeal or other means; and shall be bound by all terms of the Settlement and by all proceedings, orders, and judgments in the Action.

35.     Any challenge to the Settlement Agreement or the Final Approval Order and Judgment shall be pursuant to appeal under the Federal Rules of Appellate Procedure and not through a collateral attack.

## FINAL APPROVAL HEARING

37.     The Federal Rule of Civil Procedure 23(e) Final Approval Hearing is hereby scheduled to be held before this Court on _____, 20__ for the following purposes: (i) to finally determine whether the applicable prerequisites for settlement class action treatment under Federal Rules of Civil Procedure 23(a) and (b)(3) are met; (ii) to determine whether the Settlement is fair, reasonable, adequate, and in the best interests of the Class, and should be given final approval by the Court; (iii) to determine whether the judgment as provided under the Settlement Agreement should be entered, dismissing this Action with prejudice and releasing all Released Claims; (iv) to consider the application for an award of attorneys' fees and expenses of Class Counsel; (v) to consider the application for a Service Award to each of the Class Representatives; (vi) to consider the distribution of the Settlement benefits under the terms of the Settlement Agreement; and (vii) to rule upon such other matters as the Court may deem appropriate.

38.     On or before twenty-one (21 days after the Notice Date, Class Counsel shall file any application for attorneys' fees and expenses and Service Awards to the Class Representatives (the "Fee Petition").

39.     No later than fourteen (14) days prior to the Final Approval Hearing, Plaintiffs shall file papers in support of final approval of the settlement.

40.     The Final Approval Hearing may be postponed, adjourned, transferred, or continued by order of the Court without further notice to the Settlement Class. At, or following, the Final Approval Hearing, the Court may enter a Final Approval Order and Judgment in accordance with the Settlement Agreement that will adjudicate the rights of all class members.

41.     For clarity, the deadlines the Parties and members of the Settlement Class shall

adhere to are as follows:

| EVENT | DATE |
|---|---|
| Notice Date | 70 days after Preliminary Approval |
| Class Counsel's Fee and Cost Application | 21 days after the Notice Date |
| Claims Deadline | 90 days after the Notice Date |
| Objection/Opt-Out Deadline | 60 days after the Notice Date |
| Plaintiff's Motion for Final Approval | 14 days before the Final Approval Hearing |
| Final Approval Hearing | At the Court's Convenience, but no earlier than 120 days after the Notice Date |

42.     Settlement Class Members do not need to appear at the Final Approval Hearing or take any other action to indicate their approval.

## FURTHER MATTERS

43.     For settlement purposes, Plaintiffs' request to file an Amended Class Action Complaint to add Plaintiffs Cavanaugh and Timmons is granted.

44.     All discovery and other pretrial proceedings in the Action as between the Plaintiffs and Lytx are stayed and suspended until further order of the Court except such actions as may be necessary to implement the Settlement and this Order.

45.     In order to protect its jurisdiction to consider the fairness of the Settlement and to enter a Final Approval Order and Judgment having binding effect on all Settlement Class Members, the Court hereby enjoins all members of the Settlement Class, and anyone who acts or purports to act on their behalf, from pursuing or continuing to pursue all other proceedings in any state or federal court or any other proceeding that seeks to address Releasing Parties' or any

Settlement Class Member's rights or claims relating to, or arising out of, any of the Released Claims.

46.     The Settlement does not constitute an admission, concession, or indication by the Parties of the validity of any claims or defenses in the Action or of any liability, fault, or wrongdoing of any kind by Lytx, which vigorously denies all of the claims and allegations raised in the Action.

47.     In the event that the Settlement is terminated under the terms of the Settlement, or if for any reason whatsoever the approval of it does not become final and no longer subject to appeal, then: (i) the Settlement shall be null and void, including any provisions related to the award of attorneys' fees and costs, shall have no further force and effect with respect to any party in this Action, and may not be referred to or used as evidence or for any other purpose whatsoever in the Action or any other action or proceeding; (ii) all negotiations, proceedings, documents prepared, and statements made in connection therewith shall be without prejudice to any person or party hereto, shall not be deemed or construed to be an admission by any party of any act, matter, or proposition, and shall not be used in any manner of or for any purpose in any subsequent proceeding in this Action or in any other action in any court or other proceeding, provided, however, that the termination of the Settlement shall not shield from subsequent discovery any factual information provided in connection with the negotiation of this Settlement that would ordinarily be discoverable but for the attempted settlement; (iii) this Order shall be vacated and of no further force or effect whatsoever, as if it had never been entered; and (v) any party may elect to move the Court to implement the provisions of this paragraph, and none of the non-moving parties (or their counsel) shall oppose any such motion. This Order shall not be construed or used to show that certification of one or more classes would or would not be appropriate if the Action

were to be litigated rather than settled.

48.     Pending the final determination of whether the Settlement should be approved, any member of the Class is hereby enjoined from filing any class action, or attempting to amend an existing action to assert any claim which would be released pursuant to the Settlement Agreement. If the Settlement is terminated or final approval does not for any reason occur, the injunction will be immediately terminated.

49.     The Court retains Jurisdiction to consider all further matters arising out of or connected with the Settlement. The Court may approve the Settlement, with such modifications as may be agreed to by the Parties, if appropriate, without further notice to the Class.

**IT IS SO ORDERED.**

Dated: _____, 20__          _____
                                        HON. NANCY J. ROSENSTENGEL
                                        CHIEF U.S. DISTRICT JUDGE

# **<u>EXHIBIT B</u>**

TO:

FROM:    [TBD]

RE:      Legal Notice of Class Action Settlement

## NOTICE OF PROPOSED CLASS ACTION SETTLEMENT
*Lewis v. Lytx Inc., et al*., Case No. 3:22-cv-00046-NJR

(United States District Court for the Southern District of Illinois)

**Our Records Indicate You May Be Entitled to a Payment From a Class Action Settlement Because You Drove a Vehicle Within Illinois Equipped with a Lytx DriveCam Event Recorder and Used Lytx's Driver-Facing Machine Vision and Artificial Intelligence (MV+AI) Technology.**

**Click [HERE] To File a Claim for Payment**

**Claims Must be Submitted no later than [Claims Deadline]**

*A court authorized this notice.  You are <u>not</u> being sued.  This is <u>not</u> a solicitation from a lawyer.*

This notice is to inform you that a settlement has been reached in a class action lawsuit claiming that Defendant, Lytx, Inc. ("Lytx"), violated the Illinois Biometric Information Privacy Act ("BIPA") by collecting and storing Settlement Class Members' biometric data through dash cams and using its machine vision and artificial intelligence ("MV+AI") technology. Lytx denies these allegations, any wrongdoing, or that it violated any laws. The Settlement does not establish who is right or wrong, but rather is a compromise to end the lawsuit and avoid the uncertainties and expense of continuing on in court. The class action lawsuit is called *Lewis v. Lytx Inc., et al*., Case No. 3:22-cv-00046-NJR, and is pending in the Southern District of Illinois (the "Class Action").

<u>**Am I a Class Member?**</u> Our records indicate you may be a Settlement Class Member. Settlement Class Members are all individuals who, while present in the State of Illinois, operated a vehicle equipped with a Lytx DriveCam® Even Recorder ("DriveCam") and for whom MV+AI was used to predict distracted driving behaviors between October 12, 2016, and [the earlier of Preliminary Approval or January 1, 2025].

<u>**What Can I Get?**</u> If approved by the Court, Lytx will create a Settlement Fund of **$4,250,000.00** for the benefit of the Settlement Class. The Settlement Fund will be distributed to Settlement Class Members who file a timely and complete claim on a *pro rata* basis, after deducting any Court-approved attorneys' fees and expenses, service awards for the class representatives, and costs of settlement administration.

<u>**How Do I Get a Payment?**</u> To get a payment, please submit a Claim Form, found HERE, postmarked or submitted electronically by [DATE]. Claim Forms may be submitted online at [insert link] or by U.S. mail to the following address: [insert address]. You can also elect to receive your payment by check or electronically by Venmo, CashApp, Zelle, PayPal, etc. on the Settlement Website.

<u>**What are My Other Options?**</u> You may exclude yourself from the Settlement Class by sending a letter

If you do not want emails about this matter, please unsubscribe [_____].

to the Settlement Administrator no later than [**objection/exclusion deadline**]. If you exclude yourself, you cannot get a settlement payment, but you will keep any rights you may have to sue Lytx regarding the issues in the lawsuit. Alternatively, if you remain in the Settlement Class, you may object to the proposed Settlement, and you and/or your lawyer have the right to appear before the Court. Your written objection must be filed no later than [**objection/exclusion deadline**]. Specific instructions about how to exclude yourself from, or object to, the Settlement are available at the Settlement Website, www._____.com. If you file a claim or do nothing, and the Court approves the Settlement, you will be bound by all of the Court's orders and judgments. In addition, your claims against Lytx relating to issues in the Class Action will be released.

**Who Represents Me?** The Court has appointed the law firms of Carney Bates & Pulliam PLLC; Lieff Cabraser Heimann & Bernstein LLP; Milberg Coleman Bryson Phillips Grossman PLLC; Workplace Law Partners, P.C.;Werman Salas P.C., and Nick Larry Law LLC to represent the Settlement Class. These attorneys are called Class Counsel. You will not be charged for these lawyers. If you want to be represented by your own lawyer in this case, you may hire one at your expense.

**When Will the Court Consider the Proposed Settlement?** The Court will hold the Final Approval Hearing at __.m. on [date] in Courtroom __ at the Federal Building and U.S. Courthouse, 750 Missouri Ave, East St. Louis, IL 62201. The purpose of the hearing will be for the Court to determine whether to approve the Settlement as fair, reasonable, adequate, and in the best interests of the Settlement Class; to consider Class Counsel's request for attorneys' fees and expenses; and to consider the request for a Service Award to each of the Class Representatives. At that hearing, the Court will be available to hear any objections and arguments concerning the fairness of the Settlement.

**How Do I Get More Information?** This notice contains only a summary of the Settlement and the proceedings to date. Additional information is also available at the Settlement Website, www._____.com, or by contacting the Settlement Administrator at XXX-XXX-XXXX or Class Counsel at XXX-XXX-XXXX.

If you do not want emails about this matter, please unsubscribe [_____].

# **EXHIBIT C**

**LEGAL NOTICE ONLY TO
BE OPENED BY THE
INTENDED RECIPIENT**

**A FEDERAL COURT
AUTHORIZED THIS NOTICE.**

**YOU ARE NOT BEING SUED.**

*You May Be Entitled to Money
From A Class Action
Settlement. Read The Enclosed
Notice For More Information.*

*Lewis et al. v. Lytx, Inc.*,
Case No. 3:22-cv-00046-NJR

<<MAIL ID>>
<<NAME 1>>
<<NAME 2>>
<<ADDRESS LINE 1>>
<<ADDRESS LINE 2>>
<<ADDRESS LINE 3>>
<<ADDRESS LINE 4>>
<<ADDRESS LINE 5>>
<<CITY, STATE ZIP>>
<<COUNTRY>>

A proposed settlement has been reached 125 Lytx's DriveCam® driver-facing MV+AI 185 Artificial Intelligence ("MV+AI") product. Plaintiffs claim that Lytx violated the Illinois Biometric Privacy Information Act by collecting biometric information without consent. Lytx denies these allegations and any wrongdoing. No judgment or determination of wrongdoing has been made.

**Who's Included?** Records indicate that you are included in this Settlement as a Class Member. The Class includes all individuals who, while present in the State of Illinois, operated a vehicle equipped with a Lytx DriveCam® Event Recorder ("DriveCam"), and for whom MV+AI was used to predict distracted driving behaviors between October 12, 2016 and the earlier of Preliminary Approval or January 1, 2025.

**What Does the Settlement Provide?** Lytx will establish a $4,250,000 Settlement Fund that will be used to pay Claims that Class Members timely and complete submit, attorneys' fees and expenses, and the costs of notice and administration. All cash payments will be adjusted pro rata based on the number of Class Members that participate in the Settlement.

**How Can You Get a Payment?** You must submit a Claim Form by [DATE]. You may file a Claim online at [website] or get a paper Claim Form at the website and file by mail. Your claim must be postmarked or submitted online by [XX].

**Your Other Options**. If you file a Claim Form, object to the Settlement and attorneys' fees and expenses, or do nothing, you are choosing to stay in the Settlement. You will be legally bound by all orders of the Court and you will not be able to start, continue, or be part of any other lawsuit against Lytx about its alleged collection of biometric information. If you don't want to be legally bound by the Settlement or receive any benefits from it, you must exclude yourself by [XX]. If you do not exclude yourself, you may object to the Settlement and attorneys' fees and expenses by [XX].

The Court has scheduled a hearing in this case for [XX], to consider whether to approve the Settlement, attorneys' fees of up to $X,XXX,XXX.XX and costs, Service Awards of $10,000 for the Class Representatives, as well as any objections. You or your own lawyer, if you have one, may ask to appear and speak at the hearing at your own cost, but you do not have to.

For complete information about all of your rights and options, as well as the Claim Form, the Long Form Notice, and Settlement Agreement, visit [website]. The capitalized terms used in this Notice are defined in the Settlement Agreement, which is available on the Settlement Website.

# **EXHIBIT D**

NOTICE OF PENDENCY AND SETTLEMENT OF CLASS ACTION

**You May Be Entitled to a Payment From a Class Action Settlement Because You Drove a Vehicle That Had a Lytx DriveCam Event Recorder Installed In It and Used Lytx's Driver-Facing Machine Vision and Artificial Intelligence (MV+AI) Technology**

*A court authorized this notice. You are <u>not</u> being sued. This is <u>not</u> a solicitation from a lawyer.*

**<u>THIS NOTICE MAY AFFECT YOUR RIGHTS. PLEASE READ IT CAREFULLY.</u>**

- A proposed settlement (the "Settlement") has been reached in a class action lawsuit against Defendant Lytx, Inc. ("Lytx") over claims that Lytx violated the Illinois Biometric Information Privacy Act ("BIPA") by collecting and storing Settlement Class Members' biometric data through dash cams and using its machine vision and artificial intelligence ("MV+AI") technology without consent. Lytx denies these allegations, any wrongdoing, or that it violated any laws.

- The Class includes all individuals who, while present in the State of Illinois, operated a vehicle equipped with a Lytx DriveCam® Event Recorder ("DriveCam") and for whom MV+AI was used to predict distracted driving behaviors between October 12, 2016, and the earlier of Preliminary Approval or January 1, 2025.

- Under the Settlement, Lytx has agreed to establish a **$4.25 million** Settlement Fund to: (1) provide cash payment to Class Members who are Illinois residents and non-Illinois residents; and (2) pay the costs of settlement administration, court-approved attorneys' fees and expenses, and service awards to the named Plaintiffs.

- Read this Notice carefully. It explains your rights and options—**and the deadlines to exercise them**. Your legal rights are affected whether you act, or do not act.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM FORM BY [DATE]** | This is the only way to receive a payment. Claim Forms can be found and submitted at the Settlement Website [LINK]. <br><br> As a member of the Settlement Class, you will give up your rights to sue Lytx in the future regarding the claims in this case. |
| **EXCLUDE YOURSELF BY [DATE]** | This is the only option that allows you to sue, continue to sue, or be part of another lawsuit against Lytx for the claims this Settlement resolves. <br><br> If you exclude yourself, you will give up the right to receive any benefits from this Settlement. |
| **OBJECT TO OR COMMENT ON THE SETTLEMENT BY [DATE]** | You may object to the Settlement and requested Attorneys' fees and expenses by writing to the Court and informing it why you don't think the Settlement or the requested attorneys' fees and expenses should be approved. <br><br> You may also write the Court to provide comments or reasons why you support the Settlement. <br><br> If you object, you also may file a Claim Form to receive a payment, but you will give up the right to sue Lytx in a separate lawsuit about the legal claims this Settlement resolves. |

QUESTIONS? CALL 1-800-000-0000 TOLL FREE, OR VISIT www.XXXXXXXXXXXXXXXXXx.com

| **GO TO THE HEARING ON [DATE]** | You can attend the Final Approval Hearing where the Court may hear arguments concerning approval of the Settlement. If you wish to speak at the Final Approval Hearing, you must make a request to do so in your written objection or comment. You are <u>not</u> required to attend the Final Approval Hearing. |
|---|---|
| **DO NOTHING** | If you do nothing, you will not receive any payment from the Settlement and you will give up your rights to sue Lytx regarding the claims in this case. |

- These rights and options – and the deadlines to exercise them – are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement and the requested attorneys' fees and expenses. No Settlement payments will be provided unless the Court approves the Settlement and it becomes final.

## BASIC INFORMATION

### 1.  Why was a Class Action Notice issued?

A Court authorized this notice because you have a right to know about a proposed Settlement of this class action lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement. This Notice explains the lawsuit, the Settlement, and your legal rights.

The Plaintiffs and Defendant have reached a proposed Settlement of this matter that will affect your rights. The people who sued are called the Plaintiffs. The company they are suing, Lytx, is called the Defendant.

Chief Judge Nancy J. Rosenstengel of the United States District Court for the Southern District of Illinois is overseeing this case. The class action is called *Lewis v. Lytx Inc., et al.*, Case No. 3:22-cv-00046-NJR. The judge has authorized this notice to explain all of your options before the Court decides whether to approve the Settlement. If the Court approves the Settlement and if such approval is final with respect to appeal(s), if any, an administrator appointed by the Court will make the payments and take other actions that the Settlement allows. Because your rights will be affected by this Settlement, it is extremely important that you read this Notice carefully.

### 2. What is a class action?

In a class action, one or more people called the class representatives (in this case, Plaintiffs Joshua Lewis, James Cavanaugh, and Nathaniel Timmons) sue on behalf of a group or a "class" of people who have similar claims. In a class action, the court resolves the issues for all class members, except for those who exclude themselves from the class.

### 3. What is this lawsuit about?

This lawsuit alleges that Lytx violated the Illinois Biometric Information Privacy Act by collecting and storing Settlement Class Members' biometric data through dash cams and using its MV+AI technology. Lytx denies these allegations, any wrongdoing, or that it violated any laws. The Settlement does not establish who is right or wrong, but rather is a compromise to end the lawsuit and avoid the uncertainties and expense of continuing on in court.

### 4. Why is there a Settlement?

The Court has not decided whether the Plaintiffs or Defendant should win this case. Instead, both sides agreed to a Settlement. That way, they avoid the uncertainties and expenses associated with ongoing litigation, and Settlement Class Members will get compensation.

## WHO'S INCLUDED IN THE SETTLEMENT?

### 5. How do I know if I am in the Class?

The Settlement Class is defined as:

All individuals who, while present in the State of Illinois, operated a vehicle equipped with a Lytx DriveCam, and for whom MV+AI was used to predict distracted driving behaviors between October

12, 2016 and the earlier of Preliminary Approval or January 1, 2025.

## Settlement Benefits—What You Get

### 6. What does the Settlement provide?

*Monetary Relief*: Lytx will pay $4,250,000.00 into a Settlement Fund for the benefit of the Settlement Class to make payments to Settlement Class Members, pay the costs of administration of the settlement, and pay attorneys' fees, expenses, and any service award to the Class Representatives, as approved by the Court. The Settlement will provide Settlement Class Members residing in Illinois with 50% of the Settlement Fund that remains after subtracting the costs of administration, attorneys' fees, expenses, and service awards. The remaining 50% of the Settlement Fund that remains after subtracting the costs of administration, attorneys' fees, expenses, and service awards will go to non-Illinois residents.

### 7. How do I get a payment and how much will my payment be?

To get a payment, you must submit a Claim Form, which can be found on the Settlement Website, postmarked or submitted electronically by [DATE]. Claim Forms may be submitted online at [insert link] or by U.S. mail to the following address: [insert address]. You can also elect to receive your payment by check or electronically by Venmo, CashApp, Zelle, PayPal, etc. on the Settlement Website.

The amount in the Settlement Fund will be distributed to Settlement Class Members who do not opt out of the Settlement on a *pro rata* basis depending on their state of residence, after deducting any Court-approved attorneys' fees and expenses, service awards for the class representatives, and costs of settlement notice and administration. Payments to Settlement Class Members will come by check unless you elect to receive payment electronically by Venmo, CashApp, Zelle, PayPal, etc. via the Settlement Website, www.XXXXXXXXXXXXX.com.

### 8. When will I get my payment?

The Court will hold a hearing to consider the fairness of the Settlement on [Final Approval Hearing Date]. If the Court approves the Settlement, Settlement Class Members will receive their payment within 90 days after the Settlement has been finally approved and/or any appeals process is complete.

## Remaining in the Settlement Class

### 9. What am I giving up if I stay in the Settlement Class?

If the Settlement becomes final, you will give up (or "release") your rights to sue Lytx and certain of its affiliates (Released Parties) regarding the Released Claims, which are described and defined in the Settlement Agreement. Unless you exclude yourself (*see* Question 10), you will release the Released Claims. You may access the Settlement Agreement through the "Important Documents" tab on the website.

The Settlement Agreement describes the Released Claims with specific descriptions, so read it carefully. If you have any questions you may speak to the lawyers listed in Question 15 for free or you may, of course, speak to your own lawyer.

QUESTIONS? CALL 1-800-000-0000 TOLL FREE, OR VISIT www.XXXXXXXXXXXXXXXXXx.com

## EXCLUDING YOURSELF FROM THE SETTLEMENT

### 10. How do I get out of the Settlement?

To exclude yourself from the Settlement Class, you must mail or otherwise deliver a letter stating that you wish to be excluded. Your letter must include:

    a.  The name and number of this case, *Lewis v. Lytx Inc., et al.*, Case No. 3:22-cv-00046-NJR;

    b.  Your full name, address, and current telephone number;

    c.  The entity or entities for whom you drove and when;

    d.  All grounds for the request to be excluded, with factual and legal support for the stated request, including any supporting materials;

    e.  The identification of any other exclusion requests you have filed, or had filed on your behalf, in any other class action cases in the last five years; and

    f.  Your handwritten or electronically imaged written signature.

You must mail or deliver your exclusion letter, postmarked no later than **[objection/exclusion deadline]** to:

Settlement Administrator
[insert address]

### 11. If I don't exclude myself, can I sue the Defendant for the same thing later?

No. Unless you exclude yourself, you give up any right to sue Lytx for the Released Claims being resolved by this Settlement.

### 12. If I exclude myself, can I get anything from this Settlement?

No. If you exclude yourself, you are not eligible to receive a settlement payment from the Settlement Fund Account.

## OBJECTING TO THE SETTLEMENT

### 13. How do I object to the Settlement?

If you're a Settlement Class Member, you may ask the Court to deny approval of the Settlement by filing an objection. You may object to any aspect of the Settlement, Class Counsel's request for attorneys' fees and expenses, or the request for Service Awards. You can give reasons why you think the Court should not give its approval. The Court will consider your views.

If you choose to make an objection, you must mail or file with the Court a letter or brief stating that you object to the Settlement and the basis for your objection. Your letter or brief must include the name and number of this case, *Lewis v. Lytx Inc., et al.*, Case No. 3:22-cv-00046-NJR, as well as the following information:

    a.  Your full name and mailing address;

    b.  An explanation of the basis upon which you claim to be a Settlement Class Member;

c. All grounds for the objection, including all citations to legal authority and evidence supporting the objection;

d. The name and contact information of any and all attorneys representing, advising, or in any way assisting you in connection with your objection or who may profit from the pursuit of your objection (the "Objecting Attorneys");

e. A statement indicating whether you or your attorney intends to appear at the Final Approval Hearing;

f. a list of all class action settlements to which the objector has lodged an objection in the last five years;

g. Your handwritten or electronically imaged written signature; and

h. If you or any of the Objecting Attorneys have objected to any class action settlement where you or the Objecting Attorney asked for or received any payment in exchange for dismissal of the objection, or any related appeal, without any modification to the settlement, then you must include a statement identifying each such case by full case caption and amount of payment received.

You must mail or deliver your written objection, postmarked no later than **[objection/exclusion deadline]** to:

Settlement Administrator
[insert address]

You must also mail or otherwise deliver a copy of your written objection to Class Counsel and Lytx's counsel at the following addresses:

| Class Counsel | Defendant's Counsel |
|---|---|
| Randall K. Pulliam<br>Carney Bates & Pulliam, PLLC<br>One Allied Dr., Ste. 1400<br>Little Rock, AR 72202<br>Email: rpulliam@cbplaw.com | Max E. Kaplan<br>Cozen O'Connor<br>1650 Market St., Ste. 2800<br>Philadelphia, PA 19130<br>Email: mkaplan@cozen.com |

### 14. What's the difference between objecting and excluding myself from the Settlement?

Objecting simply means telling the Court that you don't like something about the Settlement. You can object only if you stay in the Settlement Class. Excluding yourself from the Settlement Class is telling the Court that you don't want to be part of the Settlement Class. If you exclude yourself, you have no right to object or receive a monetary benefit because the case no longer affects you.

## THE LAWYERS REPRESENTING YOU

### 15. Do I have a lawyer in the case?

The Court has appointed the law firms of Carney Bates & Pulliam PLLC; Lieff Cabraser Heimann & Bernstein LLP; Milberg Coleman Bryson Phillips Grossman PLLC; Workplace Law Partners,

P.C.; Werman Salas P.C.; and Nick Larry Law LLC to represent the Settlement Class. They are called "Class Counsel." After conducting an extensive investigation, they believe that the Settlement Agreement is fair, reasonable, and in the best interests of the Settlement Class. You will not be charged out-of-pocket for these lawyers. If you want to be represented by your own lawyer in this case, you may hire one at your own expense.

### 16. How will the lawyers be paid?

Class Counsel's attorneys' fees, costs, and expenses will be paid from the Settlement Fund in an amount determined and awarded by the Court. Class Counsel is entitled to seek attorneys' fees up to one-third of the $4.25 million Settlement Fund plus reasonable expenses, but the Court may award less than this amount.

Class Counsel may also seek a Service Award of up to $10,000.00 for each of the Class Representatives for their service in helping to bring and settle the case. Any court-awarded Service Award will be paid out of the Settlement Fund, but the Court may award less than this amount.

## THE COURT'S FINAL APPROVAL HEARING

### 17. When and where will the Court decide whether to approve the Settlement?

The Court will hold a Final Approval Hearing at [**time**] on **[date]** at the Federal Building and U.S. Courthouse, 750 Missouri Ave, East St. Louis, IL 62201. The purpose of the hearing will be for the Court to determine whether to approve the Settlement as fair, reasonable, adequate, and in the best interests of the Settlement Class; to consider Class Counsel's request for attorneys' fees and expenses; and to consider the request for Service Awards to the Class Representatives. At that hearing, the Court will be available to hear any objections and arguments concerning the fairness of the Settlement.

The hearing may be postponed to a different date or time without notice, so it is a good idea to check the Settlement Website, www._____.com, for any updates. If, however, you timely objected to the Settlement and advised the Court that you intend to appear and speak at the Final Approval Hearing, you will receive notice of any change in the date of such Final Approval Hearing.

### 18. Do I have to attend the hearing?

No. Class Counsel will answer any questions the Court may have. But you are welcome to come at your own expense. If you send an objection or comment, you don't have to attend the hearing to talk about it. As long as you filed and mailed your written objection on time, the Court will consider it. You may also retain your own lawyer (at your own expense) to attend, but it's not required.

### 19. May I speak at the hearing?

Yes. You may ask the Court for permission to speak at the Final Approval Hearing. To do so, you must include in your letter or brief objecting to the Settlement a statement saying that you or your attorney intends to appear and speak at the Final Approval Hearing.

## GETTING MORE INFORMATION

### 20. Where do I get more information?

QUESTIONS? CALL 1-800-000-0000 TOLL FREE, OR VISIT www.XXXXXXXXXXXXXXXXXXx.com

This Notice contains only a summary of the Settlement and the proceedings to date. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at [Settlement Website]. You may also write with questions to the Settlement Administrator, [Insert address]. You can also call the Settlement Administrator at 1-XXX-XXX-XXXX or Class Counsel at [class counsel contact], if you have any questions. Before doing so, however, please read this full Notice carefully. You may also find additional information elsewhere on the Settlement website.

**PLEASE DO NOT CONTACT THE COURT, THE CLERK'S OFFICE, DEFENDANT, OR DEFENDANT'S COUNSEL TO ASK QUESTIONS ABOUT THIS ACTION OR THIS NOTICE. THEY CANNOT ANSWER ANY QUESTIONS OR DISCUSS THE ACTION.**

# **EXHIBIT E**

***Lewis, et al., v. Lytx, Inc.,* Case No. 3:22-cv-00046-NJR**
In the United States District Court for the Southern District of Illinois

## SETTLEMENT CLAIM FORM

There are two ways to submit this Claim Form to the Settlement Administrator: (1) online at the Settlement Website listed below, or (2) by U.S. mail at the address listed below.

**ONLINE:**    www.xxxxxxxxxxxxxxxxxxxxxxx.com
**BY MAIL:**    Settlement Administrator
PO Box XXXX
XXXX

**DEADLINE:** If you submit your Claim Form by U.S. Mail, **it must be postmarked by [DATE].** If you file a Claim Form online, **you must do so by 11:59 p.m. EST on [DATE].**

## PART ONE: CLAIMANT INFORMATION

Provide your name and contact information below. It is your responsibility to notify the Settlement Administrator of any changes to your contact information after the submission of your Claim Form.

**FIRST NAME**     **MI**     **LAST NAME**

**STREET ADDRESS**

**CITY**     **STATE**     **ZIP CODE**

**COUNTRY**

**EMAIL ADDRESS**

**PHONE NUMBER**

If you received Notice about the Settlement by mail or email, please provide the Unique ID located on the Notice you received to assist the Settlement Administrator in validating your claim. Please be sure to include the full Unique ID, including all letters and/or numbers that appear.

**Unique ID**

**PART TWO: PAYMENT SELECTION**

Please select one of the following payment options:

        ____     Venmo

        ____     CashApp

        ____     Zelle

        ____     PayPal

Email address associated with your selected account:

| | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

        ____     Physical Check (Payment will be mailed to the address provided in Part One of this Claim Form)

**PART THREE: CERTIFICATION**

To qualify for a cash payment, you must verify that you operated a vehicle equipped with a Lytx DriveCam® Event Recorder while you were in the State of Illinois by completing the following certification.

I certify the following:

(1) Between October 12, 2016 and **[the earlier of Preliminary Approval Date/January 1, 2025]**, while present in the State of Illinois, I operated one or more vehicles equipped with a Lytx DriveCam® Event Recorder and Lytx's MV+AI technology, i.e. machine vision and artificial intelligence, was used to detect distracted driving behaviors.

(2) While operating such vehicle(s), I was employed by and/or drove for the following entity or entities:

_____

_____

_____

_____

(3) All of the information on this Claim Form is true and correct to the best of my knowledge, information, and belief, and I have not submitted another claim in connection with this Settlement and know of no other person having done so on my behalf.

|  | DATE | | – | | – | | |
|---|---|---|---|---|---|---|---|

**SIGNATURE**             MM     DD     YYYY

**Please keep a copy of your Claim Form for your records.**

# **<u>EXHIBIT F</u>**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **JOSHUA LEWIS, individually and**<br>**on behalf of all others similarly situated,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:22-cv-00046-NJR** |
| **MAVERICK TRANSPORTATION**<br>**LLC, and LYTX, INC.,** | |
| **Defendants.** | |

## [PROPOSED] FINAL APPROVAL ORDER AND JUDGMENT

This matter is before the Court on Plaintiffs' unopposed Motion for Final Approval of Class Action Settlement (the "Motion"). The Motion references and incorporates a Class Action Settlement Agreement (the "Settlement" or "Settlement Agreement") that, together with the exhibits thereto, sets forth the terms and conditions for the settlement of claims, on a classwide basis, between Plaintiffs Joshua Lewis, Nathaniel Timmons, and James Cavanaugh ("Plaintiffs") individually and on behalf of the Settlement Class and Defendant Lytx, Inc. ("Lytx" or "Defendant," and, along with Plaintiffs, the "Parties").

Having carefully considered the Motion, the Settlement Agreement together with all exhibits and attachments thereto, the record in this matter, and all of the files, records, and proceedings herein, including arguments set forth at the Final Approval Hearing on the Settlement, and finding good cause,

IT IS HEREBY ORDERED as follows:

1.     This Final Approval Order and Judgment ("Order") incorporates by reference the definitions in the Settlement Agreement, all terms defined therein shall have the same meaning in this Order as set forth in the Settlement Agreement.

2.    The Court has jurisdiction over the subject matter of this Action pursuant to 28

U.S.C. § 1332(d) and personal jurisdiction over the Parties and the members of the Settlement

Class.

3.    The Motion is granted as set forth herein.

### CERTIFICATION OF THE SETTLEMENT CLASS

4.    The Court previously certified a Settlement Class in its Preliminary Approval

Order.

5.    Pursuant to Federal Rule 23(a), (b)(3), and (e), and solely for purposes of

settlement, the Court hereby finally approves certification of the following Settlement Class:

> All individuals who, while present in the State of Illinois, operated a vehicle
> equipped with a Lytx DriveCam® Event Recorder ("DriveCam"), and for
> whom machine vision and artificial intelligence ("MV+AI") was used to
> predict distracted driving behaviors, between October 12, 2016 and the
> earlier of Preliminary Approval or January 1, 2025.

6.    For settlement purposes only, the Court confirms the appointment of Plaintiffs

Joshua Lewis, Nathaniel Timmons, and James Cavanaugh as Class Representatives of the

Settlement Class, and finds that they have adequately represented the Settlement Class.

7.    For settlement purposes only, the Court confirms the appointment of the following

counsel as Class Counsel, and finds they are experienced in class litigation and have adequately

represented the Settlement Class: Carney Bates & Pulliam PLLC; Lieff Cabraser Heimann &

Bernstein LLP; Milberg Coleman Bryson Phillips Grossman PLLC; Workplace Law Partners,

P.C.; Werman Salas P.C.; and Nick Larry Law LLC.

8.    For settlement purposes only, the Court finds that the requirements of Rules 23(a)

and (b)(3) are satisfied for the following reasons:  (1) the Settlement Class is so numerous that

joinder of all members is impracticable; (2) there are questions of law and fact common to

members of the Settlement Class that predominate over questions affecting only individual members (e.g., whether Lytx collected and stored Settlement Class Members' biometric data, without consent, through dash cam devices in a manner that violated BIPA, and whether Plaintiffs and the Settlement Class Members are entitled to uniform statutory damages under BIPA); (3) Plaintiffs' claims are typical of the claims of the Settlement Class; (4) Plaintiffs and Class Counsel have and will continue to fairly and adequately protect the interests of the Settlement Class; and (5) a settlement class action is a superior method of fairly and efficiently adjudicating this Action.

**FINAL APPROVAL OF THE SETTLEMENT AND NOTICE PROGRAM**

9.      The Court approves the Settlement as fair, reasonable, and adequate and in the best interests of the Settlement Class Members. The Court has specifically considered the factors relevant to class settlement approval pursuant to Fed. R. Civ. P. 23, including whether:

> (A)     the Class Representatives and Class Counsel have adequately represented the Settlement Class;
>
> (B)     the Settlement was negotiated at arm's length;
>
> (C)     the relief provided for the Settlement Class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal; (ii) the terms of any proposed award of attorneys' fees and costs, and Class Representative service award, including the timing of payment and any justification for the awards; and (iii) any agreement required to be identified under Rule 23(e)(3); and
>
> (D)     the Settlement treats Settlement Class Members equitably relative to each other.

The Court has also considered other factors relevant to class settlement approval, including, *inter alia*, "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery

completed." *See Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014).

10.    Having considered the terms of the Settlement and the record before it, the Court finds that the Class Representatives and Class Counsel have adequately represented the interests of Settlement Class Members; the settlement consideration provided under the Settlement constitutes fair value given in exchange for the release of the Released Claims against the Released Parties; the Settlement is the result of arm's-length negotiations by experienced, well-qualified counsel that included a day-long mediation conducted by a neutral mediator; the Settlement provides meaningful monetary benefits (*i.e.* a $4,250,000 non-reversionary settlement fund ("Settlement Fund")) to Settlement Class Members and such benefits are not disproportionate to the attorneys' fees and expenses sought by Class Counsel; the benefits provided treat Settlement Class Members equitably; and the Settlement is reasonable and appropriate under the circumstances of this Action, including the risks, complexity, expense and duration of the Action, as well as the reaction of the Settlement Class. The Court further finds that these facts, in addition to the Court's observations throughout the litigation, demonstrate that there was no collusion present in the reaching of the Settlement Agreement, implicit or otherwise.

11.    The Court finds that the notice program as set forth in the Settlement Agreement and effectuated pursuant to the Preliminary Approval Order satisfies the requirements of Federal Rule of Civil Procedure 23(c) and due process and constitutes the best notice practicable under the circumstances and shall constitute due and sufficient notice to the Settlement Class of (a) the nature of the case; (b) the terms of the Settlement, including the definition of the Settlement Class; (c) the class claims and issues; (d) the procedure for objecting to or opting out of the Settlement; (e) that the Court will exclude from the Settlement Class any Settlement Class member who timely and validly requests exclusion; (f) the time and manner for requesting such exclusion; (g) contact

information for Class Counsel, the Settlement Administrator, the Settlement Website, and a toll-free number to ask questions about the Settlement; (h) important dates in the settlement approval process, including the deadlines to request exclusion or object and the date of the Final Approval Hearing; (i) Class Counsel's request for an award of reasonable attorneys' fees and expenses; (j) Class Counsel's request for an award of reasonable attorneys' fees and expenses, and the Class Representatives' application for a service award; and (k) the binding effect of a class judgment on Settlement Class members under Rule 23(c)(3).

12.    The Court hereby reaffirms its appointment of the Settlement Administrator to perform the functions and duties of notice and settlement administration as set forth in the Settlement Agreement and to provide such other administration services as are reasonably necessary to facilitate the completion of the Settlement. Accordingly, Class Counsel and the Settlement Administrator are directed to administer the Settlement in accordance with its terms and provisions.

13.    The individuals or entities identified on Exhibit "A" hereto have timely and validly requested exclusion from the Settlement Class and, therefore, are excluded. These individuals or entities are not included in or bound by the Settlement or this Order. Such individuals or entities are not entitled to any recovery from the settlement proceeds obtained through the Settlement.

14.    No objections were filed in this matter, and any objections to the Settlement Agreement are overruled and denied in all respects.

15.    The Court hereby approves the Settlement in all respects and orders that the Settlement Agreement shall be consummated and implemented in accordance with its terms and conditions.

16.    The Parties, without further approval from the Court, are hereby authorized to agree

and adopt such amendments, modifications, and expansions of the Settlement Agreement and its implementing documents (including all exhibits to the Settlement Agreement) so long as they are consistent in all material respects with this Order and do not limit the rights of Settlement Class Members.

17.    The Court shall retain exclusive, continuing, jurisdiction to resolve any disputes or challenges that may arise as to compliance with the Settlement Agreement, or any challenge to the performance, validity, interpretation, administration, enforcement, or enforceability of the Notice, this Order, or the Settlement Agreement.

18.    In the event that this Order is reversed on appeal or otherwise does not become final, (i) this Order shall be rendered null and void and shall be vacated *nunc pro tunc*, (ii) as specified in the Settlement Agreement, the Settlement Agreement and other related orders shall be rendered null and void and shall be vacated *nunc pro tunc*, (iii) the Settlement Fund shall be refunded to the Defendant, less settlement administrative expenses actually incurred and paid, and (iv) the Action shall proceed as if no settlement had occurred and as otherwise provided for in the Settlement Agreement.

19.    Neither the Settlement Agreement, the Settlement contained therein, the negotiation nor any proceeding or document executed pursuant to or in furtherance thereof, (i) is or shall be construed as, an admission of, or evidence of, the truth of any allegation or of any liability or the validity of any claim or defense, in whole or in part, on the part of any party in any respect, or (ii) is or shall be admissible in any action or proceeding for any reason, other than an action or proceeding to enforce the terms of the Settlement or this Order.

### DISMISSAL AND FINAL JUDGMENT

20.    The Action is hereby dismissed with prejudice, with each party to bear its own

costs.

21.     Upon the Effective Date and by operation of this Order and Final Judgment, the

Releasing Parties (including Plaintiffs and those Settlement Class Members who do not timely

exclude themselves from the Settlement Class), and each of them, shall be deemed to have, and by

operation of the Final Judgment shall have, fully, finally, and forever released, relinquished, and

discharged all Released Claims against the Released Parties, and each of them. Further, upon the

Effective Date, and to the fullest extent permitted by law, each Settlement Class Member, shall,

either directly, indirectly, representatively, or in any capacity, be permanently barred and enjoined

from filing, commencing, prosecuting, continuing, pursuing, intervening in, or participating (as a

class member or otherwise) in any lawsuit, action, or other proceeding in any jurisdiction (other

than participation in the Settlement) against any Released Party based on the Released Claims.

22.     Upon the Effective Date and by operation of this Order and Final Judgment, the

Settlement Agreement will be binding on, and will have *res judicata* and preclusive effect in all

pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiffs and the

Releasing Parties.

23.     This Court hereby directs entry of this Order and Final Judgment pursuant to

Federal Rule of Civil Procedure 58 based upon the Court's finding that there is no just reason for

delay of enforcement or appeal of this Final Judgment.  The Clerk of the Court shall close the file

in this matter.

**ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS**

24.     The Court has also considered Plaintiffs' Motion for Attorneys' Fees, Litigation

Expenses, and Service Awards, as well as the supporting memorandum of law and declarations,

and adjudges that (i) the payment of attorneys' fees in the amount of one-third of the Settlement

Fund, or $1,416,666.67, and (ii) the reimbursement of out-of-pocket litigation expenses in the amount of $_____ are reasonable under Rule 23 and applicable caselaw. Such payment shall be made pursuant to and in the manner provided by the terms of the Settlement Agreement.

25.     The Court further finds that the requested service awards to each of the three (3) Class Representatives are fair and reasonable. As such, the Court approves a service award to each Class Representative in the amount of $10,000, to be paid from the Settlement Fund in the manner and at the times set forth in the Settlement Agreement.


**IT IS SO ORDERED.**

Dated: _____, 20__          _____

HON. NANCY J. ROSENSTENGEL
CHIEF U.S. DISTRICT JUDGE

# **EXHIBIT G**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOSHUA LEWIS, JAMES
CAVANAUGH, and
NATHANIEL TIMMONS,
*individually and on behalf of all
others similarly situated,*

              Plaintiffs,

   v

LYTX, INC.

          Defendant.

Case No. 3:22-CV-00046-NJR

## **AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Joshua Lewis, James Cavanaugh, and Nathaniel Timmons ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through undersigned counsel, bring this amended class action lawsuit for violations of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"), against Defendant Lytx, Inc. ("Lytx" or "Defendant").[1] Plaintiffs allege the following facts based upon personal knowledge and/or the investigation of his counsel:

## **NATURE OF THE ACTION**

1.    Plaintiffs bring this action for damages and other legal and equitable remedies resulting from the illegal actions of Defendant in capturing, collecting, storing, using, and profiting

---

[1] Plaintiff Lewis's original complaint included allegations against Defendant Maverick Transportation, Inc. ("Maverick"). Mr. Lewis and Maverick fully resolved those claims on March 9, 2023, when the Court granted final approval of a class action settlement between them and Defendant Maverick was dismissed from the case. Dkt. 63.

from Plaintiffs' and other similarly situated individuals' biometric identifiers[2] and biometric information[3] (collectively, "biometrics") without first obtaining informed written consent or providing the requisite data retention and destruction policies, in direct violation of BIPA.

2.      Lytx, Inc. is a video telematics and fleet management systems corporation based out of San Diego, California and provides video and analytics services to the transportation industry.  Lytx employs a robust suite of technologies to provide services to its transportation clients, including sensors which monitor the location and movement of the truck itself, the truck's position in relation to other vehicles of objects on the road, and cameras which monitor and record video of both the inside of the cab and the outside of the vehicle.

3.      Lytx's premier technology, however, is its machine vision and artificial technology capabilities—referred to by Lytx is its "MV+AI system" or "MV+AI."  Lytx employs this MV+AI technology in its SF-300 DriveCam ("DriveCam"), a camera which videos the interior of the cab of the truck in order to monitor the driver.  But the DriveCam does more than simply record images; in conjunction with the MV+AI, the DriveCam scans the driver's face geometry and harnesses those biometric data points by feeding them into sophisticated algorithms that identify the driver's actions, in what amounts to constant AI surveillance.  *See* Exhibit 1.

4.      Lytx contracted with various transportation companies, including Maverick in 2020, to incorporate its MV+AI-enabled DriveCam into trucks. Plaintiff Lewis was a truck driver for Maverick, and during the course of his employment drove many times while being recorded by the DriveCam system, and in each instance had his face geometry collected and captured by

---

[2] A "biometric identifier" is defined as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10.

[3] "Biometric information" means "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10.

Lytx in violation of BIPA.

5.    The implementation of this system is problematic because the DriveCam unacceptably violates the rights of truck drivers by scanning their faces and acquiring their face geometry and other biometrics in violation of their statutorily protected rights.

6.    Lytx's technology is employed by more than 4,000 fleets across the country, and over the past 20 years it has continuously gathered data which it uses to program new software products and services.  Lytx claims to hold data based on over *100 billion miles of driving* and continues adding information to a "vast and ever-growing database of driving data we use to refine the accuracy and effectiveness of our solutions."[4]

7.    The act of scanning of drivers' face geometry and storing those collected biometrics in a Lytx facility exposes drivers' sensitive personal data to privacy risks.  If a Lytx server becomes compromised through a data security breach, sensitive personal information based on the scans of these drivers' face geometry could be used to steal their identities or to track them.

8.    The Illinois legislature understood this risk when it enacted the Biometric Information Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"), which imposes strict requirements private entities must follow in conjunction with the collection of biometric identifiers or biometric information.

9.    However, Lytx failed to honor drivers' statutorily protected rights when it collected biometric data in violation of BIPA.  Defendant violated BIPA because it

        (i)    failed to develop a publicly available retention schedule and guidelines for the destruction of biometrics; and

        (ii)    failed to inform drivers of the purpose and length of term for which the

---

[4] https://www.lytx.com/en-us/about-us/our-story (attached as Exhibit 2)

biometrics would be stored or used and failed to obtain a written release from them.

10.     Lytx further violates BIPA because it expressly profits from the collection of the drivers' biometrics when it uses its trove of biometrics stored on its servers to engineer and manufacture new products for sale and to market its existing products to new customers.

11.     Plaintiffs, on behalf of themselves and the class as defined herein, bring this action to prevent Defendant from further violating the privacy rights of citizens in the state of Illinois and to recover statutory damages for Defendant's unauthorized collection, capture, storage anduse of individuals' biometrics in violation of BIPA.

## JURISDICTION AND VENUE

12.     Defendant Lytx is subject to the personal jurisdiction of the Court because it is registered to do business with the State of Illinois, regularly transacts business within the State of Illinois, and has purposefully availed itself of the laws of Illinois for the specific transactions at issue.  Further, the biometrics that give rise to this lawsuit were collected by Defendant from drivers of trucks outfitted with Lytx technology within the State of Illinois.

13.     Venue is proper in this Court because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims took place within this District because Plaintiff Lewis's biometrics were collected in this District.

## PARTIES

14.     Plaintiff Joshua Lewis was, and has been at all relevant times, a resident and citizen of Madison County, Illinois, and an employee as a driver for Maverick.

15.     Plaintiff James Cavanaugh was, and has been at all relevant times, a resident and citizen of Illinois.

4

16.     Plaintiff Nathaniel Timmons was, and has been at all relevant times, a resident and citizen of Illinois.

17.     Defendant Lytx is a software company based in San Diego, CA, and provides video and analytics software services to companies in the transportation industry.  Specifically, Lytx develops and leases to its customers technology which monitors transportation equipment and the operators of that equipment to maximize efficiency and safety.  During the relevant period, Lytx contracted with trucking companies to facilitate MV+AI-enabled DriveCam installations across its fleet to monitor drivers.

## **BACKGROUND**

### I.     The Illinois Biometric Information Privacy Act

18.     In 2008, Illinois enacted BIPA due to the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information." Illinois House Transcript, 2008 Reg. Sess. No. 276.

19.     A "biometric identifier" is defined as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10.

20.     In turn, "biometric information" means "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10.

21.     BIPA makes it unlawful for a company to, *inter alia*, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometrics, unless it first:

>     (1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or                                               stored;
>
>     (2) informs the subject or the subject's legally

> authorized representative in writing of the specific
> purpose and length of term for which a biometric
> identifier or biometric information is being collected,
> stored,                and               used;               and
>
> (3) receives a written release executed by the subject
> of the biometric identifier or biometric information or
> the subject's legally authorized representative.

740 ILCS 14/15 (b).

22.    Section 15(a) of BIPA also provides that:

> A private entity in possession of biometric identifiers
> or biometric information must develop a written
> policy, made available to the public, establishing a
> retention schedule and guidelines for permanently
> destroying biometric identifiers and biometric
> information when the initial purpose for collecting or
> obtaining such identifiers or information has been
> satisfied or within 3 years of the individual's last
> interaction with the private entity, whichever occurs
> first. Absent a valid warrant or subpoena issued by a
> court of competent jurisdiction, a private entity in
> possession of biometric identifiers or biometric
> information must comply with its established
> retention schedule and destruction guidelines.

*Id*. at 14/15(a).

23.    Further, BIPA prohibits a "private entity in possession of a biometric identifier or

biometric information" from "sell[ing], leas[ing], trad[ing], or otherwise profit[ing] from a

person's or a customer's biometric identifier or biometric information." 740 Ill. Comp. Stat. Ann.

14/15(c).

24.    Nor may a private entity "disclose, redisclose, or otherwise disseminate an

individual's biometrics absent written consent."  740 ILCS 14/15(d).

25.    Finally, BIPA places significant security requirements on private entities that

acquire individuals' biometrics, stating that they must: "(1) store, transmit, and protect from

disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry; and (2) store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits, and protects other confidential and sensitive information." 740 ILCS 14/15(e).

## II. Defendant's BIPA-Violative Conduct

### A. Defendant Captures Biometrics Absent Informed Written Consent

#### i. Defendant Collects Biometrics

26.    BIPA clearly prohibits the collection of biometrics when the subject of the biometrics is deprived of the right to be informed of, and consent to, the capture of biometric data. Under BIPA, "[n]o private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

> (1) informs the subject… in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject…in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information.

*See* 740 ILCS 14/15(b).

27.    Lytx offers a suite of technologies designed to enhance the abilities of transportation companies to manage their fleets. One particular system is AI Risk Detection, which "identif[ies] unsafe driving behavior and prompts drivers with in-cab alerts to help them self-

correct in the moment."[5] When paired with Machine Vision the technology can be used to notify transportation companies "when driving behaviors like inattentive driving, speeding, failure to wear a seat belt, smoking, eating, drinking…and using handheld devices occur."[6]

28.    The upshot is that the DriveCam uses MV+AI technology to constantly monitor and analyze the goings-on inside Class members' vehicles.

29.    This constant monitoring fundamentally relies on face detection technology.  First, an algorithm is "trained" to recognize faces in a video after having been fed hundreds of thousands of images of drivers and their behaviors.  Video is then reviewed and tagged by humans; tagged video is then again fed into the algorithm in order to teach it which data should be considered "relevant."  *See* Exhibit 4.

30.    That algorithm is then deployed in the technology behind the DriveCam.  The camera scans a driver's face geometry, identifying a host of unique points around multiple regions of the driver's face (*i.e.*, each eye, the mouth, the nose, the lips, etc.).  Once the DriveCam has successfully detected a driver is present (via a scan, *inter alia*, of face geometry), the DriveCam then applies the MV+AI algorithm described *infra*, and identifies not only the presence of the driver, but also what the driver is *doing* in real time.

31.    Thus, the DriveCam continuously "watches" the driver on whom it is trained; scans the driver's face geometry; analyzes the face geometry scans to determine whether the driver is eating, drinking, looking at a mobile device, smoking, or engaging in other prohibited behavior; and submits an alert to the driver and his or her employer upon making a judgment that the observed behavior (identified via biometric scans) are consistent with its database of video and

---

[5] https://www.lytx.com/en-us/fleet-management/fleet-safety (attached as Exhibit 3)
[6] *Id.*

images which are tagged as being sufficiently relevant events.[7]  Per Lytx, the machine vision component of the MV+AI Camera "sees and recognizes," while the artificial intelligence component of the technology "interprets and decides."





*Figure 1*[8]

---

[7] Fleet Safety, *supra*

[8] https://www.lytx.com/en-us/about-us/our-technology/machine-vision-artificial-intelligence (attached as Exhibit 5)

32.    The following illustrations, from Lytx, demonstrate the functionality of the DriveCam's face-scanning technology:



*Figure 2*[9]



*Figure 3*[10]

---

[9] https://www.lytx.com/en-us/fleet-management/features/risk-id-without-recording (attached as Exhibit 6)

[10] Demystifying MV+AI, *supra*

10



*Figure 4*[11]



*Figure 5*[12]

---

[11] Our Technology, *supra*
[12] *Id.*



*Figure 6*[13]



*Figure 7*[14]

33.    Face detection "is the first and essential step for face recognition," and is used as a

preliminary step to detect faces in images. It is a part of object detection and is used in many areas,

including biometrics.[15]  Face detection "is used to detect faces in real time for surveillance and

tracking of [a] person or objects."[16]

---

[13] *Id*.

[14] *Id*.

[15] *See,* Divyanch Dwivedi, *Face Detection for Beginners*, Towards Data Science (available at
https://towardsdatascience.com/face-detection-for-beginners-e58e8f21aad9) (attached as Exhibit
7)

[16] *Id*.

12

34.      Specifically, face detection technology uses algorithms and machine learning to find human faces within larger images.[17] Face detection algorithms start by scanning the collected image for human eyes, one of the easiest features to detect.  The algorithm then attempts to detect eyebrows, the mouth, nose, nostrils, and the iris.[18] *E.g.*



*Figure 8*[19]

35.      Once the algorithm classifies a sufficient number of data points in the scanned image as belonging to a face (i.e., eyes mouth, nose, nostrils, and iris), it applies additional tests to confirm that it has, in fact, detected a face.[20]

---

[17] *See, generally*, Corrine Bernstein, *Face Detection*, Search Enterprise AI (available at https://searchenterpriseai.techtarget.com/definition/face-detection) (attached as Exhibit 8)
[18] *Id.*; *see, also*, OpenCV, *Cascade Classifier*, (available at https://docs.opencv.org/3.4/db/d28/tutorial_cascade_classifier.html) (attached as Exhibit 9)
[19] Keval Dohsi, *Face Detection using Raspberry Pi and Smartphone*, Hackster.io (available at https://www.hackster.io/keval-doshi/face-detection-using-raspberry-pi-and-smartphone-19f1f2) (attached as Exhibit 10) (describing how to create facial detection technology using OpenCV)
[20] *See, generally*, Bernstein, *Face Detection*, fn 8, *supra*.



*Figure 9* [21]

36.    Once trained, the model extracts specific features, which are then stored in a file so that features from new images can be compared with the previously stored features at various stages. If the image under study passes through each stage of the feature comparison, then a face has been detected and operations can proceed.[22]

37.    The above-described procedures rely on "face landmark detection," generally, in order to identify the specific landmarks on a face (eyes, nose, cheeks, etc.) for face detection.  But face landmark detection is capable of even more sophisticated analyses of the face geometry scans it acquires, enabling Lytx to uniquely identify actions taken by the scanned individual, such as smoking, or eating or drinking, or using a mobile device.

38.    Face detection algorithms like Lytx's are trained by feeding the algorithm a "set of delegate training face images to find out face models."[23]  This approach, called the Appearance-Based Method "rel[ies] on techniques from statistical analysis and machine learning to find the

---

[21] OpenCV, *Cascade Classifier*, fn 9, *supra*.
[22] *See, generally*, Bernstein, *Face Detection*, fn 8, *supra*.
[23] *See,* Divyanch Dwivedi, *supra*

14

relevant characteristics of face images."[24]

39.    Lytx provides the DriveCam, the MV+AI software, and its services, which includes human reviewers, to transportation companies, and as part of this agreement, stores the data at its facilities where further analysis and AI training occurs.  Thus, Lytx actively and continuously scans and collects the face geometry of the driver to determine whether his face indicates he is engaged in prohibited conduct.

### ii.  Defendant Failed to Obtain Written Consent

40.    Defendant collected, and has collected, Plaintiffs' and the putative Class members' biometric identifiers and biometric information when its technology scans their face geometry.

41.    However, at no point are Class members informed of the collection of their biometric identifiers or biometric information, and Class members are never informed in writing the purpose or length of term for which their biometrics are being collected and stored, and they are never requested or invited to provide written consent for Defendant to collect their biometrics.

42.    Lytx provided no written information to Class members, and further purports to disclaim any responsibility for informing the subjects of its surveillance as to what it collects.  The Lytx Privacy Policy expressly disclaims any "responsibility for the privacy or data security practices of [its] clients…" and further excludes from the scope of its Privacy Policy the processing of "Personal Information" in the role of a service provider on behalf of our clients."[25]

43.    Without providing information to Class members in writing pertaining to the collection of biometrics via the DriveCam, and without obtaining informed consent to do so, Defendant violated BIPA.

---

[24] *Id.*
[25] Lytx Privacy Policy, https://www.lytx.com/en-us/privacy-policy (attached as Exhibit 11)

### B. Defendant Failed to Maintain Publicly Available Retention and Destruction Guidelines

44.    As private entities engaged in the collection, capture, storage, and use of biometric identifiers and biometric information, BIPA requires Defendant to "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining the [biometrics] has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a)

45.    Lytx designed its DriveCam and the MV+AI technology and contracted with trucking companies to install and operate its DriveCam system for the purpose of scanning the face geometry of employees and storing the data at its facilities.

46.    Lytx hosts a privacy policy on its website, but expressly "excludes from coverage under its Privacy Policy the processing of Personal Information in the role of a service provider on behalf of [its] clients."[26]

47.    As a private entity that collect biometrics, Defendant violated BIPA by failing to establish a publicly available retention schedule and destruction guidelines for the biometric identifiers or biometric information of truck drivers.

### C. Lytx Profits from the Collection of Biometrics

48.    BIPA expressly prohibits behavior which would create a market for biometrics. "No private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

---

[26] *Id.*

49.    Lytx develops and operates technology systems, including its DriveCam, for use in the transportation industry, and said technology is fundamentally based on capturing the biometrics of truck drivers.  Lytx collects this sensitive data and stores it along with data collected from over "100 billion miles of driving" and uses the data to improve the effectiveness of its software.[27]

50.    Moreover, Lytx sells its biometrics-collecting system to companies with claims that by using its services "[o]ur clients can realize significant returns on investment by lowering operative and insurance costs."[28]

51.    Lytx strategically markets its products based on its acquisition of biometrics in violation of BIPA.  According to Lytx, the precision of its technology at predicting and preventing undesired driving behaviors is the fact it can draw from such a large stockpile of data which it stores on its premises for continual and repeated reviews using human analysis.  Lytx claims it "uses innovative technology to reliably uncover risk" and its technology is superior to its competitors because it holds "the best data."[29] Going further: "The combination of high data volume and accuracy means that our MV+AI algorithms have better raw materials to work with, helping to deliver more precise results so that you aren't wading through an ocean of irrelevant information."[30]

52.    Lytx not only uses biometrics to create new products and software to sell, but explicitly markets its products and services based on the collection of biometrics.

53.    Lytx is engaged in a market based on the use and sale of biometrics in violation of BIPA.

---

[27] https://www.lytx.com/en-us/news-events/press-release/2018/lytx-presents-state-of-the-data (attached as Exhibit 12).
[28] Our Story, *supra*
[29] Demystifying, *supra*
[30] *Id.*

### III.    Plaintiffs' Experience

#### A.  Plaintiff Lewis

54.    As part of his duties as an over-the-road driver for Maverick, Plaintiff Lewis's truck was retrofitted with the DriveCam in or around October 2020.

55.    Plaintiff Lewis is an Illinois resident whose biometrics were scanned by the DriveCam and by Lytx's MV+AI software while in the state of Illinois, with full knowledge of Maverick and Lytx, and at Maverick's direction. Maverick assigned Plaintiff Lewis routes as an over-the-road driver which regularly directed him to operate his truck within the state of Illinois multiple times per week.  Defendant Lytx was also aware its software was utilized upon Plaintiff Lewis within the State of Illinois because Lytx tracks the geolocation of its cameras as part of its data collection and analysis service.[31]  Thus, Defendant knew Plaintiff Lewis's physical location while the surveillance technology was in use.

56.    In the course of his employment for Maverick, Plaintiff Lewis was required to undergo the DriveCam's scanning procedures in a manner substantially similar—if not identical—to the processes set forth above.

57.    In so doing, Defendant Lytx's technology scanned, captured, collected and obtained Plaintiff Lewis's face geometry and stored his biometrics.

58.    Neither Maverick nor Lytx informed Plaintiff Lewis they were capturing and collecting his biometrics or the purpose and length of time for such collection, nor did Defendant obtain Plaintiff Lewis's written consent beforecapturing his biometrics.  Plaintiff Lewis never consented, agreed, or gave permission—written or otherwise—to Defendant for the collection, storage, or use of his biometrics.

---

[31] *Id.*

59.     Likewise, Defendant never provided Plaintiff Lewis with the requisite statutory disclosures nor an opportunity to prohibit or to prevent the collection, storage or use of his biometrics.

60.     Moreover, despite BIPA's clear prohibition against the sale, lease, trade, or otherwise profiting from the collection of biometrics, Lytx collected Plaintiff Lewis's biometrics for storage and analysis in a Lytx facility along with a collection of "over 100 billion miles of driving" for the purpose of "tagging them for potentially hazardous behaviors and conditions."[32] Thus, Defendant Lytx collected Plaintiff Lewis's biometrics to be used for the purposes of training and informing existing technologies and developing and marketing new products for sale by Lytx.

61.     Plaintiff Lewis was deprived of his right to protect his biometrics when Defendant captured his biometrics without informing him of this practice, without obtaining his informed written consent to do so, and by exploiting Plaintiff Lewis's most sensitive personal data for profit. In so doing, Defendant invaded Plaintiff Lewis's statutorily protected right to privacy in his biometrics.

## B. Plaintiff Cavanaugh

62.     As part of his duties as an over-the-road driver for Quikrete, Plaintiff Cavanaugh's truck was retrofitted with the DriveCam.

63.     Plaintiff Cavanaugh is an Illinois resident whose biometrics were scanned by the DriveCam and by Lytx's MV+AI software while in the state of Illinois, with full knowledge of Lytx. Mr. Cavanaugh drove his truck for his employer, Quikrete, within Illinois. Defendant Lytx was also aware its software was utilized upon Plaintiff Cavanaugh within the State of Illinois because Lytx tracks the geolocation of its cameras as part of its data collection and analysis

---

[32] *Id.*

service.[33]  Thus, Defendant knew Plaintiff Cavanaugh's physical location while the surveillance technology was in use.

64.    In the course of his employment, Plaintiff Cavanaugh was required to undergo the DriveCam's scanning procedures in a manner substantially similar—if not identical—to the processes set forth above.

65.    In so doing, Defendant Lytx's technology scanned, captured, collected and obtained Plaintiff Cavanaugh's face geometry and stored his biometrics.

66.    Lytx did not inform Plaintiff Cavanaugh that it was capturing and collecting his biometrics or the purpose and length of time for such collection, nor did Defendant obtain Plaintiff Cavanaugh's written consent before capturing his biometrics.  Plaintiff Cavanaugh never consented, agreed, or gave permission—written or otherwise—to Defendant for the collection, storage, or use of his biometrics.

67.    Likewise, Defendant never provided Plaintiff Cavanaugh with the requisite statutory disclosures nor an opportunity to prohibit or to prevent the collection, storage or use of his biometrics.

68.    Moreover, despite BIPA's clear prohibition against the sale, lease, trade, or otherwise profiting from the collection of biometrics, Lytx collected Plaintiff Cavanaugh's biometrics for storage and analysis in a Lytx facility along with a collection of "over 100 billion miles of driving" for the purpose of "tagging them for potentially hazardous behaviors and conditions."[34]  Thus, Defendant Lytx collected Plaintiff Cavanaugh's biometrics to be used for the purposes of training and informing existing technologies and developing and marketing new products for sale by Lytx.

---

[33] *Id*.
[34] *Id.*

69.     Plaintiff Cavanaugh was deprived of his right to protect his biometrics when Defendant captured his biometrics without informing him of this practice, without obtaining his informed written consent to do so, and by exploiting Plaintiff Cavanaugh's most sensitive personal data for profit.  In so doing, Defendant invaded Plaintiff Cavanaugh's statutorily protected right to privacy in his biometrics.

### C.  Plaintiff Timmons

70.     As part of his duties as an over-the-road driver for Gemini Motor Transport L.P. ("GMT"), Plaintiff Timmons's truck was retrofitted with the DriveCam.

71.     Plaintiff Timmons is an Illinois resident whose biometrics were scanned by the DriveCam and by Lytx's MV+AI software while in the state of Illinois, with full knowledge of Lytx.  Mr. Cavanaugh drove his truck for his employer, GMT, within Illinois, beginning in 2020.  Defendant Lytx was also aware its software was utilized upon Plaintiff Timmons within the State of Illinois because Lytx tracks the geolocation of its cameras as part of its data collection and analysis service.[35]  Thus, Defendant knew Plaintiff Timmons's physical location while the surveillance technology was in use.

72.     In the course of his employment, Plaintiff Timmons was required to undergo the DriveCam's scanning procedures in a manner substantially similar—if not identical—to the processes set forth above.

73.     In so doing, Defendant Lytx's technology scanned, captured, collected and obtained Plaintiff Timmons's face geometry and stored his biometrics.

74.     Lytx did not inform Plaintiff Timmons that it was capturing and collecting his biometrics or the purpose and length of time for such collection, nor did Defendant obtain Plaintiff

---

[35] *Id.*

Timmons's written consent beforecapturing his biometrics.  Plaintiff Timmons never consented, agreed, or gave permission—written or otherwise—to Defendant for the collection, storage, or use of his biometrics.

75.    Likewise, Defendant never provided Plaintiff Timmons with the requisite statutory disclosures nor an opportunity to prohibit or to prevent the collection, storage or use of his biometrics.

76.    Moreover, despite BIPA's clear prohibition against the sale, lease, trade, or otherwise profiting from the collection of biometrics, Lytx collected Plaintiff Timmons's biometrics for storage and analysis in a Lytx facility along with a collection of "over 100 billion miles of driving" for the purpose of "tagging them for potentially hazardous behaviors and conditions."[36]  Thus, Defendant Lytx collected Plaintiff Timmons's biometrics to be used for the purposes of training and informing existing technologies and developing and marketing new products for sale by Lytx.

77.    Plaintiff Timmons was deprived of his right to protect his biometrics when Defendant captured his biometrics without informing him of this practice, without obtaining his informed written consent to do so, and by exploiting Plaintiff Timmons's most sensitive personal data for profit.  In so doing, Defendant invaded Plaintiff Timmons's statutorily protected right to privacy in his biometrics.

## CLASS ALLEGATIONS

78.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of similarly situated individuals ("the Class"), defined as follows:

> All individuals who, while present in the State of Illinois, operated
> a vehicle equipped with a DriveCam, and for whom MV+AI was

---

[36] *Id.*

used to predict distracted driving behaviors, between October 12, 2016 and the earlier of Preliminary Approval[37] or January 1, 2025.

79.    Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendant, Defendant's predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which Defendant or its parents have a controlling interest, as well as Defendant's current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendant; and (f) the legal representatives, successors, and assigns of any such excluded persons.

80.    **Numerosity**: the number of persons within the tens-of-thousands. It is, therefore, impractical to join each member of the Class as a named Plaintiff. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Defendant's records.

81.    **Commonality & Predominance**: there are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to, the following:

(a)    whether Defendant captured, collected, or otherwise obtained Plaintiffs' and Class members' biometrics;

(b)    whether Defendant properly informed Plaintiffs and the Class that it captured, collected, used, and stored their biometrics;

_____

[37] Plaintiffs are herewith moving for preliminary approval of a class action settlement with Lytx.

23

(c) whether Defendant obtained a written release to capture, collect, use, and store Plaintiffs' and Class members' biometrics;

(d) whether Defendant sold, leased, traded, or profited from Plaintiffs' and Class members' biometrics;

(e) whether Defendant disclosed, redisclosed, or otherwise disseminated Plaintiffs' and Class members' biometrics absent consent; and

(f) whether Defendant's violations of BIPA were committed intentionally, recklessly, or negligently.

82.    **Typicality and Adequate Representation**: Plaintiffs, who like other members of the putative class, had their biometrics captured and retained by Defendant, have claims that are typical of the class. Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex privacy class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of such a Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional Class representatives to represent the Class or additional claims as may be appropriate.

83.    **Propriety of Class Treatment**: a class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is impracticable. Even if every member of the Class could afford to invest the time and expense necessary to pursue individual litigation, the Court system could not. It would

be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual and legal issues. By contrast, the maintenance of this action as a class action presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiffs anticipate no difficulty in the management of this action as a class action. Class-wide relief is essential to compliance with BIPA.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF 740 ILCS 14/15(a)
*Failure to Develop Written Retention Schedule*
*And Destruction Guidelines*

84.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

85.    Defendant, Lytx, is a private entity as contemplated by BIPA.

86.    Lytx provides cameras to trucking companies, installs or assists in the installation of its cameras in trucks, leases its surveillance software to trucking companies, provides servicing and analysis of data obtained from its cameras and software, and stores the data obtained from its cameras and software internally.

87.    BIPA requires any private entity in possession of biometric identifiers or biometric information to develop a publicly available written policy, establishing both a retention schedule and guidelines for the permanent destruction of biometric identifiers and biometric information. BIPA requires the policy to comply with destruction timelines of either (i) when the initial purpose for which the collection of such identifiers or information has been satisfied or (ii) within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS

25

14/15(a)

88.    Lytx does not have a publicly available written retention schedule or guidelines for the destruction of biometric data anywhere on its website or otherwise available for review by the public.  In fact, Lytx's Privacy Policy *expressly* indicates it does not apply "to the extent [it] process[es] Personal Information in the role of a service provider on behalf of [its] clients." Further, it directs the reader to the respective client for information pertaining to privacy and disclaims any responsibility for the "privacy or data security practices of our clients, which may differ from those set forth in this Privacy Policy."

89.    Lytx's Terms of Service and Privacy Policy are silent on the issue of biometric identifiers or biometric information.

90.    On behalf of themselves and the Class, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, use and dissemination of biometrics as described herein; (3) statutory damages of $5,000 from Defendant for each intentional and/or reckless violation of BIPA or, in the alternative, statutory damages of $1,000 from Defendant for each negligent violation of BIPA; and (4) reasonable attorneys' fees and costs and other litigation expenses.  *See* 740 ILCS 14/20.

## COUNT II
## VIOLATION OF 740 ILCS 14/15(b)
### *Failure to Obtain Informed Written Consent*
### *and Release Before Obtaining Biometrics*

91.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

92.    Defendant, Lytx, is a private entity as contemplated by BIPA.

93.    BIPA requires private entities to obtain informed written consent from employees

before acquiring their biometric data. Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] first:

    A.  informs the subject…in writing that a biometric identifier or biometric information is being collected or stored;

    B.  informsthe subject…in writing of the specific purpose and length of term for which a biometric identifieror biometric information is being collected, stored, and used; **and**

    C.  receives a written release executed by the subject of the biometric identifier or biometric information…"

740 ILCS 14/15(b)(emphasis added).

94.    Defendant failed to comply with these BIPA mandates.

95.    Defendant systematically and automatically captured, collected, obtained, used, stored and disseminated Plaintiffs' and Class members' biometrics without first obtaining the written release required by 740 ILCS 14/15.

96.    Defendant never informed Plaintiffs and the Class in writing that their biometrics were being captured, collected, obtained, stored, used and disseminated, nor did Defendant inform Plaintiffs and the Class in writing of the specific purpose(s) and length of term for which their biometrics were being collected, stored, used and disseminated as required by 740 ILCS 14/15.

97.    By collecting, storing, using and disseminating Plaintiffs' and Class members' biometrics as described herein, Defendant violated Plaintiffs' and Class members' rights to privacy in their biometrics as set forth in BIPA. *See* 740 ILCS 14/1, *et seq*.

98.    On behalf of themselves and the Class, Plaintiffs seek: (1) declaratory relief; (2)

injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, use and dissemination of biometrics as described herein; (3) statutory damages of $5,000 from Defendant for each intentional and/or reckless violation of BIPA or, in the alternative, statutory damages of $1,000 from Defendant for each negligent violation of BIPA; and (4) reasonable attorneys' fees and costs and other litigation expenses. *See* 740 ILCS 14/20.

### COUNT III
### VIOLATION OF 740 ILCS 14/15(c)
*Selling, Leasing, Trading, or Otherwise Profiting From*
*a Person's or a Customer's Biometrics.*

99.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

100.    Defendant, Lytx, is a private entity as contemplated by BIPA.

101.    Lytx develops, manufactures, and markets products to transportation clients, such as its MV+AI technology which, in its continuous monitoring of the machine operators, collects biometric identifiers or biometric information.

102.    Lytx uses the collection of biometrics to further its capacity to engineer products which utilize biometric technology, having stored 100 billion miles of driving data on its servers for analysis and development.

103.    Lytx additionally uses its collection of biometrics to market and sell its current products and services to new clients, increasing its market share of the biometrics industry.

104.    BIPA expressly prohibits a "private entity in possession of a biometric identifier or biometric information" from "sell[ing], leas[ing], trad[ing], or otherwise profit[ing] from a person's or a customer's biometric identifier or biometric information." 740 Ill. Comp. Stat. Ann. 14/15(c).

105.    As detailed herein, Defendant clearly and deliberately profited from the collection

of Plaintiffs' and Class Members' biometrics either through the reduction of costs as a result of the collection, or the collection, analysis, and repackaging of the data for sale and development of additional technologies.

106.    On behalf of themselves and the Class, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, use and dissemination of biometrics as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA; and (4) reasonable attorneys' fees and costs and other litigation expenses. *See* 740 ILCS 14/20.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that this Court enter an Order:

A.    Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as Class Counsel;

B.    Declaring that Defendant's actions, as set out above, violate BIPA, 740 ILCS 14/1, *et seq.*;

C.    Awarding statutory damages of $5,000.00 for each and every intentional and reckless violation of BIPA, or alternatively, statutory damages of $1,000.00 for each and every negligent violation of BIPA;

D.    Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*, an Order requiring Defendant to comply with BIPA;

E.    Awarding Plaintiffs and the Class their reasonable attorneys' fees and costs and other litigation expenses;

F.    Awarding Plaintiffs and the Class pre- and post-judgment interest, to

29

the extent allowable; and

G.   Awarding such other and further relief as equity and justice may require.

Dated:  November 22, 2024                    Respectfully submitted,

*/s/ Randall K. Pulliam*
Randall K. Pulliam

Randall K. Pulliam, (admitted *pro hac vice*)
rpulliam@cbplaw.com
Samuel R. Jackson (admitted *pro hac vice*)
sjackson@cbplaw.com
CARNEY BATES AND PULLIAM, PLLC
519 West 7th Street
Little Rock, AR 72201
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

J. Dominick Larry
NICK LARRY LAW LLC
8 S. Michigan Ave., Suite 2600
Chicago, IL 60603
Telephone: 773.694.4669
Facsimile: 773.694.4691
nick@nicklarry.law

*Attorneys for Plaintiffs and the Class*

Jason L. Lichtman (admitted *pro hac vice*)
jlichtman@lchb.com
Sean A. Petterson (admitted *pro hac vice*)
spetterson@lchb.com
LIEFF   CABRASER   HEIMANN   &
BERNSTEIN LLP
250 Hudson St., 8th Floor
New York, New York 10013
(212) 355-9500

Douglas M. Werman
dwerman@flsalaw.com
WERMAN SALAS P.C.
77 W. Washington Street, Suite 1402
Chicago, Illinois 60602
(312) 419-1008

David Fish
dfish@fishlawfirm.com
WORKPLACE LAW PARTNERS, P.C.
111 E. Wacker Dr., Suite 2300
Chicago, IL 60601
(312) 861-1800

Gary M. Klinger
gklinger@milberg.com
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
227 W. Monroe Street,
Suite 2100
Chicago, IL 60606
(866) 252-0878

*Attorneys for Plaintiffs and the Class*

# EXHIBIT 1

# HARDWARE COMPARISON

LYTX® EVENT RECORDERS

  

| SPECIFICATIONS | DC3P | ER-SV2 | SF-SERIES |
|---|---|---|---|
| **Event Recorder Unit** | | | |
| Weight | .52 lb | .38 lb<br>Base Unit: 2 lb 9 oz | .74 lb |
| Dimensions (W x H x D) | 4.6 x 4.3 x 2.1 in<br>12 x 11 x 5 cm | 4.6 x 3.2 x 2.3 in<br>Base Unit: 8.5 x 5.0 x 1.5 in | 5.0 x 4.2 x 2.2 in |
| Operating Temperature | –40°F to 185°F | –40°F to 185°F<br>Base Unit: –40°F to 149°F | –40°F to 185°F |
| Microphone | Omnidirectional | Omnidirectional | Omnidirectional |
| In-Vehicle Audible Alerts on Select Triggers | No | No | SF300: Yes<br>SF200: No<br>SF64: No |
| Status Lights | 2 LED (red, green) | 7 LED (wide spectrum) | 7 LED (wide spectrum) |
| Night Vision Illumination | 6 high-lumen infrared LED lights | 8 high-lumen infrared LED lights | 8 high-lumen infrared LED lights |
| Manual Record Buttons | Yes | Yes | Yes |
| Industrial-grade Hardware | Yes | Yes | Yes |
| Limited Warranty | 2 Years | 2 Years | 2 Years |
| **Machine Vision + Artificial Intelligence (MV+AI)** | | | |
| Configurable Inside View Triggers<br>• Handheld Device<br>• No Seat belt<br>• Driver Smoking<br>• Food or Drink | No | No | SF300: All<br>SF200: No<br>SF64: No |
| Configurable Road View Triggers<br>• Rolling Stop<br>• Lane Departure<br>• Following Distance<br>• Critical Distance | No | All | SF300: All<br>SF200: Rolling Stop Only<br>SF64: Rolling Stop Only |
| Lytx Badge (Driver ID) | No | All | SF300: Yes<br>SF200: Yes<br>SF64: No |
| **Internal** | | | |
| Processor | Single-core 180 MHz | Quad-core 1 GHz | SF300: Dual Core 1.0 GHz; 512 KB cache<br>SF200: Dual Core 1.0 GHz; 512 KB cache<br>SF64: Dual Core 1.0 GHz; 512 KB cache |
| Internal Memory | 128 MB | 1 GB | SF300: 1 GB<br>SF200: 1 GB<br>SF64: 512 MB |
| Internal Storage | 4 GB | 16 GB | SF300: 16 GB<br>SF200: 16 GB<br>SF64: 64 GB |
| Memory Format | NAND | eMMC | eMMC |
| Expandable/External Memory | No | No | SF300: 128 GB<br>SF200: 128 GB<br>SF64: No |

**LYTX EVENT RECORDERS**

| SPECIFICATIONS | DC3P | ER-SV2 | SF-SERIES |
|---|---|---|---|
| **Internal (cont.)** | | | |
| Motion Sensors | • 3-Axis (Accelerometer)<br>• Built-in G-Force and motion sensor<br>• Built-in GPS | • 6-axis (Accelerometer + Gyro)<br>• Built-in G-Force and motion sensor<br>• Built-in GPS | • 9-axis (Accelerometer + Gyro + Magnetometer)<br>• Built-in G-Force and motion sensor<br>• Built-in GPS |
| **Recording** | | | |
| Wide Angle Lens / Field of View | 131° interior; 88° exterior | 131° interior; 82° exterior | 128° interior; 84° exterior (SF64)<br>128° interior; 78° exterior (SF200/SF300) |
| Video Recording Resolution | 768 x 576 | 752 x 548 | 752 x 548 (SF64)<br>1280 x 800 (SF200/SF300) |
| Frame Rate | 4 fps | 10 fps | 10 fps |
| DVR Capable | Yes | Yes | Yes |
| ActiveVision Capable | No | Yes | No<br>Yes (SF300: MV+AI Road View) |
| ECM Support | • Speed Management<br>• Fuel Reporting<br>• ADAS Management | • Speed Management<br>• Fuel Reporting<br>• ADAS Management<br>• ActiveVision® Service/<br>  Road View MV+AI | • Speed Management<br>• Fuel Reporting<br>• ADAS Management<br>• ActiveVision® Service/<br>  Road View MV+AI |
| Configurable Internal / External Lens | Yes | No | Yes |
| **Connectivity** | | | |
| Cellular | CDMA or GSM | CDMA or GSM | CDMA or GSM |
| Wi-Fi via Hotspot | Wi-Fi b/g 2.4 GHz | Wi-Fi b/g/n 2.4 GHz | SF300: Wi-Fi b/g/n/ac 2.4/5 GHz<br>SF200: Wi-Fi b/g/n/ac 2.4/5 GHz<br>SF64: N/A |
| Bluetooth Capable | No | Yes | Yes |
| Ethernet | No | Yes | Yes |
| **Power** | | | |
| Battery | Non-rechargeable | Rechargeable | SF300: Rechargeable<br>SF200: Rechargeable<br>SF64: Non-rechargeable |
| Standard Input Voltage | 12V or 24V | 12V or 24V | 12V or 24V |
| Power Draw (12V)<br><br>Ignition On (cellular)<br>• Not Transmitting<br>• Transm tting | 228mA | 530mA | SF300: 320 mA<br>SF200: 320 mA<br>SF64: 228 mA |
| Ignition Off (cellular)<br>• Not Transmitting<br>• Transm tting | 438 mA | 620 mA | SF300: 540 mA<br>SF200: 540 mA<br>SF64: 438 mA |
| Power Draw (hibernation) | <1mA | <1mA | Hibernation: 20 mA (cellular on)<br>Deep Sleep: <1 mA (cellular off) |
| Disconnect Reporting | Yes | Yes | Yes |
| Hibernation | Default: 15 Min | Default: 15 Min | Default: 15 Min |
| **Installation** | | | |
| Trigger In | Qty 2 | Qty 5 | Qty 4 |
| Trigger Out | Qty 1 | Qty 3 | Qty 1 |
| ECM / ECU Integration | Via VBI J1939<br>Via B&B module OBDII | J1939, FMS | J1939 |
| Recommended Mounting Location | Windshield<br>Bulkhead | Windshield<br>Bulkhead | Windshield<br>Bulkhead |
| Installation Services Available | Lytx Professional Installation Services<br>Training & support for client-managed<br>Installation | Lytx Professional Installation Services<br>Training & support for client-managed<br>Installation | Lytx Professional Installation Services<br>Training & support for client-managed<br>Installation |

LYTX EVENT RECORDERS

| SPECIFICATIONS | DC3P | ER-SV2 | SF-SERIES |
|---|---|---|---|
| **Included Accessories** | | | |
| ECM Cable | No | Yes | Yes |
| Mounting Bracket | Non-removable | Non-removable<br>Base Unit: Removable | Non-removable |
| Informational Guide | Yes | Yes | Yes |

DISCLAIMER: Lytx® event recorders are intended as a driver aid only and are not a substitute for a safe, conscientious driver. Lytx event recorders cannot compensate for a driver that is distracted, inattentive, or impaired by fatigue, drugs, or alcohol. It is always the responsibility of the driver to take appropriate corrective action. Never wait for the Lytx event recorder to provide a warning before taking measures to avoid an accident. Failure to do so can result in serious personal injury or death, or severe property damage.

© 2020 Lytx, Inc. All rights reserved. 0220-MUL-100-029



# EXHIBIT 2



**OUR STORY**

# Redefining safety on our roadways with innovation backed by experience

## Industry-leading fleet and compliance management solutions



At Lytx®, we harness the power of video and data to enable fleets to improve safety, efficiency, and productivity. We're trusted by more than 4,000 fleets that log billions of miles worldwide each year, contributing to a vast and ever-growing database of driving data we use to refine the accuracy and effectiveness of our solutions. Our clients can realize significant returns on investment by lowering operating and insurance costs. Most of all, we strive to save lives—on our roads and in our communities, every day. We dream of a world where no commercial driver is ever the cause of a collision.

We're driven by a passion to improve safety on our roadways. Our solutions enhance vehicles with a suite of cloud-connected dash cams, sensors, telematics, and services that help transform fleet safety and operations.

# Our mission

We believe that video enriches everything. We empower optimal fleet visibility and operations through the power of video telematics.





## Innovation guided by experience

We draw from more than 20 years of industry leadership to create smart solutions that truly help solve our customers' challenges. Our unparalleled database of driving behavior — more than 120 billion miles and growing each day — trains our machine vision and artificial intelligence-based solutions to recognize and flag risky driving with incredible accuracy. We cut through the noise to deliver real insights that help our clients save valuable time and prioritize focus where it matters most to help improve driver safety and protect their bottom lines.

**ABOUT OUR FLEET MANAGEMENT SOLUTIONS**

## We're invested in your success

Our team offers customized support at every stage of the process, from trial to implementation, to ensuring return on investment.

**MEET OUR TEAM**



## Improving safety on our roadways

Our passion for safety and saving lives drives incredible results.

**1.3M**

More than 1.3 million drivers protected worldwide

**625K**

Our clients saw 625,000 fewer instances of risky driving in 2018*

**120B**

120 billion miles of professionally analyzed driving data

# We've worked with companies across multiple industries with fleets from 5 to 500+ vehicles.

Industry: All

Fleet Size: All

Result: All



**DISTRIBUTION**

**Murphy-Hoffman Company sees 79% reduction in roadway collisions with Lytx**

79% reduction in on-roadway collisions
33% improvement in frequency and severity of incidents
59% reduction in cell phone usage while driving

Fleet Size: 500+
Result: Improve Driver Performance

**TRUCKING**

**Dart Transit Company decreases near collisions by 65% with Lytx**

65% decrease in near collisions
77% improvement in late response
69% improvement in following distance

Fleet Size: 500+
Result: Improve Driver Performance

**GOVERNMENT**

**The City of Mobile, Alabama, reduces collisions by 62% with Lytx**

62% reduction in collisions
39% reduction in risky driving behaviors
50% reduction in near collisions

Fleet Size: 50-499
Result: Manage Fleet Risk

**DISTRIBUTION**

**Southern Maryland Oil reduces identified collisions by 59% with Lytx**

86% reduction in cell phone use
69% improvement in unbelted events
59% reduction in identified* collisions

Fleet Size: 50-499
Result: Improve Driver Performance

**TRUCKING**

**JBS Carriers sees an 80% improvement in traffic violations with Lytx**

80% overall improvement in traffic violations
61% improvement in following distance
88% improvement in driver seat belt usage

Fleet Size: 500+
Result: Improve Driver Performance

**GOVERNMENT**

**U.S. Department of State reduces near collisions with the Lytx Driver Safety Program**

62% reduction in near collisions
54% decrease in the number of events
49% reduction in event severity

Fleet Size: 500+
Result: Improve Driver Performance

**WASTE**

**Liquid Environmental Solutions reduces the severity of risky driving events with the Lytx Driver Safety Program**

80% reduction in traffic violations
58% reduction in severity of risky driving events
61% reduction in cell phone use

Fleet Size: 50-499
Result: Manage Fleet Risk

**TRUCKING**

**Cargo Transporters reduces fraudulent claims costs with the Lytx Driver Safety Program**

83% decrease in near collisions
76% reduction in traffic violations
33% drop in unbelted drivers

Fleet Size: 500+
Result: Manage Fleet Risk

LOAD MORE

# Industry involvement

Lytx is an active participant in 50 key industry associations that support and advocate for commercial transportation safety and the interests of our clients across the trucking, concrete, construction, waste, government, distribution, and field services industries. In addition, we participate in educational workshops, sponsor industry events, and support key initiatives. Our engagement at the industry level helps us stay abreast of trends, advocate for legislation, promote key market activities, and design solutions to address real-world challenges.

ABOUT WHO WE SERVE





## More than 20 years of innovation

From monumental product launches to technological breakthroughs, here's a look in the rearview mirror at our history.

**1998** DriveCam, Inc. is founded

**1999** Introduced the first vehicle camera to record crashes

**2001** Developed a camera with both road-facing and driver-facing lens

**2002** Launched software to enable review and scoring of driving video

**2006** Introduced the driver coaching model

**2009** Launched online program management platform

**2011** Acquired RAIR Technologies® to round out compliance offering

**2013** Changed the company's name to Lytx, Inc.

**2015** Launched first camera equipped with machine vision and artificial intelligence

**2015** Launched continual video coverage and optional extra cameras

**2018** Surpassed 100 billion miles of driving data analyzed

**2019** Launched new, customizable fleet management solutions

# Combine services to build a comprehensive solution that meets your needs



### Driver safety solutions

Proactively manage your fleet risk with tools to help you change behavior, prevent collisions, and improve your bottom line.



### Fleet tracking

Get real-time* access to fleet status to help you respond faster, reduce callbacks, and optimize productivity.



### DOT compliance services

Meet the mandates with devices and services that streamline and simplify compliance management.



## Get started today.

**1-866-419-5861     Contact Us     Book a Demo**

**SOLUTIONS**

Fleet Management Overview

Fleet Dash Cams

Fleet Safety

Fleet Tracking

DOT Compliance

ELD Compliance

FedEx VEDR

Lytx Integration Network

**FEATURES**

DriveCam Event Recorder

Lytx Driver App

Machine Vision and Artificial Intelligence

Risk ID Without Recording

Continual Behavior Reporting

Preventative Maintenance

Diagnostic Trouble Codes

**SUPPORT & LOGIN**

Support

Lytx Account Login

Lytx Compliance Services (RAIR) Portal

Lytx DriveCam Academy

Parts Store

**GUIDES**

ADAS

CSA Scores

Defensive Driving for Commercial Fleets

Distracted Driving

DOT Regulations

ELD Guide

Fleet Maintenance

Fleet Management App

**ABOUT US**

Our Story

Our Technology

Our Team

Careers

News and Events

Who We Serve

Success Stories

**RESOURCES**

Blog

Buyer's Guide to Video Telematics

The Fleet Podcast

Videos

All Resources

# EXHIBIT 3



GET PRICING

**LYTX DRIVER SAFETY**

# Fleet safety solutions

Empower drivers to address distractions and avoid collisions with our configurable fleet safety program

## Driver safety is key to protecting your bottom line

Start changing driver behavior today while also ensuring lasting change over the long haul. Our driver safety solutions help fleets achieve maximum, sustained results with minimal time and effort. Our driver-centric tools help you prevent collisions – before they happen – to protect your bottom line.

Our machine vision and artificial intelligence technology can help detect and deter distracted driving, adding a variety of flexible coaching options, customizable reporting, and accurate, professional review of more than 60 risky driving behaviors. It's a powerful, proven, and efficient solution to help improve fleet safety management and performance – quickly and easily.

BOOK A DEMO



# How it works

See what our fleet safety solutions can do for you.



1:40



## Detect distracted driving in the moment with advanced MV+AI technology

Our machine vision and artificial intelligence (MV+AI) technology can help you detect distracted driving inside and outside the vehicle and alert your drivers to behaviors associated with collisions, including cell phone use, seat belt use, inattentiveness, eating and drinking, smoking, failure to stop at intersections, weaving within or departing from lanes, and unsafe following distances.

Not only that, you'll also have access to detailed reports that can track the duration of persistent behaviors and the percentage of drive time those behaviors consume. This can help you see how much time these habits are taking up your driver's day.

## Accurate fleet safety insights you can trust

Lytx® MV+AI technology is informed by more than 20 years of commercial driving data — representing more than 120 billion miles from all types of vehicles and road conditions. This extensive database is made even more accurate through professional human review to validate and categorize driving behaviors. Accurate results save you the time and energy it takes to filter through notifications that don't represent true risk, while also helping to ensure you don't miss critical events.



## Help drivers self-correct in the moment with real-time alerts

Real-time alerts[†] can help drivers redirect their attention in the moment to avoid potential collisions. Our alerts focus on the moments that matter, using MV+AI technology to focus on critical risks while avoiding the distraction and fatigue that can occur when alerts are overly frequent or inaccurate.

Our light and audio alerts can be configured to alert for when driving behaviors like inattentive driving, speeding, failure to wear a seat belt, smoking, eating or drinking, rolling stops, lane departures, forward collision potential, critical following distances, and using handheld devices occur. Drivers can review their own video and performance metrics after the drive and self-coach for continuous improvement.

**Lytx driver safety features**

Take a closer look at what you can do with Lytx driver safety solutions.



Empower drivers to improve their safe driving skills

**AI RISK DETECTION**

Identify unsafe driving behavior and prompt drivers with in-cab alerts† to help them self-correct in the moment.

**REMOTE COACHING**

Help drivers improve, even when face-to-face meetings aren't possible, with a remote coaching workflow.

**DRIVER SAFETY INSIGHTS**

Analyze driving performance and trends to help improve safety and efficiency across your fleet.

**POSITIVE DRIVER RECOGNITION**

Empower and recognize your drivers to reinforce safe driving behavior and improve overall fleet safety.

BOOK A DEMO

# Manage driver safety without recording video of the driver

You can configure the Lytx MV+AI technology to actively monitor the driver's patterns of movement and capture unwanted or distracted behaviors in the form of metadata — without recording video of the driver. This innovative lens configuration option gives fleet managers the power to manage distractions without recording the inside view of the vehicle, which can be key to a safer fleet.

EXPLORE RISK ID WITHOUT RECORDING



# Configurable coaching options to meet your business needs



Most professional drivers are capable of self-correcting in the moment. But for those who need more help, Lytx offers a range of tools that help drive long-term behavior change across your spectrum of risk. Our proven video-based coaching workflows can be used as needed to support:

- Traditional, face-to-face coaching sessions
- Remote coaching to support drivers when in-person sessions aren't practical
- Self-coaching that empowers drivers to learn and improve on their own
- Performance review after the drive through an engaging fleet driver app that allow drivers to see moments of risk first-hand and optimize future behavior

# Analyze your results with comprehensive reporting

Get comprehensive, customizable reporting on your fleet safety program, from industry benchmarks to progress against internal metrics to ROI analysis. You'll have the full picture so you can see the real results of your investment, prove the fleet safety program's effectiveness, and ensure ongoing executive support.



## Compare safety solutions

| | **Other driver safety solutions**<br>Driver safety features offered by other vendors. | **Lytx driver safety solutions**<br>Lytx combines innovation and experience to deliver the most accurate risk insights available. |
|---|:---:|:---:|
| **REAL-TIME, IN-CAB ALERTS†**<br>Allow drivers to self-correct risky driving in the moment. | ✓ | ✓ |
| **PROGRESS REPORTS**<br>Risk reports help you track progress toward safety metrics and achieve accountability. | ✓ | ✓ |
| **CONFIGURABLE DASH CAM VIEWS**<br>Capture in-vehicle and road views with support for auxiliary cameras to add side and rear views. | ✓ | ✓ |
| **DRIVER APP**<br>Engage drivers after the trip and allow them to observe their performance to optimize future trips. | ✓ | ✓ |
| **INTELLIGENT DASH CAM TECHNOLOGY**<br>Get insights and detect risk with devices powered by advanced machine vision and artificial intelligence. | | ✓ |
| **TECHNOLOGY BACKED BY DATA**<br>Count on accurate insights powered by the world's largest commercial driving database of its kind. | | ✓ |

**ON-DEMAND¹ ACCESS TO VIDEO**
Immediately access the video you need within minutes of capture.



**PROACTIVE DISTRACTED DRIVING DETECTION**
Accurately identify distracted driving behavior including cell phone use and inattentive driving.



**IDENTIFY RISK WITHOUT RECORDING**
Manage driving safety in real time without recording video of the driver.

"Since activating the machine vision and artificial intelligence capabilities within the Lytx Driver Safety Program, we're seeing a fuller, more accurate picture of risk in our fleet. We're able to bring our drivers' attention to risky habits in real time and offer coaching sessions as needed."

**Patrick Landreth, Vice President of Safety and Human Resources, Ozark Motor Lines**

# Powered by the innovative Lytx DriveCam device

Machine vision and artificial intelligence (MV+AI) combine to deliver real-time alerts¹ that can help address distracted driving in the moment, and provide reliable, continual video evidence for protection when the unexpected occurs.





**REAL-TIME, IN-CAB ALERTS¹**
Light and audio alerts notify drivers of their risky behaviors, helping them stay focused on the road (audio alerts available on SF300 only)



**RISK DETECTION WITHOUT RECORDING**
Manage distracted driving and other unwanted behaviors without recording video of the driver



**CONTINUAL VIDEO**
Records up to 100 hours of reliable, continual video



**LIVE STREAMING**
See what's happening in and around vehicles in near real time



**INTEGRATED MV+AI**
Advanced Machine Vision and Artificial Intelligence capture and accurately categorize risky driving behaviors



**MANUAL RECORD BUTTONS**
Enables your drivers to proactively record video when needed



## Frequently asked questions

What are the benefits of a fleet safety program?                                    +

How does a fleet safety program work?                                               +

How does coaching help change driver behavior?                                      +

How do I review risky driving data?                                                 +

Does my company need a fleet safety program?                                        +

Do I need to know how to get fleet safety certified?                                +



### We help deliver safety, success, and peace of mind for customers just like you.

Lytx® protects fleets from 5 to 500+ vehicles across multiple industries. Learn more about how we're helping to improve safety at companies like yours.

Industry

All industries ▾

**DISTRIBUTION**

**Murphy-Hoffman Company sees 79% reduction in roadway collisions with Lytx**

79% reduction in on-roadway collisions
33% improvement in frequency and severity of incidents
59% reduction in cell phone usage while driving

Fleet Size:     500+
Result:         Improve Driver Performance

**TRUCKING**

**Dart Transit Company decreases near collisions by 65% with Lytx**

65% decrease in near collisions
77% improvement in late response
69% improvement in following distance

Fleet Size:     500+
Result:         Improve Driver Performance

## Combine services to build a comprehensive solution that meets your needs



  

### Fleet dash cams

Capture critical incidents with cloud-connected, continually recorded video and find the clips you need to understand what really happened within minutes.*

### Fleet tracking

Get real-time* access to fleet status to help you respond faster, reduce callbacks, and optimize productivity.

### DOT compliance services

Meet the mandates with devices and services that streamline and simplify compliance management.



# Investing in video can lead to significant savings

Learn more about our pricing and how an investment today can result in years of savings.

CALCULATE YOUR SAVINGS

**RELATED RESOURCES**

## Let technology do the heavy lifting to help ensure safer driving across your fleet.

Learn more about how our driver safety solutions can support your business and your drivers.

All Resources



**ACCELERATING FLEET SAFETY FOR 2020 AND BEYOND**

Learn about trending driving behaviors—what they are and how to identify them in our recent webinar with EHS.

Read now



**HOW DURHAM COCA-COLA BOTTLING CO. ENSURES SAFETY WITH VIDEO TELEMATICS**

Find out how Durham Coca-Cola Bottling Co. exonerated a driver from a false claim and reduced its claims cost by 92 percent using video telematics.

Read now



**FUELING A SUCCESSFUL SAFETY CULTURE**

Safety leaders across several industries share how they managed to get organization-wide support on safety.

Read now

**THE LYTX DIFFERENCE**



# Service

Our team is invested in your success. We work with you to help ensure that your company achieves extraordinary results, from configuring the right solutions to meet your business needs to helping you get the greatest return on your investment. We're always expanding by listening to our customers and



# Innovation

Our machine vision and artificial intelligence are powered by a robust driving database (120 billion miles and counting), resulting in connected, accurate, actionable insights that keep fleets safe, on-schedule, efficient, and productive. We continuously evolve to deliver cutting-edge updates that help customers



# Leadership

For more than 20 years, Lytx has been a leading provider of complete fleet management solutions. We're focused on addressing all of your fleet needs, all in one place, with all together powerful solutions. We help fleets identify risk, stay safer, optimize efficiency and gain greater productivity. Our smart, simple hardware,

using their input to shape our next generation of features and capabilities.

simplify processes, save time, and focus on driving results for their business.

software, and API integrations provide a single, consolidated view of your fleet.

## Subscribe to our newsletter

Our Best Fleet Forward newsletter delivers monthly insights on fleet management.

First name

Last name

Email address

**SUBMIT**

## Get started today.

**1-866-419-5861   Contact Us   Book a Demo**

| SOLUTIONS | FEATURES | SUPPORT & LOGIN |
|---|---|---|
| Fleet Management Overview | DriveCam Event Recorder | Support |
| Fleet Dash Cams | Lytx Driver App | Lytx Account Login |
| Fleet Safety | Machine Vision and Artificial Intelligence | Lytx Compliance Services (RAIR) Portal |
| Fleet Tracking | Risk ID Without Recording | Lytx DriveCam Academy |
| DOT Compliance | Continual Behavior Reporting | Parts Store |
| ELD Compliance | Preventative Maintenance | |
| FedEx VEDR | Diagnostic Trouble Codes | |
| Lytx Integration Network | | |

| GUIDES | ABOUT US | RESOURCES |
|---|---|---|
| ADAS | Our Story | Blog |
| CSA Scores | Our Technology | Buyer's Guide to Video Telematics |
| Defensive Driving for Commercial Fleets | Our Team | The Fleet Podcast |
| | Careers | Videos |

# EXHIBIT 4

lytx

SOLUTIONS    ABOUT US    CLIENTS    RESOURCES    CONTACT US         LOGIN    BOOK A DEMO

Home » Driving Perspective Blog » Demystifying MV+AI Technology

# Demystifying MV+AI Technology





# What are Machine Vision and Artificial Intelligence (MV+AI)?

Machine Vision (MV) is a suite of sensor technologies that work together to recognize objects and behavior using visual data. Artificial intelligence (AI) enables computers to recognize patterns and make informed predictions about what might happen next. Together, these technologies can detect environments, discover which patterns correlate with risk, and determine potential outcomes.

MV+AI can recognize when a driver is distracted – by a mobile phone, for example – and prompt the driver with an alert before something potentially goes wrong. This is made possible by a comprehensive "training" process: hundreds of thousands of images feed the technology to teach the MV algorithm what distracted driving, and other behaviors look like. This training data is combined with additional information from GPS and a multitude of other sensors to teach the AI how to reliably detect more complex location-based behavior.

Still, the algorithms can't learn in a vacuum: human judgement plays a vital role in helping the system learn to spot driving conditions and driver behavior. Video is reviewed and the images are tagged to train the AI in knowing which data to consider more relevant. As the MV+AI system continues to learn, it identifies the correlation between behavior and risk more precisely, helping fleet managers identify which behaviors, locations, and drivers pose the greatest potential danger. In this way, MV+AI provide visibility into issues that were impossible to see just a few years ago.

## MV+AI: An Extra Pair of Eyes

The combination of machine (MV) and artificial intelligence (AI) brings the promise of detecting and anticipating risk, helping drivers avoid collisions and making the world safer. This technology serves as a tireless pair of extra eyes that can help alert drivers to hazards – including their own bad habits – and drive more safely.

But not all MV+AI systems are created equally. Without large amounts of high quality data, even the best algorithms can't know what to look for. As advanced as machine learning has become, it still requires both billions of data points and expert humans to help train the technology to detect risk.

## What Makes Lytx So Precise?

The MV+AI model is only as smart as the data used to train it. That's why it is important for humans to help: the system can't become an expert without the help of people who know which data is significant and what can be safely ignored.

Today, Lytx MV+AI technology focuses specifically on the challenges of detecting risk in commercial fleets. Our technology draws from a cache of images collected over 100 billion miles of driving, tagging them for potentially hazardous behaviors and conditions. This combination of human analysis with traditional telematics data provides more insight than machine analysis of raw data alone.

## Expanded View Of Risk

Lytx uses innovative technology to reliably uncover true risk so you can focus on what matters without the distraction of irrelevant events or information. Our focus on training algorithms with the best data provides the most precise results possible, avoiding the false positives that come from subpar or un-curated data.

Our technology is developed with one purpose in mind: delivering a view of fleet risk you can trust. The combination of high data volume and accuracy means that our MV+AI algorithms have better raw materials to work with, helping to deliver more precise results so that you aren't wading through an ocean of irrelevant information.

**Learn more about Lytx's fleet safety and fleet tracking solutions, and the DriveCam device that powers it all. Schedule a free demo.**



**Subscribe to the Lytx blog for the latest in fleet management.**

Work Email

---

**NEXT RECOMMENDATION**



### What is a CMV? Commercial Motor Vehicle Definition
What is a CMV (Commercial Motor Vehicle)? From what is considered a CMV to requirements for a CMV driver, we...

---

## Subscribe to our newsletter

Our Best Fleet Forward newsletter delivers monthly insights on fleet management.

First name

Last name

Email address

**SUBMIT**

## Get started today.

**1-866-419-5861   Contact Us   Book a Demo**

### SOLUTIONS
Fleet Management Overview
Fleet Dash Cams
Fleet Safety
Fleet Tracking
DOT Compliance
ELD Compliance
FedEx VEDR
Lytx Integration Network

### FEATURES
DriveCam Event Recorder
Lytx Driver App
Machine Vision and Artificial Intelligence
Risk ID Without Recording
Continual Behavior Reporting
Preventative Maintenance
Diagnostic Trouble Codes

### SUPPORT & LOGIN
Support
Lytx Account Login
Lytx Compliance Services (RAIR) Portal
Lytx DriveCam Academy
Parts Store

### GUIDES
ADAS
CSA Scores

### ABOUT US
Our Story
Our Technology

### RESOURCES
Blog
The Fleet Podcast



Defense for Commercial
Fleets
Solutions to Texting and Driving
Distracted Driving
DOT Regulations
Fleet Management Solutions
Fleet Risk Management
Fuel Management Systems
Telematics Systems

Our Team
Careers
News and Events
Who We Serve
Success Stories

Videos
All Resources

**SITES**

English (U.S.A.)
English (U.K.)

tx

Site Map   Legal   Terms   Privacy   Driver Info

# EXHIBIT 5





**OUR TECHNOLOGY**

# Machine vision + artificial intelligence

Award-winning technology helps detect and deter risky and distracted driving in real time

## Addressing distracted driving — one of the biggest issues facing our roads today

Lytx has expanded its machine vision system and artificial intelligence (MV+AI) technology on all dash cam devices to help drivers and fleet managers correct distracted driving as it occurs. Our unique machine vision technology helps identify distraction and risk, both inside and outside of the vehicle, including cell phone use, eating or drinking, smoking, seat belt use, general inattentiveness, failure to stop at intersections, weaving within or departing from lanes, and unsafe following distances.

MV+AI can provide in-cab alerts† that help empower drivers to change behavior in real time to avoid potential collisions. A complementary Lytx app helps your driver review their performance, self-coach, and optimize their driving for the next trip. Video footage and comprehensive dashboards help fleet managers track progress, drive accountability, and offer additional coaching, if needed.



**BOOK A DEMO**

### Identify distracted and risky driving behavior inside the vehicle

MV+AI works to help identify the hard-to-detect distractions that drivers face today.





**CELL PHONES AND HANDHELD DEVICES**

Despite laws restricting cell phone use, they consistently remain involved in fatal collisions. MV+AI can detect unsafe cell phone use with a high degree of confidence, then it can deliver a timely in-cab alert to help drivers regain focus.

**SEAT BELT USE**

Seat belts save more than 15,000 lives each year. MV+AI can help identify and notify unbelted drivers so they can address the issue right away.

**EATING AND DRINKING**

Eating and drinking can cause a variety of distractions for drivers and issues with messy vehicles. In-cab alerts and video evidence help pinpoint when eating or drinking is potentially risky.

**SMOKING**

Smoking takes a driver's hands off the wheel and eyes off the road, and can pose risks around fuel or hazardous materials. MV+AI can detect smoking and alert drivers to stop.

# How it works

See how machine vision and artificial intelligence work together to recognize and help stop risky driving in its tracks



## Machine vision systems and artificial intelligence detect distraction and risk



Lytx MV+AI technology is constantly working to scan and evaluate driving patterns to determine potential risk. Machine vision operates as our system's eyes, allowing the technology to see and recognize objects. Artificial intelligence is like the brain providing the system's ability to interpret and decide. For example, machine vision sees a cell phone in a vehicle, whether it is on the passenger seat or held to the driver's ear. Artificial intelligence then interprets cell phone images and recognizes that the phone on the seat does not represent risk, but the phone in the driver's hand does.

## Identify additional risk on the road

In addition to our new, in-vehicle capabilities, Lytx has been applying MV+AI technology to detect risk on the road ahead for many years. MV+AI can reliably detect and record road-facing risk, including:

- Failure to stop at intersections
- Weaving within or departing from lanes
- Unsafe following distances





## Our data helps MV+AI deliver accurate insights

To be effective, MV+AI algorithms must be highly accurate. Too many false alarms and drivers will ignore alerts. False negatives lead to missing critical events. Lytx MV+AI is backed by a peerless database of commercial driving behaviors, representing more than 120 billion miles driven in all types of vehicles and road conditions—validated by professional analysts. This allows our MV+AI solutions to identify driving behaviors with high levels of accuracy so drivers and fleet managers only get notified about the moments that matter.

## Configurable coaching options support drivers

Lytx MV+AI integrated dash cams can capture moments of risky and distracted driving, delivering in-cab alerts that allow drivers to address risk in the moment, and video for review through an app to optimize their performance for the next trip. Fleet managers can use video and comprehensive dashboards and reporting to track progress, drive accountability and provide coaching, if needed.



## Frequently asked questions

**What is machine vision?**                                                                 +

**What is artificial intelligence?**                                                        +

**How can I get the new MV+AI distracted driving features for my fleet?**                    +

**What Lytx products include MV+AI technology?**                                             +

**How are risky or distracted driving insights delivered?**                                 +

# Combine services to build a comprehensive solution that meets your needs



## Driver safety solutions

Proactively manage your fleet risk with tools to help you change behavior, prevent collisions, and improve your bottom line.



## Fleet tracking

Get real-time* access to fleet status to help you respond faster, reduce callbacks, and optimize productivity.



## DOT compliance services

Meet the mandates with devices and services that streamline and simplify compliance management.



## Subscribe to our newsletter

Our Best Fleet Forward newsletter delivers monthly insights on fleet management.

First name

Last name

Email address

SUBMIT

# Get started today.

**1-866-419-5861   Contact Us   Book a Demo**

**SOLUTIONS**
Fleet Management Overview
Fleet Dash Cams
Fleet Safety
Fleet Tracking
DOT Compliance
ELD Compliance
FedEx VEDR
Lytx Integration Network

**FEATURES**
DriveCam Event Recorder
Lytx Driver App
Machine Vision and Artificial Intelligence
Risk ID Without Recording
Continual Behavior Reporting
Preventative Maintenance
Diagnostic Trouble Codes

**SUPPORT & LOGIN**
Support
Lytx Account Login
Lytx Compliance Services (RAIR) Portal
Lytx DriveCam Academy
Parts Store

**GUIDES**
ADAS
CSA Scores
Defensive Driving for Commercial Fleets
Distracted Driving
DOT Regulations

**ABOUT US**
Our Story
Our Technology
Our Team
Careers
News and Events
Who We Serve

**RESOURCES**
Blog
Buyer's Guide to Video Telematics
The Fleet Podcast
Videos
All Resources

ELD Compliance

Fleet Maintenance

Fleet Management App

Fleet Management Solutions

Fleet Risk Management

Fuel Management Systems

Solutions to Texting and Driving

Telematics Systems

Success Stories

**SITES**

English (U.S.A.)

# EXHIBIT 6



## Lytx Risk ID Without Recording

Manage risky behavior without recording the driver

### Capture risky driving without recording in-cab video

Lytx® Risk ID Without Recording helps you protect your fleet against distracted driving with a configurable option that allows fleet managers to take advantage of AI-powered risk detection without recording the inside view of the vehicle. It is part of Lytx's set of driver-centric tools that can help improve fleet safety management and performance – quickly, efficiently, and easily.

BOOK A DEMO



## How it works





## Detect and manage distracted driving

Managing distractions is critical to safe fleet operation, but there are situations that might call for different camera lens configuration options. Using Lytx's ultra-precise machine vision and artificial intelligence (MV+AI), the DriveCam Event Recorder can detect patterns of distracted or unwanted driving behaviors inside the cab without recording video of the driver. This enables the proactive capture of designated in-cab driving behaviors -- using a handheld device, improper seat belt use, inattentive driving, smoking, or eating and drinking -- without having inside-lens footage stored on the device.

## Tapping into MV+AI and 120 billion of miles of data

Lytx's mature MV+AI technology, vast data set, and algorithms refined with human input give our distracted driving detection a level of accuracy that allows us to capture distracted behaviors without using video. This is possible because Lytx MV+AI technology actively monitors the driver's patterns of movement, capturing unwanted and distracted behaviors in the form of metadata rather than video.

| BEHAVIOR | DURATION | % OF DRIVE TIME |
|---|---|---|
| Driver Smoking | 1m 10s | 0.02% |
| Food or Drink | 41m 12s | 0.87% |
| Handheld Device | 2h 15m 40s | 2.21% |
| Inattentive | 3m 40s | 0.13% |

## See how much time risky behavior is consuming

Duration reporting can help managers understand the extent of a problem by calculating the percentage of trip time (ignition on to ignition off) that the driver was distracted. Lytx's MV+AI technology compiles this data and delivers it to your Lytx account without recording or saving inside-view video to the device.

# Enable real-time, in-vehicle alerts for drivers



Even without video to help correct driving behavior, drivers can benefit from Lytx's real-time† alerts. These audio alerts are based on risky behaviors that are detected, but not recorded, enabling in-the-moment correction for greater overall safety. Risk ID Without Recording gives fleet managers the option to enable in-vehicle alerts, without recording or storing video.

**READ NEXT**

## See the technology behind Risk ID Without Recording



**LYTX DRIVECAM: INTELLIGENT DASH CAM TECHNOLOGY**

Get the details about the DriveCam® Event Recorder, a 2020 EC&M Product of the Year award winner.

Learn more



**DEMYSTIFYING MV+AI TECHNOLOGY**

See how Lytx uses large volumes of high-quality data to give you the most accurate picture of your fleet's risk.

Read now



**LYTX DRIVER SAFETY SOLUTIONS**

See how Lytx can develop a comprehensive view of your driver's risk on the road.

Read now



## Subscribe to our newsletter

Our Best Fleet Forward newsletter delivers monthly insights on fleet management.

First name

Last name

Email address

## Get started today.

**1-866-419-5861**    **Contact Us**    **Book a Demo**

**SOLUTIONS**

Fleet Management Overview
Fleet Dash Cams
Fleet Safety
Fleet Tracking
DOT Compliance
ELD Compliance
FedEx VEDR
Lytx Integration Network

**FEATURES**

DriveCam Event Recorder
Lytx Driver App
Machine Vision and Artificial Intelligence
Risk ID Without Recording
Continual Behavior Reporting
Preventative Maintenance
Diagnostic Trouble Codes

**SUPPORT & LOGIN**

Support
Lytx Account Login
Lytx Compliance Services (RAIR) Portal
Lytx DriveCam Academy
Parts Store

# EXHIBIT 7



Sign in   Get started

Follow   595K Followers    ·    Editors' Picks   Features   Deep Dives   Grow   Contribute   About

# Face Detection For Beginners

Divyansh Dwivedi · Apr 27, 2018 · 7 min read



Multiple face detection in an image

In the past few years, face recognition owned significant consideration and appreciated as one of the most promising applications in the field of image analysis. Face detection can consider a substantial part of face recognition operations. According to its strength to focus computational resources on the section of an image holding a face. The method of face detection in pictures is complicated because of variability present across human faces such as pose, expression, position and orientation, skin colour, the presence of glasses or facial hair, differences in camera gain, lighting conditions, and image resolution.

Object detection is one of the computer technologies, which connected to the image processing and computer vision and it interacts with detecting instances of an object such as human faces, building, tree, car, etc. The primary aim of face detection algorithms is to determine whether there is any face in an image or not.

In recent times, a lot of study work proposed in the field of Face Recognition and Face Detection to make it more advanced and accurate, but it makes a revolution in this field when Viola-Jones comes with its Real-Time Face Detector, which is capable of detecting the faces in real-time with high accuracy.

Face Detection is the first and essential step for face recognition, and it is used to detect faces in the images. It is a part of object detection and can use in many areas such as security, bio-metrics, law enforcement, entertainment, personal safety, etc.

It is used to detect faces in real time for surveillance and tracking of person or objects. It is widely used in cameras to identify multiple appearances in the frame Ex- Mobile cameras and DSLR's. Facebook is also using face detection algorithm to detect faces in the images and recognise them.

## Face Detection Methods:-

Yan, Kriegman, and Ahuja presented a classification for face detection methods. These methods divided into four categories, and the face detection algorithms could belong to two or more groups. These categories are as follows-



Different types of Face Detection Methods

## 1.Knowledge-Based:-

The knowledge-based method depends on the set of rules, and it is based on human knowledge to detect the faces. Ex- A face must have a nose, eyes, and mouth within certain distances and positions with each other. The big problem with these methods is the difficulty in building an appropriate set of rules. There could be many false positive if the rules were too general or too detailed. This approach alone is insufficient and unable to find many faces in multiple images.

## 2.Feature-Based:-

The feature-based method is to locate faces by extracting structural features of the face. It is first trained as a classifier and then used to differentiate between facial and non-facial regions. The idea is to overcome the limits of our instinctive knowledge of faces. This approach divided into several steps and even photos with many faces they report a success rate of 94%.

## 3.Template Matching:-

Template Matching method uses pre-defined or parameterised face templates to locate or detect the faces by the correlation between the templates and input images. Ex- a human face can be divided into eyes, face contour, nose, and mouth. Also, a face model can be built by edges just by using edge detection method. This approach is simple to implement, but it is inadequate for face detection. However, deformable templates have been proposed to deal with these problems.



Template Matching

## 4.Appearance-Based:-

The appearance-based method depends on a set of delegate training face images to find out face models. The appearance-based approach is better than other ways of performance. In general appearance-based method rely on techniques from statistical analysis and machine learning to find the relevant characteristics of face images. This method also used in feature extraction for face recognition.

The appearance-based model further divided into sub-methods for the use of face detection which are as follows-

### 4.1.Eigenface-Based:-

Eigenface based algorithm used for Face Recognition, and it is a method for efficiently representing faces using Principal Component Analysis.

### 4.2.Distribution-Based:-

The algorithms like PCA and Fisher's Discriminant can be used to define the subspace representing facial patterns. There is a trained classifier, which correctly identifies instances of the target pattern class from the background image patterns.

### 4.3.Neural-Networks:-

Many detection problems like object detection, face detection, emotion detection, and face recognition, etc. have been faced successfully by Neural Networks.

### 4.4.Support Vector Machine:-

Support Vector Machines are linear classifiers that maximise the margin between the decision hyperplane and the examples in the training set. Osuna et al. first applied this classifier to face detection.

### 4.5.Sparse Network of Winnows:-

They defined a sparse network of two linear units or target nodes; one represents face patterns and other for the non-face patterns. It is less time consuming and efficient.

### 4.6.Naive Bayes Classifiers:-

They computed the probability of a face to be present in the picture by counting the frequency of occurrence of a series of the pattern over the training images. The classifier captured the joint statistics of local appearance and position of the faces.

### 4.7.Hidden Markov Model:-

The states of the model would be the facial features, which usually described as strips of pixels. HMM's commonly used along with other

of network is trained sufficiently to communicate along with image methods to build detection algorithms.

### 4.8. Information Theoretical Approach:-

Markov Random Fields (MRF) can use for face pattern and correlated features. The Markov process maximises the discrimination between classes using Kullback-Leibler divergence. Therefore this method can be used in Face Detection.

### 4.9. Inductive Learning:-

This approach has been used to detect faces. Algorithms like Quinlan's C4.5 or Mitchell's FIND-S used for this purpose.

## How the Face Detection Works:-

There are many techniques to detect faces, with the help of these techniques, we can identify faces with higher accuracy. These techniques have an almost same procedure for Face Detection such as OpenCV, Neural Networks, Matlab, etc. The face detection work as to detect multiple faces in an image. Here we work on OpenCV for Face Detection, and there are some steps that how face detection operates, which are as follows-

Firstly the image is imported by providing the location of the image. Then the picture is transformed from RGB to Grayscale because it is easy to detect faces in the grayscale.                                                                    Top highlight



Converting RGB image to Grayscale

After that, the image manipulation used, in which the resizing, cropping, blurring and sharpening of the images done if needed. The next step is image segmentation, which is used for contour detection or segments the multiple objects in a single image so that the classifier can quickly detect the objects and faces in the picture.

The next step is to use Haar-Like features algorithm, which is proposed by Voila and Jones for face detection. This algorithm used for finding the location of the human faces in a frame or image. All human faces shares some universal properties of the human face like the eyes region is darker than its neighbour pixels and nose region is brighter than eye region.



Edge features


(a)        (b)        (c)        (d)

Line features

(a) (b) (c) (d)   (e) (f) (g) (h)

Center-surround features

(a) (b)

Haar-like features for face detection

The haar-like algorithm is also used for feature selection or feature extraction for an object in an image, with the help of edge detection, line detection, centre detection for detecting eyes, nose, mouth, etc. in the picture. It is used to select the essential features in an image and extract these features for face detection.

The next step is to give the coordinates of x, y, w, h which makes a rectangle box in the picture to show the location of the face or we can say that to show the region of interest in the image. After this, it can make a rectangle box in the area of interest where it detects the face. There are also many other detection techniques that are used together for detection such as smile detection, eye detection, blink detection, etc.



Successfully detect the face in an image

## How to Run Face Detector in Real-Time (Webcam):-

Requirement for Running the code- Python, OpenCV, Webcam, Numpy.

```
#import libraries
import cv2
import numpy as np

#import classifier for face and eye detection
face_classifier =
cv2.CascadeClassifier('Haarcascades/haarcascade_frontalface_default.x
ml')

# Import Classifier for Face and Eye Detection
face_classifier =
cv2.CascadeClassifier('Haarcascades/haarcascade_frontalface_default.x
```

```
eye_classifier = cv2.Cascade
('Haarcascades/haarcascade_eye.xml')
def face_detector (img, size=0.5):

    # Convert Image to Grayscale
    gray = cv2.cvtColor (img, cv2.COLOR_BGR2GRAY)
    faces = face_classifier.detectMultiScale (gray, 1.3, 5)
    If faces is ():
    return img

    # Given coordinates to detect face and eyes location from ROI
    for (x, y, w, h) in faces
    x = x - 100
    w = w + 100
    y = y - 100
    h = h + 100
    cv2.rectangle (img, (x, y), (x+w, y+h), (255, 0, 0), 2)
    roi_gray = gray[y: y+h, x: x+w]
    roi_color = img[y: y+h, x: x+w]
    eyes = eye_classifier.detectMultiScale (roi_gray)
    for (ex, ey, ew, eh) in eyes:
    cv2.rectangle(roi_color,(ex,ey),(ex+ew,ey+eh),(0,0,255),2)
    roi_color = cv2.flip (roi_color, 1)
    return roi_color

    # Webcam setup for Face Detection
    cap = cv2.VideoCapture (0)
    while True:
    ret, frame = cap.read ()
    cv2.imshow ('Our Face Extractor', face_detector (frame))
    if cv2.waitKey (1) == 13: #13 is the Enter Key
    break

    # When everything done, release the capture
    cap.release ()
    cv2.destroyAllWindows ()
```

> *This blog is for beginners who want to start their carrier in the field of Computer Vision or AI by learning about what is face detection, its types, and how it is work.*

### Sign up for The Variable

By Towards Data Science

Every Thursday, the Variable delivers the very best of Towards Data Science: from hands-on tutorials and cutting-edge research to original features you don't want to miss. <u>Take a look.</u>

✉ Get this newsletter

Facedetection    Machine Learning    Computer Vision    Opencv    Data Science

👏 1.3K    💬 8

More from Towards Data Science    Follow

Your home for data science. A Medium publication sharing concepts, ideas and codes.

Joanne Jordan · Apr 27, 2018 ★

# From Failed Passage to Rite of Passage: The Titanic Data Set as a Data Science Educational Tool

The sinking of the RMS Titanic is one of the most well known tragedies of





modern history. Its place as an enduring [...] in history was in large part due to its 1997 retelling as a movie in which the Titanic acted both as the setting and the movie…

Read more · 4 min read

6

Share your ideas with millions of readers.     Write on Medium

TDS Editors · Apr 27, 2018

# EXHIBIT 8

SPECIAL REPORT | ... in a Post-Pandemic World   Download Now

TECHTARGET NETWORK    NEWS    FEATURES    TIPS    MORE CONTENT ▼          LOGIN    REGISTER    Follow

TechTarget   Search EnterpriseAI

TOPIC ▼
Machine learning
platforms

SUBTOPIC ▼
Pattern recognition and
machine learning

Search the TechTarget Network

Home  >  Pattern recognition and machine learning  >  Artificial intelligence - machine learning  >  face detection

DEFINITION

# face detection

By Corinne Bernstein

Face detection -- also called facial detection -- is an artificial intelligence (AI) based computer technology used to find and identify human faces in digital images. Face detection technology can be applied to various fields -- including security, biometrics, law enforcement, entertainment and personal safety -- to provide surveillance and tracking of people in real time.

Face detection has progressed from rudimentary computer vision techniques to advances in machine learning (ML) to increasingly sophisticated artificial neural networks (ANN) and related technologies; the result has been continuous performance improvements. It now plays an important role as the first step in many key applications -- including face tracking, face analysis and facial recognition. Face detection has a significant effect on how sequential operations will perform in the application.

In face analysis, face detection helps identify which parts of an image or video should be focused on to determine age, gender and emotions using facial expressions. In a facial recognition system -- which maps an individual's facial features mathematically and stores the data as a faceprint -- face detection data is required for the algorithms that discern which parts of an image or video are needed to generate a faceprint. Once identified, the new faceprint can be compared with stored faceprints to determine if there is a match.

## How face detection works

Face detection applications use algorithms and ML to find human faces within larger images, which often incorporate other non-face objects such as landscapes, buildings and other human body parts like feet or hands. Face detection algorithms typically start by searching for human eyes -- one of the easiest features to detect. The algorithm might then attempt to detect eyebrows, the mouth, nose, nostrils and the iris. Once the algorithm concludes that it has found a facial region, it applies additional tests to confirm that it has, in fact, detected a face.

To help ensure accuracy, the algorithms need to be trained on large data sets incorporating hundreds of thousands of positive and negative images. The training improves the algorithms' ability to determine whether there are faces in an image and where they are.

The methods used in face detection can be knowledge-based, feature-based, template matching or appearance-based. Each has advantages and disadvantages:

- Knowledge-based, or rule-based methods, describe a face based on rules. The challenge of this approach is the difficulty of coming up with well-defined rules.

- Feature invariant methods -- which use features such as a person's eyes or nose to detect a face -- can be negatively affected by noise and light.

- Template-matching methods are based on comparing images with standard face patterns or features that have been stored previously and correlating the two to detect a face. Unfortunately these methods do not address variations in pose, scale and shape.

### Sponsored News

Three Tenets of Security Protection for State and Local Government and Education
–Dell Technologies

Software Protection Isn't Enough for the Malicious New Breed of Low-Level ...
–Intel

See More

### Vendor Resources

Biometrics in the enterprise: An opportunity or an ethical minefield?
–ComputerWeekly.com

CIO Trends #11: Benelux
–ComputerWeekly.com

- Appearance-based methods employ statistical analysis and machine learning to find the relevant characteristics of face images. This method, also used in feature extraction for face recognition, is divided into sub-methods.

Some of the more specific techniques used in face detection include:

- Removing the background. For example, if an image has a plain, mono-color background or a pre-defined, static background, then removing the background can help reveal the face boundaries.

- In color images, sometimes skin color can be used to find faces; however, this may not work with all complexions.

- Using motion to find faces is another option. In real-time video, a face is almost always moving, so users of this method must calculate the moving area. One drawback of this method is the risk of confusion with other objects moving in the background.

- A combination of the strategies listed above can provide a comprehensive face detection method.

Detecting faces in pictures can be complicated due to the variability of factors such as pose, expression, position and orientation, skin color and pixel values, the presence of glasses or facial hair, and differences in camera gain, lighting conditions and image resolution. Recent years have brought advances in face detection using deep learning, which presents the advantage of significantly outperforming traditional computer vision methods.

Major improvements to face detection methodology came in 2001, when computer vision researchers Paul Viola and Michael Jones proposed a framework to detect faces in real time with high accuracy. The Viola-Jones framework is based on training a model to understand what is and is not a face. Once trained, the model extracts specific features, which are then stored in a file so that features from new images can be compared with the previously stored features at various stages. If the image under study passes through each stage of the feature comparison, then a face has been detected and operations can proceed.

Although the Viola-Jones framework is still popular for recognizing faces in real-time applications, it has limitations. For example, the framework might not work if a face is covered with a mask or scarf, or if a face is not properly oriented, then the algorithm might not be able to find it.

To help eliminate the drawbacks of the Viola-Jones framework and improve face detection, other algorithms -- such as region-based convolutional neural network (R-CNN) and Single Shot Detector (SSD) -- have been developed to help improve processes.

A convolutional neural network (CNN) is a type of artificial neural network used in image recognition and processing that is specifically designed to process pixel data. An R-CNN generates region proposals on a CNN framework to localize and classify objects in images.

While region proposal network-based approaches such as R-CNN need two shots -- one for generating region proposals and one for detecting the object of each proposal -- SSD only requires one shot to detect multiple objects within the image. Therefore, SSD is significantly faster than R-CNN.

**Advantages of face detection**

As a key element in facial imaging applications, such as facial recognition and face analysis, face detection creates various advantages for users, including:

- Improved security. Face detection improves surveillance efforts and helps track down criminals and terrorists. Personal security is also enhanced since there is nothing for hackers to steal or change, such as passwords.

- Easy to integrate. Face detection and facial recognition technology is easy to integrate, and most solutions are compatible with the majority of security software.

- Automated identification. In the past, identification was manually performed by a person; this was inefficient and frequently inaccurate. Face detection allows the identification process to be automated, thus saving time and increasing accuracy.

## Disadvantages of face detection

While face detection provides several large benefits to users, it also holds various disadvantages, including:

- Massive data storage burden. The ML technology used in face detection requires powerful data storage that may not be available to all users.

- Detection is vulnerable. While face detection provides more accurate results than manual identification processes, it can also be more easily thrown off by changes in appearance or camera angles.

- A potential breach of privacy. Face detection's ability to help the government track down criminals creates huge benefits; however, the same surveillance can allow the government to observe private citizens. Strict regulations must be set to ensure the technology is used fairly and in compliance with human privacy rights.

## Face detection vs. face recognition

Although the terms *face detection* and *face recognition* are often used together, facial recognition is only one application for face detection -- albeit one of the most significant ones. Facial recognition is used for unlocking phones and mobile apps as well as for Biometric verification. The banking, retail and transportation-security industries employ facial recognition to reduce crime and prevent violence.

In short, the term *face recognition* extends beyond detecting the presence of a human face to determine whose face it is. The process uses a computer application that captures a digital image of an individual's face -- sometimes taken from a video frame -- and compares it to images in a database of stored records.

## Uses of face detection

Although all facial recognition systems use face detection, not all face detection systems are used for facial recognition. Face detection can also be applied for facial motion capture, or the process of electronically converting a human's facial movements into a digital database using cameras or laser scanners. This database can be used to produce realistic computer animation for movies, games or avatars.

Face detection can also be used to auto-focus cameras or to count how many people have entered an area. The technology also has marketing applications -- for example, displaying specific advertisements when a particular face is recognized.

Another application for face detection is as part of a software implementation of emotional inference, which can, for example, be used to help people with autism understand the feelings of people around them. The program "reads" the emotions on a human face using advanced image processing.

An additional use is drawing language inferences from visual cues, or "lip reading." This can help computers determine who is speaking, which may be helpful in security applications. Furthermore, face detection can be used to help determine which parts of an image to blur to assure privacy.

This was last updated in February 2020

## Continue Reading About face detection

- London Police is deploying facial recognition technology for surveillance
- Use of facial recognition in healthcare improves hospital security
- Bypassing facial recognition: The means, motive and opportunity
- What are the most common digital authentication methods?
- Retail facial recognition and eye tracking the next tech wave, maybe

## Related Terms

### narrow AI (weak AI)

Narrow AI is an application of artificial intelligence technologies to enable a high-functioning system that replicates -- and ... See complete definition ⓘ

### recurrent neural networks

A recurrent neural network (RNN) is a type of artificial neural network commonly used in speech recognition and natural language ... See complete definition ⓘ

### What is artificial intelligence?

Artificial intelligence is the simulation of human intelligence processes by machines, especially computer systems. Specific ... See complete definition ⓘ

## Dig Deeper on Pattern recognition and machine learning



Yoti develops age estimation algorithm for under-13s

By: Sebastian Klovig S...



Time to take a step back on police use of facial recognition

By: Bryan Glick



What is a neural network? Explanation and examples

By: Ed Burns



CNN vs. RNN: How are they different?

By: David Petersson

Latest TechTarget

Search**BusinessAnalytics**



resources

BUSINESS ANALYTICS ▶

CIO

DATA MANAGEMENT

ERP

### The roadblocks of business intelligence growth

Training and cost are the two biggest business intelligence challenges impeding organizations' BI usage and expansion, according ...

### Looker adds customization capabilities to analytics platform

In concert with its virtual user conference, the vendor introduced the idea of composable analytics, along with tools that enable...

### Tableau makes data literacy a priority with new pledge

As organizations increasingly turn to data to inform decisions, more data workers are needed. To address demand, Tableau pledged ...



About Us                Contributors          Guides

Editorial Ethics Policy  Reprints             Opinions

Meet The Editors        Answers               Photo Stories

Contact Us              Definitions           Quizzes

Advertisers             E-Products            Tips

Business Partners       Events                Tutorials

Media Kit               Features              Videos

Corporate Site

All Rights Reserved, Copyright 2018 - 2021, TechTarget.

Privacy Policy

Do Not Sell My Personal Info

# EXHIBIT 9



## Cascade Classifier

**Next Tutorial:** Cascade Classifier Training

### Goal

In this tutorial,

- We will learn how the Haar cascade object detection works.
- We will see the basics of face detection and eye detection using the Haar Feature-based Cascade Classifiers
- We will use the the **cv::CascadeClassifier** class to detect objects in a video stream. Particularly, we will use the functions:
  - **cv::CascadeClassifier::load** to load a .xml classifier file. It can be either a Haar or a LBP classifier
  - **cv::CascadeClassifier::detectMultiScale** to perform the detection.

### Theory

Object Detection using Haar feature-based cascade classifiers is an effective object detection method proposed by Paul Viola and Michael Jones in their paper, "Rapid Object Detection using a Boosted Cascade of Simple Features" in 2001. It is a machine learning based approach where a cascade function is trained from a lot of positive and negative images. It is then used to detect objects in other images.

Here we will work with face detection. Initially, the algorithm needs a lot of positive images (images of faces) and negative images (images without faces) to train the classifier. Then we need to extract features from it. For this, Haar features shown in the below image are used. They are just like our convolutional kernel. Each feature is a single value obtained by subtracting sum of pixels under the white rectangle from sum of pixels under the black rectangle.



**image**

Now, all possible sizes and locations of each kernel are used to calculate lots of features. (Just imagine how much computation it needs? Even a 24x24 window results over 160000 features.) For each feature calculation, we need to find the sum of the pixels under white and black rectangles. To solve this, they introduced the integral image. However large your image, it reduces the calculations for a given pixel to an operation involving just four pixels. Nice, isn't it? It makes things super-fast.

But among all these features we calculated, most of them are irrelevant. For example, consider the image below. The top row shows two good features. The first feature selected seems to focus on the property that the region of the eyes is often darker than the region of the nose and cheeks. The second feature selected relies on the property that the eyes are darker than the bridge of the nose. But the same windows applied to cheeks or any other place is irrelevant. So how do we select the best features out of 160000+ features? It is achieved by **Adaboost**.



**image**

For this, we apply each and every feature on all the training images. For each feature, it finds the best threshold which will classify the faces to positive and negative. Obviously, there will be errors or misclassifications. We select the features with minimum error rate, which means they are the features that most accurately classify the face and non-face images. (The process is not as simple as this. Each image is given an equal weight in the beginning. After each classification, weights of misclassified images are increased. Then the same process is done. New error rates are calculated. Also new weights. The process is continued until the required accuracy or error rate is achieved or the required number of features are found).

The final classifier is a weighted sum of these weak classifiers. It is called weak because it alone can't classify the image, but together with others forms a strong classifier. The paper says even 200 features provide detection with 95% accuracy. Their final setup had around 6000 features. (Imagine a reduction from 160000+ features to 6000 features. That is a big gain).

So now you take an image. Take each 24x24 window. Apply 6000 features to it. Check if it is face or not. Wow.. Isn't it a little inefficient and time consuming?

Yes, it is. The authors have a good solution for that.

In an image, most of the image is non-face region. So it is a better idea to have a simple method to check if a window is not a face region. If it is not, discard it in a single shot, and don't process it again. Instead, focus on regions where there can be a face. This way, we spend more time checking possible face regions.

For this they introduced the concept of **Cascade of Classifiers**. Instead of applying all 6000 features on a window, the features are grouped into different stages of classifiers and applied one-by-one. (Normally the first few stages will contain very many fewer features). If a window fails the first stage, discard it. We don't consider the remaining features on it. If it passes, apply the second stage of features and continue the process. The window which passes all stages is a face region. How is that plan!

The authors' detector had 6000+ features with 38 stages with 1, 10, 25, 25 and 50 features in the first five stages. (The two features in the above image are actually obtained as the best two features from Adaboost. According to the authors, on average 10 features out of 6000+ are evaluated per sub-window.

So this is a simple intuitive explanation of how Viola-Jones face detection works. Read the paper for more details or check out the references in the Additional Resources section.

## Haar-cascade Detection in OpenCV

`C++`   `Java`   `Python`

OpenCV provides a training method (see Cascade Classifier Training) or pretrained models, that can be read using the cv::CascadeClassifier::load method. The pretrained models are located in the data folder in the OpenCV installation or can be found here.

The following code example will use pretrained Haar cascade models to detect faces and eyes in an image. First, a cv::CascadeClassifier is created and the necessary XML file is loaded using the cv::CascadeClassifier::load method. Afterwards, the detection is done using the cv::CascadeClassifier::detectMultiScale method, which returns boundary rectangles for the detected faces or eyes.

This tutorial code's is shown lines below. You can also download it from here

```cpp
#include "opencv2/objdetect.hpp"
#include "opencv2/highgui.hpp"
#include "opencv2/imgproc.hpp"
#include "opencv2/videoio.hpp"
#include <iostream>

using namespace std;
using namespace cv;

void detectAndDisplay( Mat frame );

CascadeClassifier face_cascade;
CascadeClassifier eyes_cascade;

int main( int argc, const char** argv )
{
    CommandLineParser parser(argc, argv,
                             "{help h||}"
                             "{face_cascade|data/haarcascades/haarcascade_frontalface_alt.xml|Path to face cascade.}"
                             "{eyes_cascade|data/haarcascades/haarcascade_eye_tree_eyeglasses.xml|Path to eyes cascade.}"
                             "{camera|0|Camera device number.}");

    parser.about( "\nThis program demonstrates using the cv::CascadeClassifier class to detect objects (Face + eyes) in a video stream.\n"
                  "You can use Haar or LBP features.\n\n" );
    parser.printMessage();

    String face_cascade_name = samples::findFile( parser.get<String>("face_cascade") );
    String eyes_cascade_name = samples::findFile( parser.get<String>("eyes_cascade") );

    //-- 1. Load the cascades
    if( !face_cascade.load( face_cascade_name ) )
    {
        cout << "--(!)Error loading face cascade\n";
        return -1;
    };
    if( !eyes_cascade.load( eyes_cascade_name ) )
    {
        cout << "--(!)Error loading eyes cascade\n";
        return -1;
    };

    int camera_device = parser.get<int>("camera");
    VideoCapture capture;
    //-- 2. Read the video stream
    capture.open( camera_device );
    if ( ! capture.isOpened() )
    {
        cout << "--(!)Error opening video capture\n";
        return -1;
    }

    Mat frame;
    while ( capture.read(frame) )
    {
        if( frame.empty() )
        {
            cout << "--(!) No captured frame -- Break!\n";
            break;
        }

        //-- 3. Apply the classifier to the frame
        detectAndDisplay( frame );

        if( waitKey(10) == 27 )
        {
            break; // escape
        }
    }
```

```cpp
void detectAndDisplay( Mat frame )
{
    Mat frame_gray;
    cvtColor( frame, frame_gray, COLOR_BGR2GRAY );
    equalizeHist( frame_gray, frame_gray );

    //-- Detect faces
    std::vector<Rect> faces;
    face_cascade.detectMultiScale( frame_gray, faces );

    for ( size_t i = 0; i < faces.size(); i++ )
    {
        Point center( faces[i].x + faces[i].width/2, faces[i].y + faces[i].height/2 );
        ellipse( frame, center, Size( faces[i].width/2, faces[i].height/2 ), 0, 0, 360, Scalar( 255, 0, 255 ), 4 );

        Mat faceROI = frame_gray( faces[i] );

        //-- In each face, detect eyes
        std::vector<Rect> eyes;
        eyes_cascade.detectMultiScale( faceROI, eyes );

        for ( size_t j = 0; j < eyes.size(); j++ )
        {
            Point eye_center( faces[i].x + eyes[j].x + eyes[j].width/2, faces[i].y + eyes[j].y + eyes[j].height/2 );
            int radius = cvRound( (eyes[j].width + eyes[j].height)*0.25 );
            circle( frame, eye_center, radius, Scalar( 255, 0, 0 ), 4 );
        }
    }

    //-- Show what you got
    imshow( "Capture - Face detection", frame );
}
```

**Result**

1. Here is the result of running the code above and using as input the video stream of a built-in webcam:



Be sure the program will find the path of files *haarcascade_frontalface_alt.xml* and *haarcascade_eye_tree_eyeglasses.xml*. They are located in *opencv/data/haarcascades*

2. This is the result of using the file *lbpcascade_frontalface.xml* (LBP trained) for the face detection. For the eyes we keep using the file used in the tutorial.



**Additional Resources**

1. Paul Viola and Michael J. Jones. Robust real-time face detection. International Journal of Computer Vision, 57(2):137–154, 2004. **[224]**
2. Rainer Lienhart and Jochen Maydt. An extended set of haar-like features for rapid object detection. In Image Processing. 2002. Proceedings. 2002 International Conference on, volume 1, pages I–900. IEEE, 2002. **[132]**
3. Video Lecture on Face Detection and Tracking
4. An interesting interview regarding Face Detection by Adam Harvey
5. OpenCV Face Detection: Visualized on Vimeo by Adam Harvey

# EXHIBIT 10

**hackster.io**

Projects ∨    News    Contests    Events    Videos    Workshops

Log in    Sign up

Overview
Things
Story
  Abstract
  Instructions
Code
Credits
Comments (3)

**Keval Doshi**
Published April 26, 2017 © GPL3+

# Face Detection using Raspberry Pi and Smartphone

Face Detection is really awesome! This is a tutorial about making a very cheap face detection system.

⚡ Intermediate    📋 Full instructions provided    🕐 2 hours    👁 12,674



**SAMSUNG**

Take the AXDIMM challenge!
Your imagination could win $60,000.

LEARN MORE

Ad

RELATED CHANNELS AND TAGS

facial recognition

image processing

RELATED PROJECTS

Face Detection with OpenVINO on Raspberry Pi

Face Recognition Using Mathworks on Raspberry Pi

Face to Voice | Visually Impaired | Raspberry Pi

---

## Things used in this project

### Hardware components

| | | | | |
|---|---|---|---|---|
| 🟩 Raspberry Pi 3 Model B | × | 1 | 🛒 ∨ | |
| 📷 Raspberry Pi Camera Module | × | 1 | 🛒 ∨ | |

---

## Story

### Abstract:

Face detection seems to be a very complex idea, but in reality it is really simple.

Prerequisites:

- Raspberry Pi 2 or 3 with Raspbian OS installed
- Raspberry Pi Camera module or your Smartphone
- Basic Python knowledge

### Instructions:

1. The first thing to do is install OpenCV. How to install OpenCV is instructed here.

2. Attach the Raspberry Pi Camera Module. Go to Raspi-config from the terminal and switch camera interface on.

3. The Python code for Face detection is given attached.

4. Open a terminal and run the Python script.



5. For those using a Smartphone for camera, download IP Webcam from Playstore. After that make the following change in the Python file:

```
video_capture = cv2.VideoCapture('http://192.168.43.1:8080/video')
```

And voila!

# Code

```python
import cv2
import sys
import logging as log
import datetime as dt
from time import sleep
cascPath = sys.argv[1]
faceCascade = cv2.CascadeClassifier(cascPath)
log.basicConfig(filename='webcam.log',level=log.INFO)
video_capture = cv2.VideoCapture(0)
anterior = 0
print('Keval')
while True:
    if not video_capture.isOpened():
        print('Unable to load camera.')
        sleep(5)
        pass
    # Capture frame-by-frame
    ret, frame = video_capture.read()
    cv2.rectangle(frame, (20, 20), (20, 20), (255, 0, 0), 2)
    gray = cv2.cvtColor(frame, cv2.COLOR_BGR2GRAY)
    faces = faceCascade.detectMultiScale(
        gray,
        scaleFactor=1.1,
        minNeighbors=5,
        minSize=(30, 30)
```

# Credits



**Keval Doshi**
1 project • 26 followers
Hardware Hacker. Love going to hackathons. Enough said!

**Follow**  **Contact**

# Comments

Please log in or sign up to comment.

**Darshan V.M**
3 years ago

hey i got an error bro while running python script
Traceback (most recent call last):
File "/home/pi/recongnize.py", line 6, in <module>
cascPath = sys.argv[1]
IndexError: list index out of range

1 thank

# EXHIBIT 11

GET PRICING

**Privacy Policy**

## Privacy Policy

This Privacy Policy is effective as of July 21, 2021.

This Privacy Policy relates to Lytx, Inc., together with its affiliates (collectively, "Lytx", "we", "us" and/or "our"), and describes our policies and practices with respect to your personal information ("Personal Information") that you may give us or that we may collect about you, such as (i) when using our website or Lytx Mobile Application ("Mobile App") which contain a link to this policy, (ii) when entering information into an online form which contains a link to this Privacy Policy, (iii) when providing your Personal Information to a Lytx representative at a tradeshow, or (iv) when you otherwise provide Lytx with your Personal Information in a manner described in this Privacy Policy.

**This Privacy Policy does not apply to the extent we process Personal Information in our role as a service provider on behalf of our clients.** For detailed privacy information related to a Lytx client's use of Lytx website and Mobile App, please direct your inquiry to the respective client. We are not responsible for the privacy or data security practices of our clients, which may differ from those set forth in this Privacy Policy.

**This Privacy Policy also does not apply to the Personal Information obtained from or related to our current and former employees, independent contractors, and applicants.** Please see Lytx's Human Capital Privacy Policy for more information related to Personal Information obtained from or related to our current and former employees, independent contractors, and applicants. This Human Capital Privacy Policy also applies to any beneficiaries or emergency contacts of Lytx employees, independent contractors, or applicants who are California residents.

By submitting information via any method on our website or through our Mobile App, which includes a link or reference to this policy you acknowledge that Lytx will collect, use, share, transfer, and store Personal Information in the manner described in this Privacy Policy.

## A Special Note for Parents Concerning Privacy

The Lytx website and Mobile App are not intended for use by children. We do not knowingly accept Personal Information from any person under the age of 13. We ask that children (under the age of 13) do not submit any Personal Information to us.

## Information We Collect

The Personal Information we collect depends on how you interact with us, the website and Mobile App you use, and the choices you make.

We may collect information about you from different sources and in various ways when you use our services, including information you provide directly, information collected automatically, third-party data sources, and data we infer or generate from other data.

Information you provide directly. We collect Personal Information you provide to us. For example:

- **Contact Information**: for example, if you express an interest in obtaining additional information about our services, request customer support, use our "Contact Us" or similar features, register to use our website and Mobile App, sign up for or attend an event or webinar, or download certain content, we generally require you to provide us with your contact information, such as your name, job title, company name, address, phone number, or email address;

- **Demographic Information**: for example, in some cases, such as when you register or participate in surveys, we may collect age, gender, marital status, and similar demographic details;

- **Financial Information**: for example, if you make purchases via our website and Mobile App or register for an event, we may also require you to provide us (or our service providers who provide payment processing services) with financial information and billing information, such as billing name and address, credit card number, or bank account information;

- **Content and Files**: for example if you contact us via telephone or email, we will collect and retain those communications (or records relating to those communications or if you participate in a survey we may collect information you submit related to your use of our website and Mobile App; or

Information we collect automatically. When you use our website and Mobile App, we collect some information automatically. For example:

- **Identifiers and device information**. When you access or use our website and Mobile App, our web servers automatically log your Internet Protocol (IP) address and information about your device, including device identifiers (such as MAC address); device type; and your device's operating system, browser, and other software including type, version, language, settings, and configuration. As further described in the Cookies, Mobile IDs, and Similar Technologies section below, our websites and online services store and retrieve cookie identifiers, mobile IDs, and other data.

- **Geolocation data**. Depending on your device and app settings, we collect precise geolocation data when you use our apps or online services.

- **Usage data.** We automatically log your activity on our websites, apps, and online products, including the URL of the website from which you came to our sites, pages you viewed, how long you spent on a page, access times, and other details about your use of and actions on our website.

<u>Information we create or generate.</u> We may infer new information from other data we collect, including using automated means to generate information about your likely preferences or other characteristics ("**inferences**"). For example, we may infer your general geographic location (such as city, state, and country) based on your IP address.

## Cookies, Mobile IDS and Similar Technologies

<u>What are cookies and similar technologies?</u>

Cookies are small text files placed by a website and stored by your browser on your device. A cookie can later be read when your browser connects to a web server in the same domain that placed the cookie. The text in a cookie contains a string of numbers and letters that may uniquely identify your device and can contain other information as well. This allows the web server to recognize your browser over time, each time it connects to that web server.

Web beacons are electronic images (also called single-pixel or clear GIFs) that are contained within a website or email. When your browser opens a webpage or email that contains a web beacon, it automatically connects to the web server that hosts the image (typically operated by a third party). This allows that web server to log information about your device and to set and read its own cookies. In the same way, third-party content on our websites (such as embedded videos, plug-ins, or ads) results in your browser connecting to the third-party web server that hosts that content. We also include web beacons in our email messages or newsletters to tell us if you open and act on them.

Mobile analytics and advertising IDs are generated by operating systems for mobile devices (iOS and Android) and can be accessed and used by apps in much the same way that websites access and use cookies. Our apps contain software that enables us and our third-party analytics and advertising partners to access the mobile IDs.

<u>How do we and our partners use cookies and similar technologies?</u>

We, and our analytics and advertising partners, use these technologies in our websites, apps, and online services to collect Personal Information (such as the pages you visit, the links you click on, and similar usage information, identifiers, and device information) when you use our services, including Personal Information about your online activities over time and across different websites or online services. This information is used to store your preferences and settings, enable you to sign-in, analyze how our websites and apps perform, track your interaction with the site or app, develop inferences, deliver and tailor interest-based advertising, combat fraud, and fulfill other legitimate purposes. We and/or our partners also share the information we collect or infer with third parties for these purposes.

<u>What controls are available?</u>

- **Advertising controls.** Our advertising partners may participate in association that provide simple ways to opt out of ad targeting, which you can access at:

  - <u>United States</u>: NAI (http://optout.networkadvertising.org) and DAA (http://optout.aboutads.info/)

  - <u>Canada</u>: Digital Advertising Alliance of Canada (https://youradchoices.ca/)

  - <u>Europe</u>: European Digital Advertising Alliance (http://www.youronlinechoices.com/)

  These choices are specific to the browser you are using. If you access our services from other devices or browsers, take these actions from those systems to ensure your choices apply to the data collected when you use those systems.

- **Browser cookie controls.** Most web browsers are set to accept cookies by default. If you prefer, you can go to your browser settings to learn how to delete or reject cookies. If you choose to delete or reject cookies, this could affect certain features or services of our website. If you choose to delete cookies, settings and preferences controlled by those cookies, including advertising preferences, may be deleted and may need to be recreated.

- **Mobile advertising ID controls.** iOS and Android operating systems provide options to limit tracking and/or reset the advertising IDs.

- **Email web beacons.** Most email clients have settings which allow you to prevent the automatic downloading of images, including web beacons, which prevents the automatic connection to the web servers that host those images.

- **Do Not Track.** Some browsers have incorporated "Do Not Track" (DNT) features that can send a signal to the websites you visit indicating you do not wish to be tracked. Because there is not a common understanding of how to interpret the DNT signal, our websites do not currently respond to browser DNT signals. Instead, you can use the range of other tools to control data collection and use, including the cookie controls and advertising controls described above.

<u>California "Do Not Sell My Personal Information"</u>

The California Consumer Protection Act ("CCPA") requires us to describe the categories of Personal Information we sell to third parties and how to opt-out of future sales. The CCPA defines Personal Information to include online identifiers, including IP addresses, cookies IDs, and mobile IDs. The law also defines a "sale" broadly to include simply making data available to third parties in some cases. We let advertising and analytics providers collect IP addresses, cookie IDs, and mobile IDs, along with associated device and usage data, when you access our online services, but we do not "sell" any other Personal Information.

If you do not wish for us or our partners to "sell" Personal Information relating to your visits to our sites for advertising purposes, you can make your Do Not Sell Request by emailing us or using the choices above in the previous section "What controls are available?" If you opt-out using these choices, we will not share or make available such Personal Information in ways that are considered a "sale" under the CCPA.  However, we will continue to make available to our partners (acting as our service providers) some Personal Information to help us perform advertising-related functions. Further, using these choices will not opt you out of the use of previously "sold" Personal Information or stop all interest-based advertising.

## Our Use of Personal Information

We use the Personal Information we collect for purposes described in this Privacy Policy or otherwise disclosed to you. For example, we use Personal Information for the following purposes:

- *Operating our website and Mobile App:* We base the processing of your Personal Information on our legitimate interest to operate and administer our website and Mobile App and to provide you with content you access and request (e.g., download of certain content from our website and Mobile App);

- *Analyzing and monitoring our website and Mobile App:* We will process Personal Information to analyze overall trends, to help us provide and improve our website and Mobile App and assess whether they are functioning properly;

- *Promoting security of our website and Mobile App:* We will process your Personal Information by monitoring use of our website and Mobile App, creating

aggregated, non-personal information, verifying accounts and activity, investigating suspicious activity, as well as violations of and enforcement of our terms and policies, to the extent this is necessary for the purpose of our legitimate interests in promoting the safety and security of the systems and application used for our website and Mobile App, and protecting our rights and the rights of others;

- *Handling contact and user support requests:* If you fill out a "Contact Us" web form, request user support, or if you contact us by other means, we will process your Personal Information for the performance of our contract with you and to the extent it is necessary for the purpose of our legitimate interests to fulfill your request and communicate with you;

- *Managing event registrations and attendance:* We will process your Personal Information to plan and host the event, conference or webinar, including related communication with you;

- *Business Operations:* We will process your Personal Information to operate our business, such as billing, accounting, improving our internal operations, securing our systems, detecting fraudulent or illegal activity, and meeting our legal obligations. For example, if you have provided financial information, Lytx, or its service provider, will process your respective Personal Information to check the financial qualifications and collect payments to the extent this is necessary for completing transaction with you under the purchase order submitted by you;

- *Providing Mobile App Services:* If you have installed and use our Mobile App, you provide us with GPS location information which is required in order for us to provide you with our Route Risk program. We also use other electronic information received from your mobile device to send updates to the Mobile App that includes driver safety tips.

- *Developing and improving our website and Mobile App:* We will process your Personal Information to analyze trends, track your usage of our website and Mobile App and interactions with emails to the extent this is necessary for our legitimate interests to develop and improve our website and Mobile App and to provide our users with more relevant and interesting content;

- *Displaying personalized advertisements and content:* We will process your Personal Information to conduct marketing research, advertise to you, provide personalized information about us on and off our website and Mobile App, and provide other personalized content based upon your activities and interests to the extent it is necessary for our legitimate interests to advertise our website and Mobile App or, where necessary, to the extent you have provided your prior separate consent;

- *Sending business communications:* We will process your Personal Information to send you information, including confirmations, invoices, technical notices, updates, security alerts, and support and administrative messages

- *Sending marketing communications:* We will process your Personal Information to send you marketing information, product recommendations and other non-transactional communications (e.g., marketing newsletters, SMS, or push notifications) about us and our affiliates and partners, including information about our products, promotions or events as necessary to conduct direct marketing or to the extent you have provided your prior separate consent; and

- *Complying with legal obligations:* We will process your Personal Information when cooperating with public and government authorities, courts or regulators in accordance with our legal obligations under applicable laws to the extent this requires the processing or disclosure of Personal Information to protect our rights, and is necessary for our legitimate interests to protect against misuse or abuse of our website and Mobile App, to protect personal property or safety, to pursue remedies available to us and limit our damages, to comply with a judicial proceedings, court order or legal process, and/or to respond to lawful requests.

## Our Sharing of Personal Information

We share Personal Information with your consent or as necessary to complete your transactions or provide the website and Mobile App you have requested or authorized. For example, when you provide payment data to make a purchase, we will share that data with banks and other entities as necessary for payment processing, fraud prevention, credit risk reduction, or other related financial services.

In addition, we share each of the categories of Personal Information described above for the following business purposes:

- Our contracted service providers who provide services such as IT and system administration and hosting, credit card processing, research and analytics, marketing, customer support and data enrichment;

- If you use our website and Mobile App to register for an event or webinar, we may share your Personal Information with the entity responsible for organizing and/or managing the event to the extent this is required on the basis of the contract with you to process your registration and ensure your participation in the event;

- With third-party social networks, advertising networks and website and Mobile App, which usually act as separate controllers, so that we can market and advertise on third party platforms and website and Mobile App;

- In individual cases we may also share Personal Information with professional advisers acting as processors or joint controllers including lawyers, bankers, auditors and insurers based in countries in which we operate who provide consultancy, banking, legal, insurance and accounting services;

- We may also share your Personal Information with other affiliates to the extent this is necessary to fulfill a request you have submitted via our website and Mobile App, or for customer support, marketing, technical operations, or account management purposes;

- If we are involved in a merger or reorganization, sell a website or Mobile App, or business unit, or if all or a portion of our business, assets or stock are acquired by another company, we may transfer some or all of your Personal Information to such third party; or

- Any Personal Information or other information you choose to submit to public online forums (e.g. forums, blogs, or chat rooms) on our website and Mobile App may be read, collected, and/or used by others who visit these forums.

Lytx does not sell or trade any Personal Information accumulated through its website and Mobile App in any manner inconsistent with this Privacy Policy. However, Lytx, its partners, agents, officers and employees may provide specific information collected about you, including Personal Information, to third-parties if required to do so by law or in the good faith belief that such action is required to: (i) protect Lytx against legal liability; (ii) protect and defend the rights or property of Lytx, including without limitation, exchanging information with other companies and organizations for fraud protection or investigation; (iii) comply with a legal obligation; or (iv) act in urgent circumstances to protect the personal safety of visitors or the public.

Data collected from or about you may be used in an aggregate form, that is, as a statistical measure, and not in a form that would reasonably allow anyone to identify you. Along with using this data in aggregate form ourselves, we may share these statistics with certain strategic relations.

## Your Privacy Rights

You may have certain rights regarding your Personal Information, subject to local data privacy and data protection laws.

If you are a resident of the European Union, these may include the following rights:

- to access your Personal Information processed by us and receive copies of that information (right to access);

- to rectify inaccurate Personal Information and ensure it is complete (right to rectification);

- to erase/delete your Personal Information to the extent permitted by other legal obligations (right to erasure; right to be forgotten);

- to restrict our processing of your Personal Information (right to restriction of processing);

- to transfer your Personal Information to another controller to the extent possible (right to data portability);

- to object to any processing of your Personal Information carried out on the basis of our legitimate interests (right to object). Where we process your Personal Information for direct marketing purposes or share it with third parties for their own direct marketing purposes, you can exercise your right to object at any time to such processing without having to provide any specific reason for such objection;

- not to be subject to a decision based solely on automated processing, including profiling, which produces legal effects ("Automated Decision-Making"); Automated Decision-Making is not currently implemented as part of our website and Mobile App; and

- to the extent we base the collection, processing and sharing of your Personal Information on your consent, to withdraw your consent at any time, without affecting the lawfulness of the processing based on such consent before its withdrawal.

If you are a resident of the state of California:

- You have a right to request that we disclose to you the Personal Information we have collected about you. You also have a right to request additional information about our collection, use, disclosure, or sale of such Personal Information. Note that we have provided much of this information in this Privacy Policy;

- You also have a right to request that we delete Personal Information under certain circumstances, subject to a number of exceptions. Please note, if your request relates to data processed by Lytx in connection with Lytx's role as a service provider for clients, you must direct your request to the client;

- You have the right to opt-out of the sale of your Personal Information, which is described in more detail in the above California "Do Not Sell My Personal Information" section;

- You have the right to not receive discriminatory treatment because you exercised any of your privacy rights; and

- You have the right to designate an authorized agent to make requests under the California Consumer Privacy Act; provided however that you must submit written proof of such designation to us and we may require additional verification.

We do not knowingly sell Personal Information of minors under 16 years of age.

To exercise your rights, please contact us either by email or mail in accordance with the "Contact" section below. Please note that we must verify any requests pursuant to this section to ensure the individual making such request is authorized to exercise such rights. Therefore, you must submit your name and email address, as well as confirm access to such email address, in order for us to process your request. Lytx will comply with the applicable privacy and data protection laws and the exercising of your rights under such laws, however please note that such rights specified above are not absolute, and exemptions may be applicable. We try to respond to all legitimate requests within one month and will contact you if we need additional information from you in order to honor your request. Occasionally it may take us longer than a month, taking into account the complexity and number of requests we receive.

Lytx may also process Personal Information in the role of a processor on behalf of Lytx clients' use of Lytx services. If your Personal Information has been submitted to us in connection with Lytx's provision of services to a client, and you wish to exercise any rights you may have under applicable data protection laws, please inquire with the specific client directly. Because we may only respond to a request related to our client's data with such client's permission, if you wish to make your request directly to us, please provide the name of the Lytx client who submitted your information when contacting us. We will refer your request to that client, and will support them as needed in responding to your request within a reasonable timeframe. If you are an employee of a Lytx client, we recommend you contact your company's system administrator for assistance in correcting or updating your information.

## Preferences for Marketing Communications

If we process your Personal Information for the purpose of sending you marketing communications, you may manage your receipt of marketing and non-transactional communications from us by clicking on the "unsubscribe" link located on the bottom of our marketing emails, by replying or texting 'STOP' if you receive SMS communications, or by turning off push notifications on our apps on your device. Additionally, you may unsubscribe here or by contacting us using the information in the "Contact" section below. Please note that opting-out of marketing communications does not opt you out of receiving important business communications related to your current relationship with us, such as information about your subscriptions or event registrations, service announcements or security information.

## Security

We take reasonable and appropriate steps to help protect Personal Information from unauthorized access, use, disclosure, alteration, and destruction.

## International Transfer of Information Collected

Our servers, and service providers, are located in the United States. Accordingly, if you reside outside of the United States, by accessing or using our Products and Service, you agree that your information will be transferred to the United States, and processed and stored in the United States. You also acknowledge and agree that your information may be transferred to facilities of those third parties with whom we share data as described herein.

Individuals Located in the European Union: Your Personal Information may be processed outside the European Economic Area ("EEA"), and in countries which are not subject to an adequacy decision by the European Commission and which may not provide for the same level of data protection in the EEA. In this event, we will ensure that such recipient offers an adequate level of protection, for instance by entering into standard contractual clauses for the transfer of data as approved by the European Commission (Art. 46 GDPR), or we will ask you for your prior consent to such international data transfers. By submitting any of your Personal Information to the Products and Service(s), you consent and agree to the transfer of your Personal Information to Lytx and its affiliates, as well as Lytx's service

providers which include without limitation, SalesForce.com, Marketo, Amplitude.com, SnapApp and AtEvent.

## Limitation of Liability

By providing us with any Personal Information you expressly and unconditionally release and hold harmless Lytx, Inc., and its subsidiaries, affiliates, directors, officers, employees and agents from any and all liability for any injuries, loss or damage of any kind arising from or in connection with the use and/or misuse of your collected Personal Information. In addition, while Lytx takes efforts to ensure the proper and appropriate use of data provided by Lytx to third party companies, promotional partners or vendors, Lytx is not liable for any injuries, loss or damage of any kind arising from or in connection with the use and/or misuse of your collected Personal Information by Lytx or the above-mentioned non-Lytx entities.  The foregoing shall not apply where such limitation of liability is prohibited by law.

## Reservation of Rights

Lytx reserves the right to change this Privacy Policy at any time, for any reason, without prior notice. Your continued use of this website and Mobile App after any changes have taken effect will indicate that you have agreed to the terms of the revised Privacy Policy. We recommend that you check this Privacy Policy regularly for changes and updates.

## External Links

Our website and Mobile App may include integrations, references, or links to services provided by third parties whose privacy practices differ from ours. If you provide Personal Information to any of those third parties, or allow us to share personal information with them, that information is governed by their privacy statements.

## Other Legal Information and Terms and Conditions

Your access and use of this website and Mobile App is further subject to the terms and conditions at https://www.lytx.com/legal-information.

## Changes in Corporate Structure

Notwithstanding any of the foregoing, Lytx may sell, share or otherwise transfer some or all of its assets, including information gathered by one of its websites, in connection with a bankruptcy, merger, acquisition, reorganization or sale of substantially all of its assets or substantially all of the assets of a division or other unit of Lytx. You acknowledge that such transfers may occur and that any acquirer may continue to use your Personal Information as set forth in this Privacy Policy.

## Changes to this Privacy Statement

We will update this Privacy Policy when necessary to reflect changes in our website and Mobile App, how we process Personal Information, or the applicable law. When we post changes to the Privacy Policy, we will revise the "Last Updated" date at the top of the statement.  If we make material changes to the Privacy Policy, we will provide notice or obtain consent regarding such changes as may be required by law.

## How to Contact Us

If you have a privacy question, concern, or complaint, please contact the Lytx Privacy Department directly by e-mail at privacy@lytx.com. If you prefer to contact us by mail, please send any communications to:

Lytx, Inc.

9785 Towne Centre Drive

San Diego, California 92121

Attn: Chief Privacy Officer



## Subscribe to our newsletter

Our Best Fleet Forward newsletter delivers monthly insights on fleet management.

First name

# Get started today.

**1-866-419-5861    Contact Us    Book a Demo**

| SOLUTIONS | FEATURES | SUPPORT & LOGIN |
|---|---|---|
| Fleet Management Overview | DriveCam Event Recorder | Support |
| Fleet Dash Cams | Lytx Driver App | Lytx Account Login |
| Fleet Safety | Machine Vision and Artificial | Lytx Compliance Services (RAIR) Portal |



# EXHIBIT 12

**PRESS RELEASE**

# Lytx Presents "State of the Data" Based on 100 Billion Miles of Driving Data

*Trucking's commitment to safety shows in the data: 358,359 fewer risky events in 2018*

## SAN DIEGO and AUSTIN, Tex. – (Oct. 28, 2018) –

Lytx®, the world's leading provider of video telematics, analytics and safety solutions for commercial and public sector fleets, shared its State of the Data presentation today at the American Trucking Associations Management Conference and Exhibition (ATA MC&E), the premiere meeting for trucking executives. Based on 100 billion miles of driving data, the presentation focuses on truck-driving safety, risk factors and behaviors.

"With one hundred billion miles of driving data and our proprietary human-review processes, our ability to provide fleets with game-changing insights into their road- and site-based operations is unequaled," said Brandon Nixon, Chairman and CEO of Lytx. "Our State of the Data presentation highlights behavioral trends and areas of opportunity to help keep truck drivers, cargo and our roadways even safer."



*Lytx Presents "State of the Data" Based on 100 Billion Miles of Driving Data*

## About the Data

Insights are derived from Lytx's trucking-industry client database. The data is anonymized, normalized and generalizable to the trucking industry as a whole, given Lytx's majority market share in video telematics solutions for commercial trucking industry at large.

## Trucking is Getting Safer

Lytx trucking-industry data shows 358,359 fewer instances of risky driving between June-August 2018 compared to the same period in 2017. The following list reflects the top ten observed driving behaviors by frequency during that same timeframe, along with their relative, correlative collision risk:

| Top 10 observed driving behavior (in order of frequency) | Correlative Collision Risk | 2017-2018 Frequency |
|---|---|---|
| Driver not wearing seatbelt | 4 | Declining |
| Late response | 5 | Declining |
| Following distance >1 second to <2 seconds | 25 | Increasing |
| Smoking | 35 | Declining |
| Following distance >2 seconds to <3 seconds | 34 | Declining |
| Posted speed violation | 17 | Increasing |
| Food/drink observed | 32 | Declining |
| Cell Handheld observed | 20 | Declining |
| Other violation* | 14 | Increasing |
| Following distance <1 second | 27 | Declining |

*Other violation examples include: traveling over the centerline, blocking traffic in an intersection or driving on the shoulder.*

"The driving behavioral improvements we're seeing are largely the result of our clients' strong focus on

driver coaches to minimize risk, and provide them a sense of safety, detecting and identifying risky driving behaviors and delivering that information in a format that is concise, intuitive and prompts us to understand and act on is key. Based on the data, we're confident our clients are doing just that, and as a result are making the roadways safer for all."

## Risk in the Cab

With exponentially more human-reviewed data than any other video telematics provider, Lytx is able to identify real correlations between specific risky driving behaviors and the likelihood of those behaviors resulting in a collision. Here are the top ten driving behaviors correlated to a driver experiencing a collision in the next 90 days:

1. Collision
2. Blank stare
3. Drowsy driving
4. Driver not wearing seatbelt
5. Late response
6. Failed to keep an out**
7. Near collision
8. Near collision (unavoidable)
9. Aggressive driving
10. Falling asleep

**Failed to keep an out means the driver cut it unnecessarily close to another vehicle, person or object.

"Behind the wheel, even risky behaviors that may seem limited to just the driver–such as not wearing a seatbelt–can have real, quantifiable correlations to getting involved in a collision that can result in serious injury, loss of life and damage to an individual and company's reputation and equipment," said Lisk. "Insight into the relationship between risky driving behaviors and getting into a collision are invaluable for the trucking industry to consider as they prioritize and focus coaching efforts on the behaviors that will have the most impact in reducing collisions and improving overall safety within their fleet."

## Riskiest Roads

Lytx trucking-industry data shows the top five riskiest road segments for North American truck drivers between January and September 2018 were:

1. Pennsylvania Route 309: Near Vera Cruz Road, Upper Saucon Township, (South of Allentown)
2. Pennsylvania Route 309: Near W. Emmaus Avenue, Allentown (Southeast of Queen City Municipal Airport)
3. Pennsylvania Route 181: Near Crooked Hill Road, Susquehanna Township (East of Harrisburg Area Community College)
4. Tennessee Interstate 40: Near Green Hill Road, Dandridge (East of Knoxville)
5. Tennessee Interstate 24: Near Belvoir Avenue, Chattanooga (Southwest of Chattanooga Metropolitan Airport)

"The ability to determine the level of risk posed by other vehicles on the road, beyond just other large trucks, is a degree of insight only Lytx can provide," said Ryan Brandos, a Lytx data analyst, who presented the findings at ATA MC&E. "With this level of detail, managers and coaches can consider areas of concentrated risk so they can make informed decisions about the best routes for their drivers."

These five road segments are 172 times more risky on average than the rest of Lytx's trucking-industry footprint, based on Lytx's proprietary risk score system. Four out of the five segments are near interchanges and the other is near an exit/on ramp, which are areas of high driver volatility. Rapid changes in driving speed and sudden lane changes to make exits/connections not only lead to more triggered events, but also amplify the risk posed by risky driving behaviors, as these volatile areas necessitate a greater amount of proactive and reactive driving.

Interestingly, the No. 1 and 2 riskiest segments only had two other road segments in between them. These two segments were substantially safer, as the 103rd and 811th riskiest across Lytx's entire trucking-industry footprint and were both less than one-fourth as risky as the riskiest segment. The ability to provide insights into not only the riskiest segments along routes, but also potentially less risky alternatives are insights that only Lytx's one-of-a-kind data set can provide.

## Riskiest Times

Lytx trucking-industry data shows top riskiest days of the week and times of day for North American truck drivers between January and September 2018 were:

1. Day of the week with most collisions: Wednesday (peak between 2:00 – 4:00 a.m.)

2. Time of day with most collisions: Overnight (11:00 p.m. – 5:00 a.m.)

3. Day of week with most near collisions: Friday

4. Time of day with most near collisions: Afternoon (1:00 p.m. – 5:00 p.m.)

5. Day of week with least collisions: Monday

"There is a distinct difference between collision and near-collision trends," said Brandos. "Collisions occur more frequently at night. We see those same drivers avoid contact during the afternoon hours, resulting in more near collisions during the day."

## About Lytx

At Lytx® we harness the power of video to transform fleets with improved safety, efficiency, productivity and profitability. Our flagship service, the Lytx DriveCam® safety program, sets the standard for driver safety in the industries we serve. The Lytx Video Services℠ enhancement delivers a highly configurable user interface to provide fleet managers unparalleled visibility into their fleet operations, both in the moment and up to a week later. RAIR® Compliance Services helps DOT-regulated fleets comply with safety regulations, complementing the DriveCam Program. Lytx ActiveVision® service helps fleets detect and address distracted and drowsy driving, both in real time and over time, and additional services offer virtually limitless solutions for fleets and field operations of any profile. We protect more than 3,000 commercial and government fleet clients worldwide who drive billions of miles each year. For more information, visit www.lytx.com, @lytx on Twitter, or our Facebook page or YouTube channel.

**SHARE**

**MEDIA INQUIRIES**

corpcomm@lytx.com

← Back to all news



## Subscribe to our newsletter

Our Best Fleet Forward newsletter delivers monthly insights on fleet management.

First name

Last name

Email address

SUBMIT

## Get started today.

1-866-419-5861    Contact Us    Book a Demo

**SOLUTIONS**

Fleet Management Overview

Fleet Dash Cams

Fleet Safety

Fleet Tracking

DOT Compliance

ELD Compliance

FedEx VEDR

Lytx Integration Network

**FEATURES**

DriveCam Event Recorder

Lytx Driver App

Machine Vision and Artificial Intelligence

Risk ID Without Recording

Continual Behavior Reporting

Preventative Maintenance

Diagnostic Trouble Codes

**SUPPORT & LOGIN**

Support

Lytx Account Login

Lytx Compliance Services (RAIR) Portal

Lytx DriveCam Academy

Parts Store

**GUIDES**

ADAS

CSA Scores

Defensive Driving for Commercial Fleets

Distracted Driving

DOT Regulations

ELD Guide

Fleet Maintenance

Fleet Management App

Fleet Management Solutions

Fleet Risk Management

Fuel Management Systems

**ABOUT US**

Our Story

Our Technology

Our Team

Careers

News and Events

Who We Serve

Success Stories

**RESOURCES**

Blog

Buyer's Guide to Video Telematics

The Fleet Podcast

Videos

All Resources



SITES

English (U.S.A.)

English (U.K.)

Site Map | Legal | Terms | Privacy | Driver Info